# EXHIBIT 9

1                UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4    SORRELL SHIFLETT, an individual,  )
                                       )
5                   Plaintiff,         )
                                       )
6    vs.                               ) NO. 3:21-CV-07802-LB
                                       )
7    CITY OF SAN LEANDRO,              )
                                       )
8                   Defendants.        )
     _____)

9

10

11

12

13

14              DEPOSITION OF ROBERT FONZI

15               ONTARIO, CALIFORNIA

16            FRIDAY, FEBRUARY 9, 2024

17

18

19

20

21

22

23

24   Reported by:  Donna Ball
                   CSR No. 11191
25                 Job. No.:  290398

                                                              1

Robert Fonzi                                                    February 9, 2024

```
1                    UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4    SORRELL SHIFLETT, an individual,  )
                                       )
5                    Plaintiff,        )
                                       )
6    vs.                               ) NO. 3:21-CV-07802-LB
                                       )
7    CITY OF SAN LEANDRO,              )
                                       )
8                    Defendants.       )
     _____)
9

10

11

12

13   DEPOSITION OF ROBERT FONZI, taken on behalf of the

14   Plaintiff, Sorrell Shiflett, at 3200 Guasti Road,

15   Suite 100, Ontario, California 91761, beginning at

16   11:05 a.m. and ending at 1:19 p.m., on Friday,

17   February 9, 2024, before Donna Ball, Certified

18   Shorthand Reporter No. 11191

19

20

21

22

23

24

25
```

2

```
 1     APPEARANCES:

 2

 3

 4     For the Plaintiff, Sorrell Shiflett:

 5              POINTER & BUELNA, LLP, LAWYERS FOR THE PEOPLE
                BY:  PATRICK BUELNA, ESQ.
 6              (In Person)
                155 Filbert Street
 7              Suite 208
                Oakland, California 94607
 8              (510) 929-5400
                pbuelna@lawyersftp.com
 9

10
       For the Defendant, San Leandro:
11
                CASTILLO MORIARTY TRAN AND ROBINSON
12              BY:  PATRICK DANIEL MORIARTY, ESQ.
                (In Person)
13              75 Southgate Avenue
                Daly City, California 94015
14              (415) 213-4098
                pmoriarty@cmtrlaw.com
15

16
       For the Defendant, Anthony Pantoja:
17
                MCNAMARA, AMBACHER, WHEELER, HIRSIG & GRAY LLP
18              BY:  NOAH G. BLECHMAN, ESQ.
                (Via Zoom)
19              3480 Buskirk Avenue
                Suite 250
20              Pleasant Hill, California 94523
                (925) 939-5330
21              noah.blechman@mcnamaralaw.com

22

23     ALSO PRESENT:

24              TYE CLARK (VIA ZOOM)
                EDWARD DIARADUCY (VIA ZOOM)
25
```

3

1                         I N D E X

2

3    WITNESS                                         PAGE

4

5    ROBERT FONZI

6          Examination by Mr. Buelna                  5

7

8

9                         EXHIBITS

10   MARKED              DESCRIPTION                  PAGE

11   Exhibit 1     Report of Robert Fonzi, Training    6
                   and Consulting, Dated October 11,
12                 2023

13   Exhibit 2     Intellectual Disability, Domain 37  45

14

15

16                 INFORMATION REQUESTED

17                        (None)

18

19                 QUESTIONS NOT ANSWERED

20                        (None)

21

22

23

24

25

                                                      4

```
 1              FRIDAY, FEBRUARY 9, 2024, 11:05 A.M.

 2                    ONTARIO, CALIFORNIA

 3                          ***

 4                      ROBERT FONZI,

 5         having been first duly sworn by the reporter

 6            was examined and testified as follows:

 7

 8                        EXAMINATION

 9  BY MR. BUELNA:

10      Q    All right.  Good morning still, Mr. Fonzi.

11      A    Good morning, sir.

12      Q    If you could just state your name for the record.

13      A    First name Robert, last is Fonzi, spelling

14  F-o-n-z-i.

15      Q    Okay.  And I don't have to go through the

16  admonitions with you; right?

17      A    No.  I'm comfortable without it.

18      Q    Okay.  Approximately -- or let me ask you this:

19  What did you do to prepare for deposition today?

20      A    In preparation, just review my reports, my notes,

21  materials that I've been provided up to this point.

22  That's pretty much it.

23      Q    Do you have a copy of your report in this case

24  before you?

25      A    I do.
```

5

1      Q    Great.  If you could pull it up.  And I'm just

2    going to show you mine, and I'm going to send this as an

3    electronic Exhibit 1.  It's dated October 11th, 2023.  I

4    don't know if you can see it.

5      A    Yes, that is my report.

6      Q    Let me just go through your signature.  There it

7    is.  On page 17?

8      A    Yes, sir.

9      Q    Does that appear to be your signature?

10      A    It is.

11           (Exhibit No. 1 marked for identification.)

12    BY MR. BUELNA:

13      Q    Okay.  All right.  So what I'm going to do is I'm

14    going to use your report as kind of a guide to our

15    examination today.

16           Okay?

17      A    Sure.

18      Q    What was your assignment in this case?

19      A    Not necessarily an assignment.  I was contacted

20    by Mr. Moriarty's firm.  I'm not sure if it was him

21    directly or someone that works in his office.  And

22    usually -- and I don't remember the conversation exactly,

23    but generally, what occurs is they ask me my availability

24    and we look at dates and things like that.  You know, any

25    trials scheduled, any reports due just to be sure I'm

                                                              6

1    available.

2              And then once we're able to do that and there's

3    no conflict scheduling-wise, then, of course, I ask for

4    whatever materials are relevant to the case or whatever

5    discovery has been produced up to that point.  The

6    complaint, so that I can vet out those areas in which is

7    within my wheelhouse and then, of course, I know the

8    requirements for a Rule 26 report.  So really I'm not

9    given any other assignment other than I have a date and I

10   prepare a report.

11        Q    And on pages 3 and 4 of your report, you provide

12   a list of the materials you reviewed in this case; right?

13        A    Yes, sir.  Up to the point in time that the

14   support is submitted.  That is correct.

15        Q    And then I recently received a supplemental

16   reviewed material list; is that right?

17        A    Yes, sir, that is correct.

18        Q    And what was that additional material that you

19   reviewed?

20        A    You know, let me look and I can tell you without

21   guessing.  There was some previous arrest report, if I

22   remember correctly.  Here we go.  Yeah, there was some

23   9-1-1 calls.  Stuff related to that additional arrest.

24   The booking, and I think there's a warrant, that kind of

25   stuff that was involved.  And then, of course, Mr. Ryan's

7

1    report that was provided.

2         Q    Okay.  You were not asked to write a rebuttal

3    report; correct?

4         A    That is correct, I was not.

5         Q    Obviously, my understanding is that you were --

6    that it's your intention to testify -- correct me if I'm

7    wrong -- as to whether or not there was a reasonable

8    detention arrest in force used in this incident?

9         A    I'm prepared to offer opinions.  What I'm asked

10   at trial, I don't have control over.  But I am prepared to

11   offer opinions with respect to those areas.

12        Q    Those three categories; right?

13        A    That is correct.

14        Q    And it's related to this incident; right?

15        A    Yes, sir.

16        Q    And as we both know, officers are judged, their

17   force, their arrests, their detentions, by the information

18   that they have available at the time that they do those

19   things; right?  Not -- they can't be informed post

20   incident about something?

21             (Reporter Clarification.)

22   BY MR. BUELNA:

23        Q    Not about the things that they may learn post

24   incident?

25        A    I'm going to agree in part with the question in

                                                              8

1   your summary of what an officer knew.  You're correct in

2   that their actions are predicated on information provided.

3   But oftentimes, their actions can and will be predicated

4   on things they may not know depending on the

5   circumstances, of course.

6        Q    Okay.  But what I'm asking you is can an item of

7   information an officer learns after an incident inform

8   whether or not their force or arrest at the time was

9   reasonable?

10       A    I would agree after the incident would not be

11  relevant to the decisions they made during the incident.

12       Q    All right.  And that's all I was sharing.  So,

13  for example, if you received arrest reports post incident

14  of Sorrell Shiflett, that doesn't go into your calculation

15  of whether or not force was used reasonably at the time of

16  the incident; right?

17       A    It has some bearing with respect to what I would

18  call connecting the dots.  Behaviors that an individual

19  may display in this particular incident, and then later

20  similar incidents connect the dots with respect to the

21  officer's decision.  Is it important or relevant to the

22  officer's decision?  No, it's not.  It would not be

23  relevant to the officer's decision.

24       Q    All right.  What I'm hearing is information that

25  you reviewed post incident, like post arrest, post

9

1    categories of information may corroborate certain things

2    that happened during the incident?  Or am I

3    misunderstanding what you're saying?

4            MR. MORIARTY:  Objection.  I didn't -- vague.

5    Post.  Corroborative.  I didn't understand that.

6            If you understand, go ahead and answer.

7            THE WITNESS:  Yeah, I wouldn't say corroborate.

8    It's just another piece of information relevant to my

9    review of this incident.  Did it change, alter or affect

10   my opinions in any way?  No, it did not.

11   BY MR. BUELNA:

12       Q    Okay.  So you don't intend at trial to offer

13   either post-incident arrest or pre-incident arrest that

14   were not -- was not information available to the officers

15   at the time of the incident to justify the officer's

16   actions; is that right?

17       A    I would agree.

18       Q    Okay.  All right.  I'm going to turn to page 4 of

19   your report.  And it's -- the heading is the subsection 6,

20   "Summary of Opinions."

21           Is it fair to say this section includes,

22   following this, your opinions in this case, or a

23   summary?

24       A    Yes, this section does reflect my opinions in

25   this case.

1     Q    All right.  And the prior sections are

2   essentially a summary of your qualifications, a curriculum

3   vitae, compensation, some charts with exhibits mentioned,

4   and materials reviewed leading up to this; right?

5     A    Those are the subsections prior to my opinions.

6   I would agree with that.

7     Q    Okay.  I'm going to turn to opinion No. 1 on page

8   5.  Okay?  And I'm going to read from the first paragraph

9   that says, "Based on my review of the listed materials, it

10   is my opinion, as determined by standard police practices

11   and training, that Officers Navarro and Pantoja have

12   reasonable suspicion to conduct an investigatory stop and

13   detain," open parens, "detention," close parens, "on

14   Sorrell Shiflett, hereinafter referred to as Sorrell,

15   pending their investigation into the call for service.

16   Officers Navarro and Pantoja were given the following

17   information," colon.

18         Did I read all that correct?

19     A    Yes, sir.

20     Q    And following the colon, there's a number of

21   bulletins -- not bulletins.  Bullet points that contains

22   what you believe is information that was given to Officers

23   Navarro and Pantoja when they made the detention; right?

24     A    Well, it's bullet points that I have acquired

25   information from the materials, and yes, they are the

11

1    bullet points that support the reasonable suspicion to

2    conduct investigative stop.

3         Q    Okay.  And for an officer to rely on information

4    to conduct a detention, they have to actually know that

5    information when they conduct the detention; right?

6         A    Know the information, observe the information,

7    acquire the information prior to initiating the detention,

8    yes.

9         Q    Okay.  Let's go back to the original point.

10   Essentially, if an officer stops someone because they

11   think the person has some illegal contraband, they have to

12   do so on information available to them.  They can't base

13   it on a hunch and then it turns out the person does have

14   contraband and then use that to sort of retrofit the

15   reasonable suspicion, if you understand what I'm saying?

16              MR. MORIARTY:  Objection.  Incomplete

17   hypothetical.  Compound.

18              If you understand, go ahead and answer.

19              THE WITNESS:  It's extraordinarily compound and

20   probably not enough information to make a competent

21   opinion on.  But I will state, as I did so in this

22   opinion, in order for an investigative stop and detention,

23   an officer must have information or observe information or

24   have observations that would at least support reasonable

25   suspicion that a crime may have occurred that these

                                                            12

1    individual -- or individuals are involved.

2         And it can be the call for service.  It can be

3    the time of day.  It can be their -- what they're wearing,

4    what they're carrying, their physical demeanor, their

5    verbal responses would all contribute to an officer's

6    reasonable suspicion to at least investigate further for

7    the purposes of determining whether or not they were

8    involved in a criminal act or were about to commit a

9    criminal act.

10        As your question asks, a hunch or retrofit, I

11   would agree a hunch or retrofit would not be consistent

12   with law enforcement training.

13   BY MR. BUELNA:

14   Q    And just to elucidate that -- or illustrate that

15   point a little further, I'm going to provide to you a

16   hypothetical, and if I don't mention some fact, it's

17   because it's not within my hypothetical.

18        Does that make sense?

19   A    It does.  We'll listen to the hypothetical first.

20   Q    Essentially, what I'm saying is I'm making my own

21   world, so the only facts that exist in my hypothetical are

22   the ones I provide you.

23        Does that make sense?

24   A    It does.

25   Q    Okay.  So I want you --

                                                              13

1            MR. MORIARTY:  I can make my own objections to

2    your world.

3            Go ahead.

4            MR. BUELNA:  Sure.

5       Q    So assume that an officer is on patrol, and for

6    whatever reason, he gets a spidey sense, a tingle that

7    some person walking down the street has methamphetamine in

8    their pocket.  Okay?  It's not based on anything, like the

9    way they're walking or a bulge in the pocket or anything.

10   They just have a feeling, and they can't explain why.

11   They can point to articulable facts.

12           Do you understand?

13      A    I follow you.

14      Q    So the officer, based on that, detains the person

15   and happens to discover methamphetamine on the person.

16   Can the discovery of methamphetamine supply reasonable

17   suspicion to the officer, even though originally he had no

18   articulable facts?

19      A    If there are no articulable facts, which are one

20   of the requirements within reasonable suspicion to detain,

21   I would agree with you.  However, any police officer, at

22   any time, can initiate contact.  Whether the person

23   chooses to talk to them or not would be their choice.  But

24   if they don't have reasonable suspicion as is defined in

25   my report, I would agree with you.

14

1      Q     And to be clear, I don't want to -- I don't want

2    to merge concepts.  What I said was he detained someone.

3    So consensual stops are different; right?

4      A     I would agree.

5      Q     At any time -- well, officers know that, because

6    even when they initiate a consensual encounter, it can

7    convert to a detention; right?

8      A     It can or can't?

9      Q     Can.

10     A     It could.  Depending on what -- what occurs and

11   what they observe.  It's quite possible.

12     Q     Okay.  Let's return to the bullet points.  So the

13   first one says, "On October 6th, 2019, at approximately

14   2:18 hours, Officers Navarro and Pantoja responded to a

15   call of two males acting suspiciously."

16           Did I read that all correctly?

17     A     Yes, sir.

18     Q     Is acting suspiciously an articulable fact, in

19   your opinion?

20     A     It depends if there's any additional information.

21   In and of itself, might be subjective.  But there are

22   other contributing factors, of course, that might lend

23   itself.  And there was additional information that --

24     Q     I'm not asking that.  I understand that.  We're

25   going to go down that road.  I just want to focus on --

15

Robert Fonzi                                                    February 9, 2024

```
1        A    You're cherry-picking certain bullet points

2   you're going to ask, and I want to make sure that my

3   responses are clear.  And the sound bites can't be taken

4   out later and misrepresented.  Not that you would do that.

5   I respect what you're doing.  And I'm just saying, I've

6   done this long enough to know sound bites happen, and I

7   just want to prevent sound bites from happening because

8   that, in and of itself, may or may not be enough, but

9   there's quite a few other bullet points.

10       Q    Sure.  And just so you know, and I'm sure you

11  know because you've testified at trial dozens of times,

12  even if an attorney, one attorney cherry-picks parts of

13  your testimony, the other attorney has the opportunity to

14  rehabilitate you by showing the completeness of those

15  answers.  So you have a good attorney.  I wouldn't worry

16  about cherry-picking.  I'd like you to focus on the

17  question I present.

18            Okay?

19       A    Well, I'll answer the way I feel is appropriate.

20            MR. MORIARTY:  I don't think you need to instruct

21  him how to answer questions, and if the question is

22  objectionable, I'll object.  Let's keep going.

23  BY MR. BUELNA:

24       Q    So you'd agree, though, sitting on its own,

25  acting suspiciously is not an articulable fact.
```

                                                                16

1            MR. MORIARTY:  Objection.  Incomplete

2    hypothetical.

3            THE WITNESS:  May or may not be.

4    BY MR. BUELNA:

5        Q    What does acting suspiciously mean?

6        A    It depends on the context of the call for

7    service.  Where the person is, what they're doing, time of

8    day, residential, commercial, in a parking lot around

9    vehicles.  I mean, there would need to certainly be more

10   context that I, as a police officer, would hope to have.

11       Q    And just -- I'll turn my head toward you because

12   I -- you have trouble with vision, I have trouble with

13   hearing, so I turned my good ear towards.  All right.

14            But, in and of itself, if an officer -- if

15   someone points, learns or stops on the street and says,

16   "That person is acting suspiciously," that, in and of

17   itself, isn't a basis for detention; right?

18       A    Again, I'm going to say it depends.  Okay?  If

19   the person is just -- it's 2 o'clock in the afternoon and

20   they're just walking down the street and nothing more than

21   that, perhaps not.  But if it's 2 o'clock in the morning

22   and the person looks -- their attire would lend themselves

23   to -- maybe they're dressed in all dark clothing and that

24   could be deemed someone that's trying to conceal

25   themselves.  There are many other factors that you would

                                                              17

1    take into consideration.  But I did indicate, and I'll say

2    it again, in and of itself, it may not.  But it depends on

3    the circumstances.

4            MR. BLECHMAN:  Are you still there?  We can't

5    hear anything.

6            MR. BUELNA:  Yeah.

7            MR. BLECHMAN:  Okay.

8            MR. BUELNA:  Just looking through my stuff.

9    You're exposing me.  The reason why I do it without video

10   is so I can take my long pauses.

11           MR. BLECHMAN:  Okay.  No problem.

12           (Pause in proceedings.)

13   BY MR. BUELNA:

14       Q    I'm going to give you another hypothetical.

15   Let's say a person is walking at night at 2:00 a.m. on a

16   sidewalk and dressed like a dinosaur.  Okay?  And an

17   officer is driving down the block and a pedestrian waves

18   the officer down and says, "That person is acting

19   suspiciously," and then leaves.  The officer looks over,

20   and the person is walking in a dinosaur costume down the

21   block.  Nothing else.  It is 2:00 a.m.

22           Does that, in and of itself, lend itself to a

23   detention?

24           MR. MORIARTY:  Same objection.  Incomplete

25   hypothetical.

18

1          Go ahead and answer.

2          THE WITNESS:  Not in and of itself.  There would

3    certainly need to be more information, at least from the

4    officer's perspective.  They still may initiate some type

5    of contact.  Would it be enough to investigate?  We're not

6    sure what we're investigating at this point.  Without some

7    other information, it would be a stretch to initiate a

8    detention pursuant to reasonable suspicion.

9    BY MR. BUELNA:

10        Q    Well, I mean, officers can do what all people are

11   allowed to do, which is they can initiate conversation,

12   right, with someone?  That's what a consensual encounter

13   is, is they have the same rights as me or you to stop

14   someone and say, "Hey, how's it going?"

15        A    Well, they can initiate contact, yes, I would

16   agree.

17        Q    The same way that an officer is allowed to

18   approach a front door and knock on it without a warrant,

19   because there's an invitation that we accept in society

20   that you're allowed to walk up to people's door and knock;

21   right?

22        A    I think you're changing the hypothetical a little

23   bit, far different than what this situation is.  But could

24   an officer walk up to a door and simply knock on it and

25   have a conversation?  Of course, they can.

19

1      Q    And the law is held that's because any other

2   person can do that; right?

3      A    Well, I'm not sure that the laws are real clear

4   on that specific issue.  But I do agree an officer could

5   walk up, simply knock on a door and have a conversation.

6      Q    The second bullet point is "The reporting party

7   described the two males as male white adults carrying

8   bags."

9           Did I read that correctly?

10     A    Yes, sir.

11     Q    It's not a crime to be a white male carrying

12   bags; correct?

13          MR. MORIARTY:  Objection.  Incomplete

14   hypothetical.

15          Go ahead.

16          THE WITNESS:  That, in and of itself, I would

17   agree.

18   BY MR. MORIARTY:

19     Q    Okay.  9-1 -- I'm reading the next one.

20     A    Sure.

21     Q    "9-1-1 caller makes reference to burglaries in

22   the neighborhood and not recognizing the two suspicious

23   subjects."

24          Did I read that correctly?

25     A    Yes, sir.

20

1    Q    Did the officers know the 9-1-1 caller made

2  reference to burglaries in the neighborhood?

3    A    I -- I'm not 100 percent clear on whether that

4  was radio or within the CAD report --

5          (Reporter Clarification.)

6          THE WITNESS:  CAD, C-A-D, report.

7          But it's information that I took into

8  consideration, that the 9-1-1 caller did reference

9  burglaries.

10  BY MR. BUELNA:

11    Q    CAD stands for computer-automated dispatch;

12  correct?

13    A    Yes.

14    Q    I'll represent to you that the information about

15  burglaries in the neighborhood was neither in the CAD nor

16  was it in the radio dispatch.

17          Would you agree if it's neither in the CAD nor

18  the radio dispatch, the officers can't rely on that

19  information in making a detention?

20    A    Well, not necessarily.  If the officers are

21  familiar with the area, they may already know that

22  information.  But I would agree if they didn't have that

23  provided to them by the 9-1-1 caller, either through

24  dispatch or CAD, it would not be relevant.

25    Q    And officers also do not testify that they knew

                                                          21

1    about burglaries in the neighborhood in their depositions;

2    correct?

3        A    I'm not sure if that was even asked.  So if it

4    wasn't asked, then, of course, they wouldn't have answered

5    that question.

6        Q    They were asked, though, what information was

7    available to them to support their detention; right?

8            MR. MORIARTY:  Objection.  That's a different

9    question.

10           THE WITNESS:  They provided the basis for their

11   detention when asked to do so during their deposition.

12   BY MR. BUELNA:

13       Q    Neither one of them mentioned burglaries in the

14   neighborhood; correct?

15       A    You know, I don't recall.  I don't recall if that

16   was ever asked, so I don't believe that was information

17   that they testified to.

18       Q    Next bullet point.  "Officers were informed" --

19   you see where I'm at?

20       A    Yes.

21       Q    "-- that two suspicious subjects were walking up

22   and down the street, and both were carrying bags."

23           It is not, in and of itself, a crime to walk up

24   and down the street carrying bags; correct?

25       A    As I indicated in your previous answer, just the

                                                              22

1    simple fact carrying bags would not be a criminal act.

2        Q    Okay.  The next sentence says, "Officers -- or

3    bullet point -- "Navarro and Pantoja arrived and contacted

4    Sorrell and a relative of Sorrell Shiflett."

5            So basically, the information prior to this,

6    right, these bullet points, is information they had before

7    they made contact; right?

8        A    Yes.

9        Q    Okay.  Based on the information they had before

10   they made contact, was that information, in and of itself,

11   enough to make a detention?

12           MR. MORIARTY:  Objection.  Incomplete

13   hypothetical.

14           THE WITNESS:  The information which is contained

15   in my report and also in the CAD, that information that

16   was passed on to the officers at this time would support

17   reasonable suspicion to at least stop, investigate, detain

18   the subject, if need be, for the simple purposes of

19   determining whether or not they're involved in any

20   criminal act.

21   BY MR. BUELNA:

22       Q    Okay.  So you disagree with Officer Navarro, who

23   believed that he didn't have reasonable suspicion based on

24   the information alone to make a detention?

25       A    I don't think that's totally accurate.  He

23

1    outlines the information that was provided to him.  He

2    chose to elicit consensual contact and search, which is

3    fine.  It makes things, or the process easier when you

4    have someone that's cooperating.  And as he testified to

5    and as he indicated, things were going fine.  There was no

6    resistance, no confrontation.  He was cooperating.  He,

7    being, I believe you pronounce it Sorrell.

8        Q    Correct.

9        A    Everything was fine.  So to consider that a

10    consensual encounter would certainly be fine under these

11    circumstances.  You have Pantejo or --

12        Q    Pantoja.

13        A    -- Pantoja who indicated that they did have

14    reasonable suspicion, and he testified to that.  So my

15    evaluation is taking all these things into consideration,

16    and could they have, or Navarro or the other officers,

17    initiated this contact and detained based on reasonable

18    suspicion?  Yes.  Navarro, took it a step and asked

19    permission for a search, which he agreed to.  So when you

20    have someone that's compliant, it's far easier to work

21    with them, based on --

22        Q    Trailing off the question.

23        A    I know.  I'm -- I'm going to end it.

24        Q    Thank you.  Only because I only have so much time

25    with you.

24

1           Okay?

2      A     I understand.

3      Q     And I have to pay you for that time.

4      A     Well, I have all day.

5           MR. MORIARTY:  Hold on.  We don't have all day

6    here.

7           THE WITNESS:  Okay.

8    BY MR. BUELNA:

9      Q     So you're prepared to testify at trial that, in

10   accordance with standards and police standards within the

11   industry of law enforcement, that there was sufficient

12   factual information within the CAD and radio dispatch to

13   justify a detention; correct?

14          MR. MORIARTY:  Objection.  Incomplete

15   hypothetical.

16          THE WITNESS:  I'm prepared to testify, based on

17   my review, the information available to the officers at

18   the time that they initiated contact, was there reasonable

19   suspicion pursuant to the POST training to initiate that

20   contact to determine whether or not there was any crimes

21   being committed, or have been committed, involving the two

22   individuals in this case.  I am prepared to offer opinions

23   that, yes, they had reasonable suspicion to initiate the

24   contact and detain, only for the purposes of determining

25   whether or not they were involved in a crime.

25

1    BY MR. BUELNA:

2        Q    Okay.  Would you agree with the statement that

3    reasonable suspicion requires that a tip be reliable in

4    its assertion of illegality, not just in its tendency to

5    identify to determine that person?

6             MR. MORIARTY:  Objection.  Incomplete.  Calls for

7    a legal conclusion.

8             Go ahead.

9             THE WITNESS:  Yeah.  The first part, I'm going to

10   struggle with, because an officer may rely upon

11   information given to them through dispatch and/or

12   information provided by a 9-1-1 caller.  Do the officers

13   have the ability to validate the credibility of that

14   information?  No, they don't.  Rarely, if ever, would they

15   be in a position to do so.  That's why the training and

16   the court's guidelines have provided law enforcement

17   officers the opportunity to detain for only a period of

18   time -- it's not unlimited -- just to determine whether or

19   not something had or is occurring that is related to a

20   criminal act.

21             So your question suggests reliability or

22   credibility.  And rarely, if ever, are they going to be

23   able to do that.  Information is always changing from the

24   time it's called in to the officers arriving on scene.

25   They just have to act pursuant to their training.

                                                              26

 1   BY MR. BUELNA:

 2       Q    Were these officers provided the name and address

 3   of the reporting party?

 4       A    I believe it's in there.  I don't know if they

 5   had a name, a specific name.  Let me check here.  Yeah,

 6   the RP's address is in the CAD report.

 7            (Reporter Clarification.)

 8            THE WITNESS:  RP.

 9            MR. BUELNA:  Reporting party.

10            THE WITNESS:  Reporting party address was 1408

11   Pearson Avenue.  So they were provided an address.

12   Whether -- I don't see a name there.  It's not required.

13   BY MR. BUELNA:

14       Q    And now you said this was in the -- the CAD as

15   they provided the address of the person but not the name;

16   right?

17       A    I only have a portion of the CAD in my notes.

18   It's certainly part of the materials I've reviewed.  But

19   at 2:22:02, there is an RP's address.  I don't see a name

20   in my notes.  It may very well be there.  But there is an

21   address.

22       Q    Okay.  What about a phone number?

23       A    I don't have a phone number.  It doesn't mean

24   there wasn't one acquired.

25       Q    Do you remember in the radio dispatch or seeing

                                                              27

1    in the CAD, a phone number?

2        A    I don't recall.

3        Q    Okay.  Do you agree with the statement that to

4    establish reasonable suspicion, an officer cannot rely

5    solely on generalizations that, if accepted, would cast

6    suspicion on large segments of the law-abiding

7    population?

8            MR. MORIARTY:  Objection.  Incomplete.  Also

9    calls for a legal conclusion.

10           If you understand, go ahead and answer.

11           THE WITNESS:  Yeah, I'm going to have to ask for

12   that question again and make sure I'm understanding it

13   correctly.

14           MR. MORIARTY:  I won't interrupt.  Same

15   objection --

16           (Reporter Clarification.)

17           MR. MORIARTY:  Sorry.  I'm not going to interrupt

18   the question so Mr. Fonzi can hear it, but it's going to

19   be the same objection after you ask the question.

20   BY MR. BUELNA:

21       Q    To establish reasonable suspicion, an officer

22   cannot rely solely on generalizations that, if accepted,

23   would cast suspicion on large segments of the law-abiding

24   population?

25       A    I'm going to agree and disagree.  They're often

                                                            28

1    given generalizations, and that term, in and of itself, as

2    you know, is subjective.  What do we mean by

3    generalizations?  There was specific information here.  It

4    wasn't general.  It was specific with physical

5    descriptions and two individuals.  It was not casting --

6        Q    Can I stop?  I'm not applying it -- so you're

7    taking a concept and applying it to this incident.  I'm

8    not asking that.  I'm asking whether or not you agree with

9    the actual concept itself that I stated.  Okay.  Before

10   you start to wind down, applying it.

11       A    And I was trying to answer your question.  So I

12   agree and disagree with the form of your question.  And I

13   was trying to explain why.  And if you'd like me to, I can

14   go further.  If not, I'll wait for your next question.

15       Q    Well, I heard you in the initial -- like, so, you

16   understand the idea of a concept and a concept's

17   application; right?

18       A    I understand the language.  I speak English very

19   well, and I understand the question.  It's just the manner

20   in which the question is phrased is what I struggle with.

21           You're using the term, "general information" and

22   casting upon an entire social area.  I don't agree with

23   parts of that question.  Can an officer take general

24   information and support reasonable suspicion to stop and

25   detain someone?  It's possible.  You still need more

29

1    context and you need more information.  Your question

2    doesn't have enough of that in it.

3          So -- and then can you cast general suspicion

4    over an entire social area?  Probably not.  I mean, anyone

5    and everyone walking in that area would not be subject to

6    that unless they fit the general descriptions or

7    information initially provided.

8          So that's where the question is lacking is that

9    it doesn't have any context or enough information.

10    Q    Sure.  Let's draw it out a little bit.  Let's

11    say, for example, officers were provided information that

12    two white males were walking up and down the street

13    carrying bags.  Would you believe that would be considered

14    generalizations that, if accepted, would cast suspicion on

15    large segments of the law abiding population?

16          MR. MORIARTY:  Same objections.  Incomplete, and

17    also calls for a legal conclusion.

18          THE WITNESS:  I really have a problem with the

19    last part of your question, large segments of a

20    population.  Because if they're not in this particular

21    area at this particular hour, then I would tend to agree

22    with you.  You just can't cast a blanket over everyone in

23    a city or a block.

24          But if it's specific, which the question has more

25    specific information with respect to white males, their

30

Robert Fonzi                                                    February 9, 2024

1    basic ages, carrying bags, that's more specific.  That's

2    not general.  That's really focusing more on things that

3    an officer can look for.

4            Just hypothetically, if we're told it's a bus, a

5    large 40-passenger bus in this area and all we see is

6    Volkswagens, I would agree that would allow them to stop

7    all the Volkswagen in the area.  So it depends on the

8    context and what type of information is available or

9    provided to them.

10   BY MR. BUELNA:

11       Q    Do you agree that one of the factors that

12   officers are trained to consider in whether or not their

13   encounter is a seizure is how many of them there are

14   versus the suspect they're talking with?

15       A    I'm sorry.  How many who?

16       Q    Sure.  Let me repeat.  In determining whether or

17   not a seizure has occurred, are officers trained that one

18   of the factors they should consider, so they don't

19   unintentionally create a detention, is the number of

20   them?

21            MR. MORIARTY:  Objection.

22   BY MR. BUELNA:

23       Q    Numbers versus the person who they're

24   consensually encountering?

25            MR. MORIARTY:  Objection.  The numbers of

                                                              31

1    officers, number of suspects?

2              MR. BUELNA:  Number of officers.

3              MR. MORIARTY:  Incomplete hypothetical, because

4    obviously, none of them are suspects.

5              But go ahead.

6              (Reporter Clarification.)

7              MR. MORIARTY:  You have to understand the number

8    of suspects the number of officers are encountering.

9              But if you understand it, go ahead and answer.

10             THE WITNESS:  I don't understand the question.

11   BY MR. BUELNA:

12        Q    Let me give you an example.  Are officers that

13   are trying to make the consensual encounter of a single

14   person trained to keep in mind that a large crowd of them

15   might be intimidating if they approach the person?

16             MR. MORIARTY:  Again, a large crowd of them

17   referring to officers?

18             MR. BUELNA:  I'm not going to keep doing this.

19   So you can put down or lodge a regular legal objection, or

20   he can clarify it.

21             MR. MORIARTY:  I'm sorry.  I'm just trying to --

22   go ahead.

23             Objection.  Vague.

24             If you understand the question, go ahead and

25   answer it.

                                                              32

```
1              THE WITNESS:  Well, large numbers would suggest
2     10, 15, 20 officers.  Whether or not -- it needs more
3     context.  It depends.  Could a large number of officers
4     standing over one individual be intimidating?  I believe
5     it could be.
6     BY MR. BUELNA:
7         Q    Well, one of the things that transforms a
8     consensual encounter into a seizure is some sort of show
9     of authority; right?
10             MR. MORIARTY:  Objection.  Incomplete
11    hypothetical.
12             Go ahead and answer it.
13             THE WITNESS:  Well, it's natural that the
14    officer's going to have to show authority.  I mean, the
15    uniform, the police car, the badge is authority in and of
16    itself.  That's just inherent part of the business.  You
17    can still have a consensual encounter with that inherent
18    authority that's clear to the individuals involved.  If an
19    officer asks for consent and they believe the individual
20    is providing that consent, then that's appropriate.
21             What's in that person's mind, an officer does not
22    have the ability to read their mind, if they felt
23    intimidated or they felt there were too many officers
24    there.  So it depends.  If the officers simply ask if they
25    can search them and the person says, sure, that's okay and
```

33

1    every indication is they're cooperating, I'm not following

2    where the intimidation would be an issue unless the

3    officer has a baton out and he's slapping his hand with

4    it, which might be intimidation or might be deemed or

5    considered intimidation.

6    BY MR. BUELNA:

7        Q    Well, I guess, are officers trained on how to

8    avoid turning -- converting a consensual encounter into a

9    detention if they don't want it to be one?

10            MR. MORIARTY:  Incomplete hypothetical.

11            THE WITNESS:  I don't think there's a specific

12   learning domain that would even address that issue.  They

13   are trained that if they're asking for consent, that they

14   have it or that the person acknowledges it.  Just them

15   walking away or not acknowledging wouldn't, in and of

16   itself, provide consent.  But if the person physically or

17   verbally acknowledges the officers, maybe officers

18   considered that to be consent, yes.

19   BY MR. BUELNA:

20       Q    So officers aren't trained on how to avoid

21   conducting -- or turning a consensual encounter into a

22   detention at all?

23            MR. MORIARTY:  Objection.  Misstates the

24   testimony.

25            Go ahead.

34

1            THE WITNESS:  If you're asking if there's a

2    specific learning domain that says avoid intimidation, no,

3    there wouldn't be.  Are officers trained on how to

4    communicate effectively to gain voluntary compliance?

5    Yes.  They're provided that.  And it's as simple as just

6    asking them a question.  There's no technique, if that's

7    what you're asking me.  Should the officers stand 15 or 20

8    feet away or remain in a patrol car?  Is there anything

9    specific in terms of tactics?  Should they intimidate a

10   person into submitting to consent?  No, that would be not

11   be appropriate.

12   BY MR. BUELNA:

13       Q    Well, are officers trained to take in mind

14   certain factors in order to ensure that they don't turn a

15   consensual encounter inadvertently into a seizure?

16           MR. MORIARTY:  Objection.  Incomplete

17   hypothetical.

18           THE WITNESS:  Yeah, really, your question doesn't

19   contain enough information.  Officers are trained that

20   intimidation would not be appropriate.  And it could be

21   physically or verbally, nonverbal or verbal, if they're

22   seeking consent.

23   BY MR. BUELNA:

24       Q    Well, can't in the middle of a consensual

25   encounter convert suddenly into a detention?

                                                            35

1          MR. MORIARTY:  Objection.  Incomplete

2   hypothetical.

3          THE WITNESS:  Could a consensual encounter

4   initially transition to a detention based on additional

5   information or observations?  Yes, it could.

6   BY MR. BUELNA:

7      Q    Listen carefully to my question.  What I'm asking

8   is are officers trained that their consensual encounter

9   can inadvertently transition or convert into a

10  detention?

11         MR. MORIARTY:  Same objection.  Incomplete

12  hypothetical.

13         THE WITNESS:  I'm not following the term,

14  "inadvertently."  It doesn't make sense, the question.  So

15  I'm not following your question.  I apologize.

16  BY MR. BUELNA:

17     Q    Sure.  You can substitute "inadvertently" for

18  "unintentionally."  Are officers trained that their

19  consensual encounter can unintentionally convert into a

20  detention?

21         MR. MORIARTY:  Same objections.

22         THE WITNESS:  Unintentionally on the officer's

23  part or on the subject's part?

24  BY MR. BUELNA:

25     Q    On the officer's part.

36

1        A       Could it?  I believe it is possible.

2        Q       Are officers trained that it's possible?

3        A       Well, it depends.  If their contact initially is

4    consensual but they have the basis for a detention

5    pursuant to reasonable suspicion, then the consensual

6    isn't relevant.  They could have done it anyway.  And as I

7    said a moment ago, that an officer's decision to seek, you

8    know, voluntary compliance, I would not be critical of

9    them doing so.  It helps calm the situation.  It allows

10   them to agree to work together on whatever the situation

11   may be.

12            So when you say "unintentionally," would suggest

13   that they don't have any information or have anything that

14   would justify the detention to begin with.  I would agree

15   that if they didn't have any information, then they would

16   not have reasonable suspicion for a detention.

17       Q       What I'm saying is that -- let me just give you

18   an example.  Let's say an officer stops to talk with

19   someone in the area because they want to ask them about a

20   crime that occurred nearby.  Okay?  You can assume that

21   fact.  All right?  And when the officer stops to talk to

22   that person, says, "Hey, can you stop for a minute," and

23   the person ignores them and keep walking.  And the person

24   says -- and then the officer says, "Hey, you need to stop

25   right now and talk to me," and the person stops and talks

37

1     to them, are officers trained that that would be a

2     seizure?

3             MR. MORIARTY:  Objection.  Incomplete

4     hypothetical.  The record also doesn't reflect at a

5     certain point during the hypothetical you raised your

6     register.

7             If you understand, go ahead and answer.

8             THE WITNESS:  You know, your questions are way

9     too vague.  You're not providing enough information to

10    accurately and competently opine on whether or not that

11    would be reasonable or not.  What crimes are involved,

12    what's the person doing, what's the relationship to the

13    contact.  I agree exercising your authority to

14    intentionally influence them with their authority to gain

15    compliance when they wouldn't normally do so would not be

16    appropriate.

17    BY MR. BUELNA:

18    Q    Well, no, I'm telling you specifically they don't

19    have reasonable suspicion, but the officer ordered the

20    person to stop walking.  Are officers trained that their

21    mere verbal commands can cause a seizure?

22            MR. MORIARTY:  Same objections.

23            Go ahead.

24            THE WITNESS:  Depends.  It depends.  If this is

25    just a citizen walking down the street, would the citizen

                                                            38

1    be required to stop?  No.

2    BY MR. BUELNA:

3        Q    And if the citizen did stop because an officer

4    ordered them to stop, would the officer be trained that

5    that would be a seizure or a detention?

6            MR. MORIARTY:  Hold on.  Hold on.  Same

7    objection.  Incomplete hypothetical.

8            THE WITNESS:  They're extraordinary, and that's

9    why I'm struggling.  And I'm not trying to not answer your

10   questions.  I think they're intentionally vague.  They're

11   not containing enough information.  You're not giving me

12   enough basis or context.  These things could go either

13   way, as you know.  If you give me more specific

14   information, or the officer on scene, then it can be more

15   accurate.

16           When the case law and the training is provided to

17   these officers, it's not as cloudy as your questions.

18   That's the problem.  You're intentionally not providing

19   enough information, and I'm not going to allow a sound

20   bite to occur with insufficient information.

21           If you want to give me more context, then I will

22   do my best to answer your questions right straight up.

23   But I'm struggling because you're just -- they're too

24   generic.  They're not enough.  The case law isn't generic.

25   The training isn't generic.  So your question should be

39

1    reflective of those two things.  And that's why I'm having

2    a difficult time trying to answer your question in the

3    best way I can.

4            MR. BUELNA:  Motion to strike as nonresponsive.

5        Q    So what other information do you feel like you

6    need in this situation?  Ask as much questions as you

7    like.

8            MR. MORIARTY:  Objection.  He's going to ask

9    questions of you?

10           MR. BUELNA:  I'm asking what information --

11           MR. MORIARTY:  We're not going to allow him to

12   ask questions.

13           MR. BUELNA:  Look, I'm not doing speaking

14   objections.  Put down your legal objection, and that's

15   it.

16           MR. MORIARTY:  Objection to form, you asking him

17   to ask you questions.  Objection to form.

18           MR. BUELNA:  Thank you.  He's not even your

19   client.  He's an expert.

20       Q    All right.  What other information would you

21   need?

22           MR. MORIARTY:  Objection.  Vague.  Objection to

23   form.

24           Go ahead.

25           THE WITNESS:  Yeah, I'm not going to ask you

                                                                    40

1    questions.  I think that's inappropriate.  But for an

2    officer to initiate contact, whether it be reasonable

3    suspicion, we've already articulated that they must have

4    information that would support whether or not they believe

5    a crime had been committed, was about to be committed and

6    they have information that the person or persons are

7    involved.  If they have that, they can initiate the

8    contact, stop and detain.  Consensual encounter, they can

9    stop and talk to anyone.  If the person chooses not to

10   talk to them, they don't have to.  If the officer asserts

11   their authority on a consensual encounter, it would not be

12   appropriate.

13   BY MR. BUELNA:

14       Q    If they assert their authority on, as you said,

15   on a consensual encounter, would it become a seizure?

16            MR. MORIARTY:  Objection.  Incomplete

17   hypothetical.

18            THE WITNESS:  If that person is not involved in

19   any criminal act and has not been the subject of the call

20   for service, I would agree.

21   BY MR. BUELNA:

22       Q    Okay.  So therefore, an officer can

23   unintentionally convert consensual encounter into a

24   seizure?

25            MR. MORIARTY:  Same objection as before.

                                                              41

```
1              THE WITNESS:  In the context --

2              MR. MORIARTY:  Sorry.  And asked and answered.

3              Go ahead.

4              THE WITNESS:  In the context of my last answer,

5      yes.

6              MR. BUELNA:  Thank you.

7              THE REPORTER:  Slow it down, please.

8      BY MR. BUELNA:

9        Q    Are officers trained, in the context of your last

10     answer, that their consensual encounters can convert into

11     a seizure?

12       A    I think you just asked that and I answered it.

13     And I'll stick with my last answer in the context of the

14     previous answer.

15       Q    Which is yes?

16       A    You can have it read back.  You asked the

17     question twice.  I'm not going to change it.  In the

18     context, I said yes, in the context of the previous

19     answer.

20       Q    So you can't refuse to answer questions.  Okay?

21     Otherwise, I'll have you come back and compel you to

22     answer the question.  Or you're not going to testify at

23     trial.

24             MR. MORIARTY:  You're arguing with the witness

25     right now.
```

                                                                        42

1          MR. BUELNA:  I'm letting him know --

2          THE REPORTER:  Slow down.

3          MR. MORIARTY:  The objection would be

4  argumentative.

5          Go ahead.

6          THE WITNESS:  I'm sorry.  Is there a question

7  pending?

8          MR. BUELNA:  There isn't right now.

9          MR. MORIARTY:  Okay.

10  BY MR. BUELNA:

11     Q    So what other ways can an officer unintentionally

12  convert a consensual encounter into a seizure, other than

13  verbal commands?

14          MR. MORIARTY:  Objection.  Vague.

15          THE WITNESS:  Physical.

16  BY MR. BUELNA:

17     Q    Okay.  For example?

18     A    Grab them and handcuff them.

19     Q    What about, for example, walking in front of them

20  when they're trying to walk, and every time they try to

21  get around them, an officer steps in front of them?

22     A    Well, I can give you 100 ways.  I said

23  physically.  Yeah, your description, physically getting in

24  their way to stop them, I would agree.

25     Q    Anyway else?

                                                                                         43

Robert Fonzi                                                    February 9, 2024

1         A    Physically, verbally.  No.  I think that would...

2         Q    Are officers trained to recognize intellectual

3    disabilities?

4         A    Yes, they have training that would reflect that.

5         Q    Are officers trained that people with cognitive

6    impairment -- do you know what that means?

7         A    Yes.

8         Q    Are officers trained that people with cognitive

9    impairments might be unintentionally more compliant than

10   other people?

11        A    I don't know if they would be more compliant.

12   But they are trained that there are some challenges when

13   you have people with mental disabilities.

14        Q    Are they trained not to take advantage of those

15   proclivities, as well?

16        A    You use a lot of big words.  But I would agree

17   that they would not take advantage of someone's

18   disability.

19        Q    Well, I'm speaking -- and I'm just trying to pull

20   up the learning domain.  Could you just give me a moment

21   here.

22        A    And when it's appropriate, I don't want to

23   interfere with your line of questions, for a bathroom

24   break, when it's appropriate.

25        Q    We could take one right now.  I'm looking for the

                                                                      44

1    learning domain.  So we'll go off the record at 11:57.

2         A    Okay.

3              (A break was taken.)

4              MR. BUELNA:  All right.  Going back on the record

5    after a brief break.

6         Q    So would you agree that officers are trained to

7    look at the certain behavioral cues or behavior indicators

8    to determine if someone might have an intellectual

9    disability?

10        A    They are provided training with respect to those

11   behaviors.

12        Q    For example, impaired communication may indicate

13   to an officer that a person has intellectual disability;

14   right?

15             MR. MORIARTY:  Objection.  Vague as to "impaired

16   communication."

17             THE WITNESS:  It may.

18   BY MR. BUELNA:

19        Q    Okay.  Well, and so impaired communication means,

20   for example, has difficulty understanding or answering

21   questions; right?

22        A    Impaired could also mean intoxication.  So is

23   that -- can be one of the considerations, yes, I would

24   agree.

25        Q    I'm just -- I'm literally just -- and I'm going

                                                                45

1      to show you and I'll attach it as Exhibit 2.  This is the

2      learning domain.

3              Have you seen this before?  It's learning domain

4      37.  And you can briefly read this portion, if you'd like.

5          A    I'm familiar with 37, yes.

6              (Exhibit No. 2 marked for identification.)

7      BY MR. BUELNA:

8          Q    And so you would agree that one of the things

9      that officers are trained on is impaired communication,

10     right, as being a behavioral indicator of intellectual

11     disability?

12         A    Yes, I would agree.

13         Q    And they're trained that impaired communication

14     can be indicated by such things as difficulty

15     understanding or answering questions; right?

16         A    Is that one of the training points?  Yes.

17         Q    As well as mimics responses or answers;

18     correct?

19         A    With respect to learning domain 37, yes.

20         Q    That they may have limited vocabulary; correct?

21         A    Yes.

22         Q    They may take a long time to answer questions;

23     correct?

24         A    With respect to that learning domain, yes, I

25     would agree.

1      Q    Which covers essentially behavioral indicators

2    for officers that can lead them to believe someone suffers

3    an intellectual disability; right?

4      A    It could.  However, you have other learning

5    domains that would suggest other things that, quite

6    frankly, are similar.  But is that what's taught with

7    respect to learning domain 37?  Yes.

8      Q    For example, they're also taught that people with

9    intellectual disabilities may have a short attention span;

10   right?

11     A    Yes.

12     Q    Which means that they may be easily distracted;

13   right?

14     A    Well, it -- with respect to that, yes.  However,

15   if you read that entire learning domain, police officers

16   are not expected nor required to diagnose a person's

17   disability.  Are they taught those are possibilities?

18   Yes, they are.  In addition to other learning domains that

19   would suggest that it could also mean that they're under

20   the influence of narcotics.  They're quite similar.  But I

21   do agree with what you're reading from in learning domain

22   37.

23     Q    And we can get to that.  I'm just kind of asking

24   you to shorten the questions.

25          MR. MORIARTY:  I'm sorry about that.

47

```
 1   BY MR. BUELNA:

 2      Q    Another thing they're taught in regards to short

 3   attention span --

 4           Can you close that?

 5           MR. MORIARTY:  Yes.

 6   BY MR. BUELNA:

 7      Q    -- is that short attention span may be recognized

 8   because they maybe appear to be fascinated by shiny

 9   objects, like an officer's badge or safety lights; right?

10      A    Again, I would agree that is one of the training

11   points in learning domain 37.

12      Q    As well as a person may have a poor sense of

13   time; right?

14      A    Yes.

15      Q    They also be may overly compliant; right?

16      A    Is that a possibility?  Yes.

17      Q    They may be overly willing to confess; correct?

18      A    Never had that happen, but it is a possibility.

19      Q    How many -- how many people with severe cognitive

20   impairments have you encountered?

21      A    Hundreds.

22      Q    Hundreds.  They've never been overly compliant?

23           MR. MORIARTY:  Did you say compliant or confess?

24           MR. BUELNA:  Compliant.

25           THE WITNESS:  I would generally say no.
```

```
 1    BY MR. BUELNA:

 2        Q    Okay.

 3        A    They were quite the opposite.

 4        Q    Would you agree that they're trained at least

 5    that overly compliant means that they may agree with

 6    everything, even if statements are contradictory?

 7        A    Well, all of these are possibilities.  However,

 8    they would not be known to the officer.

 9        Q    Well, these are some of the behavioral indicators

10    that officers trained on from which to draw the inference

11    that that person may have a disability; right?

12        A    Okay.  You are completely misrepresenting the

13    learning domain.  Okay?  And I am going to have to give

14    you a narrative.  You have not read the entire learning

15    domain.  There -- it's providing you some bullet points in

16    areas that are medical diagnosed disabilities.  And an

17    officer's not required, as I said a moment ago, nor

18    expected to make a mental health or medical designation to

19    an individual they're confronted with on the street.  It's

20    virtually impossible.

21            It's even impossible, or next -- or extremely

22    difficult for a trained professional.  That's also part of

23    that learning domain.  So with bullet points you're

24    reading, you are slightly misrepresenting them and taking

25    them out of context, the way you're asking the questions.
```

49

1    Are they things that are possibilities with an individual

2    that may have some mental challenges or disabilities?

3    Yes, I agree that those are all.

4              But to know whether or not the person is being

5    overly compliant because of their disability, an officer

6    would have no way of knowing that.  If you have a person

7    that's compliant, that's what you hope to do anyway is

8    just have some compliance and address whatever the

9    circumstances are.

10             So I agree that those are possibilities.  Whether

11   or not an officer can make that determination is extremely

12   difficult, if not impossible, for them to do so at

13   2 o'clock in the morning in the field.  But they are

14   things that officers are presented with respect to

15   learning domain 20.  Is there a check-off box where they

16   check all these things that you're asking me and say, "Oh,

17   that person has to have a mental disability."  It's not

18   that simple.  As you --

19   Q    You went on quite a long time.

20   A    I haven't finished.  I haven't finished.

21        MR. BUELNA:  I'm moving to strike.

22   Q    It's my time.  I'm paying for your time.  So you

23   can't go on long, long, long narratives on my time.  So

24   I'm going to read from the learning domain itself that's

25   above the table, and this will be lodged as Exhibit 2

1    attached to this deposition for everyone to read, as well

2    as the jury.

3        "Behavioral indicators.  The following table

4    identifies several behavioral cues and indicators which

5    may lead an officer to believe that a person's affected by

6    intellectual disability."

7        That being said, are these indicators supposed to

8    supply training to an officer that would help them

9    determine or believe or adjust their behavior in some way

10    if they suspect a person does have a disability?  Not

11    diagnose it, but if they suspect that they do, allow them

12    some tools to modify their behavior in order to

13    successfully resolve the interaction?

14        MR. MORIARTY:  Objection.  Incomplete

15    hypothetical.  Compound.  Don't know where the question is

16    going.

17        Go ahead.

18        THE WITNESS:  And It's a different question.  And

19    based on your different question, I would agree with that

20    training.

21    BY MR. BUELNA:

22    Q    Okay.  Thank you.  Are they also trained -- are

23    they also trained that the person with the mental

24    disability or intellectual disability may have difficulty

25    with simple tasks?

51

1        A    Yes.

2        Q    Okay.  That includes using public transportation

3    as different from a routine memorized route?

4        A    Yes.

5        Q    They're also trained that they may have poor

6    understanding of consequences of actions; correct?

7        A    There's a possibility.  I would agree.

8        Q    They may act impulsively; correct?

9        A    Yes.

10       Q    They may not differentiate between appropriate

11   and inappropriate behavior for a given situation; correct?

12       A    Yes.

13       Q    They make not recognize appropriate boundaries;

14   correct?

15       A    Yes.

16       Q    Officers are also trained on different ways to

17   make contact with people they suspect may be suffering

18   from intellectual disability; correct?

19       A    If the officer believes or has information that

20   they have a mental disability, yes, I would agree.

21       Q    One of the things they're trained, if they

22   suspect a person has an intellectual disability, okay, is

23   to approach in a calm and respectful manner; correct?

24       A    I agree.

25       Q    That they're to be patient; right?

                                                                     52

1       A     Yes.

2       Q     Use simple language and ask short, open-ended

3   questions; correct?

4       A     Yes.

5       Q     Excuse me.

6             Speak slowly and clearly in a normal tone of

7   voice; correct?

8       A     I would agree.

9       Q     Not to exaggerate inflections or speak louder

10  than normal; correct?

11      A     I would agree.

12      Q     Proceed slowly, allow the individual to set the

13  pace?

14      A     I would agree to the extent predicated on the

15  circumstances barring any other issues, I would agree.

16      Q     Also, officers should keep in mind that the

17  person may be extremely fearful and may appear to be

18  uncooperative; right?

19      A     Yes.

20      Q     I'm going to return back here to your report.

21  And I'm going to pick up where I left off.  I believe I

22  had stopped where it says about midway through the page,

23  "Officers Navarro and Pantoja arrived and contacted

24  Sorrell and a relative of Sorrell Shiflett."

25            Do you see where I'm at?

1        A    Yes.

2        Q    Okay.  Great.  I'm going to read the next one.

3             "Sorrell informed Navarro that he was lost and

4    looking for a friend who lived on Kelly Street."

5             Did I read this correctly?

6        A    Yes, sir.

7        Q    Next one.

8             "When asked where Sorrell was coming from,

9    Officer Navarro indicated that Sorrell did not seem to

10   understand his question."

11            Did I read that correctly?

12       A    Yes, sir.

13       Q    Okay.  Next one.

14            "Sorrell was dressed in a Karate Gi underneath a

15   jacket and a black belt tied around his martial arts

16   uniform."

17            Did I read that correctly?

18       A    Yes, sir.

19       Q    "Sorrell would only indicate that he was lost."

20            Did I read that correctly?

21       A    Yes, sir.

22       Q    "Sorrell verbally identified himself to

23   Officer Navarro."

24            Did I read that correctly?

25       A    Yes.

54

Robert Fonzi                                                    February 9, 2024

1        Q     Okay.  "Officer Navarro conducted a

2    wants/warrants check and was able to confirm that Sorrell

3    was on active probation for vandalism."

4              Did I read that correctly?

5        A     Yes.

6        Q     And there was no search terms attached to that

7    probation; right?

8        A     That is my understanding, yes.

9        Q     What are search terms?

10       A     That means they waive their Fourth Amendment

11   rights, and anytime an individual is contacted by law

12   enforcement, they are subject to a search.

13       Q     And in this case, that -- I'm trying to say this

14   in a correct way.

15             In this case, Sorrell didn't have search terms,

16   so he was still protected by the Fourth Amendment; right?

17       A     I would agree.

18       Q     I'm saying it that way because even if you had

19   search terms, you're still protected by the Fourth

20   Amendment, you're just subject to a pass search.

21             You're not here to resolve disputes of fact;

22   right?

23       A     I am not.

24       Q     You understand that in these cases that you do,

25   dozens and dozens of cases, they're usually a plaintiff's

                                                              55

1    sort of set facts of what occurred and the defendant's set

2    of facts that occurred; right?

3         A    That's why we're here.

4         Q    And very rare that they agree on undisputed facts

5    or all the facts and still have a case.

6              Fair enough?

7         A    There are times there's agreements, but I agree

8    basically with the form of your statement.

9         Q    So I'm going to read the next one.

10             "When asked if he had any weapons, Sorrell

11   admitted he had a throwing knife."

12             Did I read that correctly?

13        A    Yes, sir.

14        Q    You understand that that -- in this cases that's

15   disputed here, that Sorrell doesn't recall saying he told

16   officers that he had a throwing knife; right?

17        A    Yes, sir.

18        Q    All right.  "Sorrell gave Officer Navarro consent

19   to a pat-down search for any other weapons."

20             Did I read that correctly?

21        A    Yes, sir.

22        Q    All right.  Almost done here.

23             "When Sorrell turned around and placed his hands

24   behind his back, Officer Navarro attempted to grasp

25   Sorrell's hands to begin the search."

1          Did I read that correctly?

2     A    Yes, sir.

3     Q    Okay.  If a suspect -- strike that.

4          At the time that Sorrell tells, allegedly,

5   Officer Navarro that he has a throwing knife, it's just

6   Pantoja, Navarro, Sorrell and his cousin; right?

7     A    Yes.

8     Q    Lieutenant Brandt has left?

9          (Reporter Clarification.)

10         MR. BUELNA:  Lieutenant Brandt, B-r-a-n-d-t.

11         THE WITNESS:  I'm not aware he was present.

12   BY MR. BUELNA:

13    Q    Okay.  Did you read Lieutenant Brandt's

14   deposition?

15    A    I did.

16    Q    Okay.  So it was essentially two, you know, call

17   them suspects, and two officers at the time that Sorrell

18   said he had a throwing knife; right?

19    A    That is my understanding; correct.

20    Q    Is that something for police officers, a scary

21   thing when a suspect mentions they have a throwing knife

22   or any kind of weapon?

23    A    I wouldn't say it's a scary thing.  It does spark

24   a concern whether or not the individual has the intent to

25   use it or the ability to use it.  It does spark concern.

                                                         57

Robert Fonzi                                                    February 9, 2024

1        Q    And when a suspect says that they have a weapon

2   on them, an officer doesn't know, just based off of that,

3   what kind of weapon it is; right?

4        A    Just based on your question, I wouldn't know what

5   type of weapon.  That would be correct.

6        Q    And you wouldn't assume that it's -- for example,

7   if a suspect told you that, like, I have a weapon, you

8   wouldn't assume that it's a baton versus a throwing knife

9   versus a firearm; right?

10       A    Would I know specifically the type of weapon just

11  based on an individual saying they have a weapon?  No, I

12  wouldn't.

13       Q    And you would treat them as if that weapon could

14  be a firearm; right?

15       A    In the context of a contact at this hour with an

16  individual based on the call, I would assume or believe

17  that that is a possibility that the individual could use a

18  weapon.

19       Q    Including a firearm; right?

20       A    Yes, I would agree.

21       Q    Okay.  That's something that you're trained to

22  also communicate to your fellow officers if they're

23  present that the suspect has a weapon on them; right?

24       A    If I have the opportunity to do so, yes.

25       Q    Especially if you suspect it might be a firearm;

                                                              58

1    right?

2        A    Again, if I have the opportunity to do so, yes, I

3    would agree.

4        Q    Okay.  And if you -- if that suspect later got

5    away from you or was running from you and was coming into

6    close proximity with a fellow officer who wasn't aware

7    they were armed with a weapon, would you alert that

8    officer --

9             MR. MORIARTY:  Objection.  Incomplete

10   hypothetical.

11   BY MR. BUELNA:

12       Q    -- or try to, if you had time?

13            MR. MORIARTY:  Objection.  Incomplete

14   hypothetical.

15            Go ahead and answer.

16            THE WITNESS:  I agree that an officer would

17   provide that information, if it's feasible to do so in the

18   context of their encounter and the subject fleeing.

19   BY MR. BUELNA:

20       Q    Well, especially if that fleeing subject's coming

21   into close proximity with another officer; right?

22       A    That was part of your question I agree based

23   on -- I'll stay with the same answer that if it's

24   appropriate and feasible for the officer to do so, yes,

25   they would communicate.

59

Robert Fonzi                                                    February 9, 2024

1        Q    Okay.  Let's say, then, you and that officer get

2    this suspect who was fleeing and you suspect has a weapon,

3    because he said he had a weapon, onto the ground.

4             Okay?  Are you with me?

5        A    I am.

6        Q    And he's not handcuffed yet, but you're trying to

7    get him handcuffed.  You're trying to get his arms behind

8    his back.

9             Are you with me?

10       A    I am.

11       Q    Okay.  So he's on his belly.  He's probably dealt

12   with this before.  He thrashing around.  You're trying to

13   get his hands behind his back.  You suspect he has a

14   weapon.  And now backup, meaning other officers are

15   arriving to assist you.

16            Are you with me?

17       A    Yes.

18       Q    Would you let those other officers know, that are

19   arriving to help grab him, that this guy has a weapon on

20   him?

21       A    I may inform them if the dynamics and the

22   circumstances allow me to do so without diverting my

23   attention away from the task at hand, if I'm trying to

24   control an individual.  And officers that encounter a

25   subject, they will assume that they may or could be armed

                                                           60

1    based on the fact they haven't searched them.

2          So the first following objective is to secure

3    them.  Get them in cuffs or get their hands restrained so

4    that if they do have a weapon on them, they can't use it

5    against any of the officers.  That would be the first

6    priority.  If I have the opportunity to do so, I may

7    inform the other officers of additional information that I

8    may have acquired during the contact.

9      Q    And if you had that person's arms behind their

10   back, secured, and their hands, and another officer was

11   moving to go pat them down, would you try to let that

12   officer know, "Hey, this guy said he had a knife on him"

13   or a firearm on him, or would you just let him search,

14   assuming that he would treat the person as if they had a

15   weapon on them?

16         MR. MORIARTY:  Objection.  Compound.

17         If you understand, you can answer.

18         THE WITNESS:  It would depend on the

19   circumstances.  Again, I may inform them.  I may not.  It

20   just depends on what's transpiring, what had occurred.  If

21   you want to put it in the context -- if it's just a global

22   universal situation, then it depends.  In the context of

23   this, again, it would depend.  They're going to search him

24   anyway.  If I have an opportunity to do so, I may provide

25   that information.

61

1    BY MR. BUELNA:

2        Q    And if the person is handcuffed already and on

3    the ground laying there crying, would you at that time, if

4    another officer is going to come up to pat search him and

5    they don't know that he has a weapon on him, would you

6    take time to say, "Hey, just so you know, he said he had a

7    weapon on him"?

8             MR. MORIARTY:   Same objections.

9    BY MR. BUELNA:

10       Q    Is that something that you're trained to do?

11       A    There's no timing issue.  Because your question

12   is all specific to timing.

13       Q    Let me strike it and rephrase it then.

14            When it's reasonable -- when it's feasible, are

15   you trained as an officer to communicate threats that

16   you've learned to other officers so -- to give them some

17   warning?

18            MR. MORIARTY:   Probably not the greatest

19   question, but...

20            THE WITNESS:   Better question.  But yes, I'd

21   agree.

22   BY MR. BUELNA:

23       Q    Okay.  And are you also trained to report those

24   threats over dispatch when it's feasible?

25            MR. MORIARTY:  Objection.  Vague.  Incomplete

                                                              62

1   hypothetical.

2            THE WITNESS:  Not necessarily, no.

3   BY MR. BUELNA:

4        Q    What if, for example, a subject is fleeing and

5   you're chasing after him and you're updating dispatch

6   where that person is going, is that a time when you might

7   tell dispatch, "Hey, because other officers are coming to

8   respond, this guy said he has a weapon"?

9        A    It depends.  If I'm actually physically running

10  and chasing him.  If you've ever been in a foot pursuit,

11  just small pieces of information are very difficult while

12  you're trying to run and communicate on the radio.  If I'm

13  sitting in a patrol car, it's far easier.  Would I

14  communicate that type of information?  Yes.

15       Q    Have you ever done it while you were running,

16  though, communicated to dispatch that the suspect was

17  running and was armed?

18       A    There are times I've done it.  There are times I

19  have not.

20       Q    Is that something that you want to put over

21  dispatch so that other responding officers have some

22  information about the threat they might be encountering?

23       A    Yes.

24       Q    Okay.  And that's important to you because you

25  want those officers to be safe, as well; right?

63

1        A    I would agree.

2        Q    Let me ask you this:  And this is going to be

3   general.  If you saw a suspect charging at your fellow

4   officer with a knife or a weapon, would you intervene with

5   deadly force if you had to?

6        A    If I believe that officer was in imminent threat

7   of serious injury or death, yes.

8        Q    Have you done that before?

9        A    Have I used deadly force?

10       Q    Yes.

11       A    Yes.

12       Q    On how many occasions?

13       A    Twice.

14       Q    What were the circumstances of each one?  Brief.

15       A    Yeah.  One was a pursuit, assault with a deadly

16   weapon on a police officer.  And the second one involved a

17   kidnapping in progress.  Guy was armed with two guns and

18   he got in the car and he was going to kidnap his

19   girlfriend and pulled a gun out and pointed it at me.

20       Q    Okay.  What about the first one?  Can you tell me

21   a little bit more about the first one?

22       A    A pursuit, throwing furniture at pursuing

23   officers, and we were given the authority to disable the

24   vehicle.  So that one wasn't deadly force intended for the

25   driver.  It was intended for the vehicle.

1       Q    I'm just going to stand up for a minute.  Not

2    meant to tower over you.

3       A    No, I understand.

4       Q    Okay.  I think I'm done with -- the last two

5    bullet points are, "Sorrell immediately ran from

6    Officer Navarro."

7            Did I read that correctly?

8       A    Yes, sir.

9       Q    "Officers Navarro and Pantoja chased Sorrell and

10   ordered him to stop running, but Sorrell ignored the order

11   and continued to run."

12           Did I read that correctly?

13      A    Yes, sir.

14      Q    Okay.  If officers don't have reasonable

15   suspicion and they're just conducting a consensual

16   encounter, you'd agree that the person can terminate that

17   consensual encounter whenever they wish and walk away;

18   right?

19      A    I would agree.

20      Q    They could even run away if they wanted to;

21   right?

22      A    I would agree.

23      Q    They could bicycle away?

24      A    I would agree.

25      Q    Would you also agree -- I'm going to have you

                                                              65

1    assume a set of facts here, which is all the ones that you

2    just gave.  I'm going to have you assume those are all

3    true.  All right?  So Sorrell runs away.  Okay?

4            Are you with me?

5        A    Yes, I'm following.

6        Q    So is it also true that if Sorrell stopped and

7    walked back and opened up his hands and said, "I

8    surrender," at that point, it would be unreasonable for an

9    officer to hit Sorrell in the head with a baton; right?

10       A    Based on the information and all the bullet

11   points in your hypothetical, yes, I would agree with you.

12       Q    Or to tase him at that point; right?

13       A    Again, based on all the information and the fact

14   that he's not a threat or actively resisting, I would

15   agree.

16       Q    Well, the suspects, even if they committed some

17   sort of crime earlier in an incident are permitted to

18   surrender themselves to officers, right, without

19   repercussion?  Oh, I shouldn't say repercussion.  Without

20   retaliation?

21       A    From the officers, I would agree.

22       Q    Okay.  Now, I want you to -- if a suspect in an

23   encounter similar to what we have here with Sorrell, if

24   the suspect tells you that he has a knife on him and you

25   ask to search him, would you tell your fellow officer,

66

1    "Hey, this guy just told me he had a knife on him"?

2        A    Not necessarily.  I mean, if my partner is just

3    standing there doing nothing, it might be.  But if he's

4    dealing with another individual or involved in something,

5    I may not.  In the context of that question, it appears to

6    be low key.  I may not immediately notify him.  A knife,

7    in and of itself, isn't illegal.  It just depends on the

8    circumstances.  But if the context -- contact is going

9    well and my partner is involved or engaged in other

10   activities, I probably wouldn't at that particular moment.

11       Q    And when the person turned around to have you

12   search him, would you make sure you kept an eye on his

13   hands?

14       A    Yes, I would.

15       Q    Aren't officers always trained, you know, watch

16   the hands, that's where the danger comes from, or

17   something to that effect?

18       A    In most cases, yes, I would agree.

19       Q    I think it's the hand will hurt you, or something

20   like that?

21       A    Yes.

22       Q    And so you would be careful, since he told you

23   that he had a knife, to make sure his hands don't dip into

24   his pockets or to his waistline or anything like that;

25   right?

                                                                    67

Robert Fonzi                                                    February 9, 2024

```
1        A    I would agree.

2        Q    Okay.  And you may even secure his wrists or his

3   hands as you walk him over to search him; right?  To make

4   sure he doesn't do anything with his hands; right?

5        A    Yes.

6        Q    And that's because you don't want an officer --

7   want him to grab a weapon and injure you, your fellow

8   officer or anyone else; right?

9        A    I would agree.

10       Q    What's the 17-foot rule?  Or was it 20-foot rule?

11       A    It's more of a theory than a rule.  Everyone

12  calls it a rule and it gets misled or misrepresented.  But

13  there is a 21-foot rule or theory based on a subject being

14  armed with an alleged weapon and have an ability to attack

15  and cause harm to an officer before they have the ability

16  to respond appropriately and defend themselves.

17       Q    What's the 21 feet about?

18       A    If you and I were 21 feet away and I'm not

19  prepared and you reach and pull a knife and decide to

20  attack me, you have the ability to strike me with that

21  weapon before I can respond.

22       Q    And that's 21 feet away?

23       A    That is correct.

24       Q    And how many feet was Sorrell away?

25            MR. MORIARTY:  Objection.  Vague as to what
```

68

1   time.

2          MR. BUELNA:  Approximately when -- when they were

3   talking.

4          THE WITNESS:  Yes, there were different

5   distances.  I mean, they were interchanging back and

6   forth.  But I would say they were within 10 feet, roughly.

7   BY MR. BUELNA:

8      Q    Okay.  No. 3 -- well, maybe I should go

9   to No. 2 -- No. 2, your opinion is that they had -- that

10  it was -- that Officer Navarro's initial conduct with

11  Sorrell was consensual; right?  That's part of it?

12     A    Well, based on my review, yes.

13     Q    And it was reasonable for him to do a safety

14  pat-down search with Sorrell's consent?

15     A    Yes.

16     Q    And he had reasonable suspicion to initiate

17  contact with Sorrell and David after receiving --

18          THE REPORTER:  Slow down.

19          MR. BUELNA:  Sorry.  That's my fault.  I was

20  reading.

21     Q    "Officer Navarro and Pantoja had reasonable

22  suspicion to initiate contact with Sorrell and David after

23  receiving a call for service indicating that two males

24  were acting suspicion during the early morning hours"; is

25  that correct?

Robert Fonzi                                                    February 9, 2024

1        A    Yes, it is.

2        Q    Okay.  All right.  No. 3, which is on page 7.

3   You also -- it's your opinion, as well, that they had

4   probable cause to arrest Sorrell under Penal Code 148;

5   correct?

6        A    Yes.

7        Q    And that's based off of when he ran.

8             Fair enough?

9        A    I would agree.

10       Q    Up to the point that he ran, there was no 148;

11  right?

12       A    I would agree.

13       Q    And then, additionally, there was a cause,

14  probable cause to arrest Sorrell for the dirk and dagger;

15  right?

16       A    Yes.

17       Q    Which is having, essentially, a knife that's

18  outside of the correct -- or the dimensions of the law?

19       A    Yeah.  It's illegal to possess double-edge six

20  blades in the manner which these were.  So yes, I would

21  agree with that.

22       Q    Now, under -- on opinion three, about halfway

23  through, it says, "Pursuant to California POST training,

24  probable cause existed under the totality of the

25  circumstances for the following reasons," colon.  And then

                                                              70

1    you list all the facts that you believe supported in this

2    incident the arrest; right?

3        A    Yes.

4        Q    Okay.  Now, I want you to go to page 8, and I'm

5    not going to read all the bulletins.  I'm going to go

6    through -- however, I'm going to read one which is the

7    second one from the top of the page where it says,

8    "Sorrell put."

9            "Sorrell put his hands up in what has been

10   described as a karate stance, which is indicative of

11   assaultive behavior."

12           Obviously, that's a disputed fact amongst the

13   parties; right?

14       A    Yes.

15       Q    Because you reviewed Sorrell's deposition; right?

16       A    Yes.

17       Q    And that's obviously not his testimony; right?

18       A    I would agree.

19       Q    Even that said, both officers testified or

20   admittedly testified that Sorrell never punched, kicked,

21   kneed them in any way; right?

22       A    Yes, I agree.

23       Q    Okay.  Opinion 4 is essentially that the -- in

24   your opinion, that the force they used, which included a

25   uniform presence, repeated verbal commands, physical

71

1    control measures or PCM, use of baton, and the use of the

2    Taser.  I think it's electronically conducted machine?  I

3    think it's electrical -- electrically conducted device,

4    usually?

5         A    Yeah.  That should be D instead of an M.

6              MR. BUELNA:  Okay.  That's what I thought.

7              MR. MORIARTY:  Yeah, you could have corrected

8    him.

9              THE WITNESS:  I was just waiting to see.

10             MR. BUELNA:  I was going to say machine.

11             THE WITNESS:  It's a mis-typo.  It should be D.

12   BY MR. BUELNA:

13        Q    It's a mis-typo in a lot of these cases.

14             But that's the force that you said was reasonable

15   in this case they used; right?

16        A    Under the totality of the circumstances, yes,

17   that is correct.

18        Q    And also, it's assuming the officer's narrative

19   of what happened, of how it transpired; right?

20        A    Based on their statements and the reasons they

21   deployed force under the circumstances, I agree.

22        Q    And that would assume that what they said is

23   true; correct?

24        A    Yes.

25        Q    If what Sorrell described is true, you would

1    agree that would be excessive force being that he

2    surrendered himself and they struck him multiple times

3    with the baton and tased him?

4         A    Based on that, yes, I would agree.

5         Q    When you were -- when you were on patrol, there

6    certainly weren't body-worn cameras; right?

7              (Reporter Clarification.)

8    BY MR. BUELNA:

9         Q    There were not body-worn cameras when you were on

10   patrol?

11        A    We did not have them when I was on patrol, no.

12        Q    Now, when you were in a supervisor position, had

13   your department yet required body-worn cameras?

14        A    I have command staff, and we were researching and

15   beginning the process of evaluating various devices,

16   technologies, and more importantly, what I refer to as the

17   back end, and that's the storage and the capability to

18   retrieve the documents or videos.  So I was involved in

19   that aspect of it.

20        Q    You would agree, though, that at this day and age

21   where officers are equipped with body cameras, it's

22   important that they properly charge them, activate them

23   and use them as described in their policies?

24             MR. MORIARTY:  Objection.  The day of this date

25   or anytime?

1              MR. BUELNA:  Yeah.  I mean generally, I think.

2              THE WITNESS:  Well --

3              Go ahead.

4              MR. MORIARTY:  Is it today or the date of the

5       incident?  That's my question.

6              MR. BUELNA:  Sure.  Let me ask it -- I'll strike

7       it.

8         Q    You would agree that it's important that officers

9       follow their policies within their department; right?

10        A    Yes.

11        Q    That's regardless to what day it is; right?

12        A    I would agree officers are expected to comply

13      with their policies.

14        Q    And those policies are designed to ensure not

15      just officers' safety, but the public safety; right?

16        A    There are guidelines to establish both.  I would

17      agree.

18        Q    Okay.  And one of the -- one of the pieces of

19      equipment that officers in this case were equipped with

20      are body cameras; right?

21        A    Yes.

22        Q    And you agree that it's important that those

23      officers operate those body cameras according -- in

24      accordance with their department policies; right?

25        A    I would agree.

74

1        Q    And you agree that one of the policies that their

2    department had was that they should activate their body

3    cameras when they do enforcement actions; correct?

4        A    Yes.

5        Q    And both officers -- well, one officer

6    acknowledged that he thought he activated his body camera,

7    but it turned out he didn't; right?

8        A    Yes, that is my understanding.

9        Q    The other officer did activate his body camera,

10   but consequently, his body camera was purged; correct?

11       A    Yes.

12       Q    And he watched that body camera that day multiple

13   times; right?

14       A    I believe that's correct.

15       Q    Okay.  You would agree that it's a breach of

16   trust, of professional and public trust, for an officer to

17   intentionally destroy body camera evidence; right?

18       A    I would agree intentionally, yes.

19       Q    As well as to intentionally destroy or cause to

20   be lost Taser use -- Taser logs; correct?

21            MR. MORIARTY:  There's two questions there.

22   Compound.

23            THE WITNESS:  Yes.

24   BY MR. BUELNA:

25       Q    It undermines, you would agree, the trust in both

                                                              75

1    the officers' actions as well as what they purport to say

2    happened; correct?

3            MR. MORIARTY:  Compound.

4            THE WITNESS:  If the officers intentionally did

5    the things that you've asked, yes, I would agree.

6    BY MR. BUELNA:

7       Q    There's also requirements for these officers to

8    report and document their uses of force; right?

9       A    Yes, I agree.

10      Q    Specifically when they cause injury; right?

11      A    I would agree.

12      Q    And you would agree that one injury that's a very

13   serious injury is -- to cause a suspect is a head injury;

14   right?

15      A    Yes.

16      Q    That's something that needs to be documented;

17   right?

18      A    If it's known, yes.

19      Q    Okay.  You agree that these officers already

20   testified that they did know that Mr. Shiflett suffered

21   two brain bleeds; correct?

22      A    At the time of the incident, they knew he had two

23   brain bleeds?  Is that the question?

24      Q    At the time of the incident, they both knew that

25   he suffered a head injury?

                                                                    76

1          MR. MORIARTY:  That's a different question.

2          THE WITNESS:  It is.

3          MR. BUELNA:  That's why I'm augmenting.

4          THE WITNESS:  After the incident, I believe

5    that's accurate.  But at the time that they were dealing

6    and confronting him and handling the situation, no.

7    BY MR. BUELNA:

8         Q    Well, they saw him, and they reported in their

9    reports, they saw him hit his head on the ground; right?

10        A    Yes.

11        Q    So then they did see a head injury while they

12   were -- during the incident?

13        A    Well, they saw him hit his head.  Whether he had

14   an injury or not is subjective.  Did they know he

15   sustained an injury from his head hitting?  I don't

16   believe they knew that for sure.  Did they report that his

17   head hit the ground?  Yes, they did.

18        Q    And part of that is because they're trained to

19   document things like head injuries; right?

20        A    If they know there's a head injury, yes.

21        Q    And shortly after this incident, Defendant

22   Navarro testified that he did know he had a head injury;

23   correct?

24        A    After the incident, yes.

25        Q    Shortly after the incident; right?

                                                              77

1        A    Well, define shortly.  Are you talking at the

2    scene?  Are you talking after he went to the hospital?  I

3    mean, you know that's not a -- not enough information.

4    Did he know after the fact?  Yes.  Did he know at the

5    scene or in that moment?  I don't believe that he did.

6        Q    In -- short enough to where he was -- he told or

7    informed, he testified, his supervisor that Sorrell

8    suffered a head injury?

9        A    I'm aware he informed his supervisor, yes.

10       Q    And officers are -- these officers specifically

11   are trained to inform their supervisors when they use

12   force; right?

13       A    Yes.

14            MR. MORIARTY:  Asked and answered.

15            Go ahead.

16   BY MR. BUELNA:

17       Q    When you -- when officers are trained on

18   conducting detentions where there's multiple people,

19   meaning two, three people they're confronting, are they

20   trained to separate the suspects?

21            MR. MORIARTY:  Objection.  Incomplete

22   hypothetical.

23            THE WITNESS:  Sometimes.

24   BY MR. BUELNA:

25       Q    What's the purpose of doing that?

                                                                    78

1          A    To try and get their story from each one of them

2     and compare.

3          Q    Does it also diminish the likelihood that they

4     could jointly attack the officers, or anything like

5     that?

6          A    It's a possibility.  Again, it depends on the

7     circumstances.  Some officers may do it, some may not.

8     It's a decision.  It's discretionary.  There's no

9     absolute.

10         Q    All right.  At the top -- do you understand that

11    all the -- before I get to that.  All the opinions that --

12    strike that.

13              How many Rule 26 reports do you think you've

14    prepared?

15         A    700.

16         Q    So you understand very well that all the opinions

17    that -- that you're prepared to say at trial as of today

18    are supposed to be contained within your report; right?

19         A    I am aware of that, yes.

20         Q    And that's what you've done here is included the

21    opinions that you're prepared to tell at trial; correct?

22         A    Yes, sir.

23         Q    Okay.  Now, are officers also trained to document

24    if someone has a disability that they encounter in the

25    reports?

79

1       A    It depends.  They may reference that if they're

2    aware of a disability that is relevant to the arrest or

3    the circumstances.

4       Q    Okay.  Is something like having a cognitive

5    impairment after use of force incident something that

6    would be relevant?

7       A    It depends.  Again, if it has relevance to the

8    arrest and the circumstances, maybe.

9       Q    Let me -- let me ask you this:  Let's assume in

10   this incident, it occurred how it occurred as the officers

11   said but the officers knew that Sorrell suffered a

12   cognitive impairment.  Do you think that's something that

13   they should have included in their report?

14            MR. MORIARTY:  Objection.  Vague.  Incomplete

15   hypothetical.

16            THE WITNESS:  If they knew that for sure, they

17   may.  If they are going to detain him pursuant to welfare

18   and institution Code 5150.  If it's applicable to the

19   circumstances, they may include it.  But even learning

20   domain 37 that you've read from indicates individuals with

21   disabilities have the capability to commit crimes, and

22   they will be held accountable for those crimes, hopefully

23   getting them additional resources or help that they may

24   need.  So it depends on whether it's relevant and if, in

25   fact, the officers know that.

80

1    BY MR. BUELNA:

2        Q    I understand.  But you supervised officers;

3    right?

4        A    I have, yes.

5        Q    Hundreds, maybe, officers; right?

6        A    Yes.

7        Q    Keeping the case how it is, meaning the

8    information that you have now all stays the same.  The

9    only thing I want you to add is that the officers,

10   Defendant Navarro and Pantoja, knew that Sorrell had a

11   cognitive impairment.  Do you believe that that is

12   relevant to this case?

13        MR. MORIARTY:  Objection.  Vague.  Vague as to

14   time.  Vague as to all facts.

15        If you can answer that, go ahead.

16        THE WITNESS:  Even committing the crimes, that

17   may not be relevant.  If he committed the crimes so stated

18   in the reports, if he has those impairments, there are

19   other processes to vet that out, and it would not be the

20   officers' responsibility to do so.  Would I expect them to

21   include it in the report?  It depends.  I mean, you're

22   asking a mental health confirmation or a medical

23   confirmation that is an issue regarding the officers'

24   actions here, and it may not be relevant because the

25   individual, even if they have those disabilities, can

81

1    still commit crimes and still be held accountable for

2    them.

3    BY MR. BUELNA:

4        Q    You don't think the cognitive impairment

5    disability would be relevant to, for example, the initial

6    encounter and the exchange?

7        A    Well, it also depends on whether or not the

8    individual is under the influence.  And as you know, as I

9    know, he did have in possession methamphetamines.  And

10   that's one of the other things that the arrest that

11   happened after this is important is it also involved the

12   use of methamphetamines because he had methamphetamines.

13   So based on that, it appears that he consistently uses

14   illegal narcotics which can be contributing to some, if

15   not all of his cognitive issues.  He still has to be

16   accountable for it.  So it really depends.  It's not a

17   mandate.  Is it relevant to preparing the report?  Not

18   necessarily.

19       Q    You're not a medical expert; right?

20       A    Pardon?

21       Q    You're not a medical expert; right?

22       A    Oh, medical.  No.

23       Q    Okay.  You don't have an expert opinion as to how

24   methamphetamines or cognitive impairments interact or

25   manifest themselves --

82

1           (Reporter Clarification.)

2    BY MR. BUELNA:

3      Q    You don't have an opinion as to how

4    methamphetamines in cognitive impairments interact with

5    each other and manifest themselves?

6      A    Well, I'm not going to agree with that

7    specifically.  I am going to agree I'm not a medical

8    expert or have a medical background.  But I'm not going to

9    ignore the fact that I have had contact with thousands of

10   individuals under the influence of methamphetamines, and

11   quite frankly, I have qualified and testified as an expert

12   with respect to 11550, which is Health and Safety Code.

13   So I know what methamphetamine does to an individual.

14           I dealt with thousands of them, not just in the

15   field but from my jail background, having been a deputy, a

16   supervisor and commanding officer and how it affects and

17   influences their ability to make decisions, whether it be

18   cooperative and/or violent or both.

19           So from that perspective, a law enforcement

20   perspective, I do have some expertise, but not from a

21   medical perspective.

22      Q    Sure.  Do the officers know that Mr. Shiflett was

23   high on the encounter?

24      A    I don't believe they had the ability to make that

25   determination yet.

83

Robert Fonzi                                                    February 9, 2024

1      Q    Did they know that he had methamphetamines on

2   him?

3      A    Initially, no.

4      Q    They didn't know that until after the arrest;

5   correct?

6      A    I would agree.

7      Q    Do you know what his methamphetamine levels

8   were?

9      A    Specifically, no.

10     Q    Okay.  Have you ever reviewed any medical records

11  in this case?

12     A    I've been provided them, but I don't dissect them

13  because I'm not a medical person.

14     Q    And so you don't know any of the times when he

15  was tested for methamphetamines what his levels were;

16  right?

17     A    I don't know.

18     Q    You don't know what his tolerance was; right?

19     A    I would agree.

20     Q    Do you know if he was tested after this incident

21  for methamphetamines?

22     A    I don't believe he was arrested for 11550, so I

23  don't believe he was.

24     Q    Do you know if they tested his blood at all

25  afterwards?

                                                                          84

1      A    They may -- the hospital may have.  I would not

2   have reviewed that.

3      Q    You didn't review those records; right?

4      A    Again, I reviewed some, but again, I didn't

5   dissect or go into them from that perspective, so no, I

6   don't know.

7      Q    Do you understand whether or not they ever

8   prosecuted him for these charges?

9      A    No, I don't.

10     Q    All right.  Did you read all the police reports

11  on this?

12     A    Well, I reviewed what was provided.  I mean, I

13  don't control what documents I'm provided.  I have

14  reviewed police reports.

15     Q    Do you recall how -- you reviewed the ones in

16  this incident, right, the police report?

17     A    Yes.

18     Q    Do you recall how he got to the hospital?

19     A    Not specifically, no.

20     Q    Did you read Officer Thompson's report?

21     A    If I was provided it, yes.  He did not -- he was

22  not at the scene involving the use of force.  If I was

23  provided it, I reviewed it, but it's not part of my

24  report.

25     Q    Officer Thompson is a woman, just so you know.  I

85

Robert Fonzi                                                    February 9, 2024

```
 1    don't know if you recall that.

 2         A    I don't know.

 3         Q    Well, you said "he," so that's why.

 4         A    You said he, so I just agreed.

 5         Q    I'll let the record speak for that one.

 6              When someone suffers, for example, a severe

 7    injury at a scene, is it -- is it protocol to call an

 8    ambulance to the scene?

 9         A    Yes.

10         Q    Okay.  For example, suffering a severe head

11    injury or even a Taser discharge requires an ambulance to

12    come; correct?

13         A    I'm sorry.  What?

14         Q    Let me do one question at a time.

15              Suffering severe head injury requires an

16    ambulance to come to the scene; right?

17         A    Medical aid.  I would agree.  Maybe an ambulance,

18    maybe paramedics or fire personnel.  So I would agree,

19    someone medical.

20         Q    And, in fact, when Tasers are used, then there --

21    the prongs actually hit in the dart mode, officers are

22    trained not to remove those prongs and to allow a medical

23    professional to do it; right?

24         A    If they're still inserted, yes, sir.

25         Q    And when people are tased, officers are actually
```

86

1    trained to call the ambulance to the scene, as well;

2    correct?

3         A    Not necessarily.  But many agencies do have a

4    medical personnel that would evaluate them.

5         Q    Okay.  Do you have an understanding that

6    Mr. Shiflett was released from custody at the hospital?

7         A    Yes.

8         Q    Okay.  Meaning the charges weren't brought?

9         A    Well, it doesn't mean they didn't submit for

10   review.  They would have gone what we refer to as long

11   form.

12        Q    But you don't have any records that indicate that

13   he was convicted, charged or prosecuted at all; correct?

14        A    I didn't review the DA's actions in this matter.

15   And if I can correct earlier, I do know how he got to the

16   hospital.  It was Officer Thompson who transported him for

17   medical clearance.

18        Q    Obviously, your curriculum vitae is all true to

19   the best of your knowledge; right?

20        A    Well, I hope so.

21        Q    I could either walk you all through it or I can

22   ask you that question.

23        A    No.  I mean, it's your time.  If you want to walk

24   through it, I would be more than happy to talk about me.

25        Q    It's okay.  I actually think my first deposition

87

1    of you, I did that.  So I'll hold on to that.

2              All right.  Let me go to -- well, on the top of

3    your report, it says, "Attention:  Joanne Tran."

4              Are you familiar with Ms. Tran?

5        A    Only because I believe that's who initially

6    contacted me, and I would have addressed it to her.  Do I

7    know her personally?  No.

8        Q    More of my question is:  Do you know Greg Fox?

9    Do you know Greg Fox?

10       A    I don't recall.  I'm not familiar with his name.

11       Q    So have you ever been retained by his firm,

12   the -- I think it's Fox, Elliot, Bertrand and Osman?

13             MR. MORIARTY:  I think Bertrand is first.

14             MR. BUELNA:  Okay.  Yeah.

15             THE WITNESS:  I believe so, but I just don't

16   remember.  It doesn't stand out, but that doesn't mean

17   they haven't.

18   BY MR. BUELNA:

19       Q    Okay.  What about Mr. Blechman's firm?

20       A    Yes.

21       Q    Approximately how many times?

22       A    Let's see, I'd estimate 10, 15.

23       Q    Okay.  What about -- do you recognize

24   Dale Allen's name?

25       A    Do I recognize his name, yes.

88

1      Q    Have you ever been hired by his firm?

2      A    And the name of his firm?  I don't recall.

3      Q    Allen?

4           MR. MORIARTY:  I'll say it.  Allen Glaessner

5    Hazelwood and Werth.  I'll give you the spellings.

6           THE WITNESS:  I believe so.

7    BY MR. BUELNA:

8      Q    Approximately how many times?

9      A    Just maybe one or two.  It doesn't stand out, but

10   I do recognize the names.

11     Q    Okay.  But what about Mr. Moriarty's firm?  Is

12   this the first case or --

13     A    No.  I think there may be one or two others.

14     Q    Okay.  In the last year?

15     A    Last couple of years.

16     Q    Haven't been open that long, so that's --

17          MR. MORIARTY:  It's going really well.

18   BY MR. BUELNA:

19     Q    Let me -- As opposed to doing this -- I have a

20   list of cases before me that date back five years that are

21   work contained in your report.

22          Understood?

23     A    I follow you.

24     Q    Of those cases, how many would have been for

25   plaintiff's side?

                                                              89

```
1        A    Just a few, if they're listed there.

2        Q    How would I tell the difference?

3        A    You'd have to ask.  You wouldn't know by looking

4    at them.

5        Q    Sure.

6        A    Or look up the case number.

7        Q    Sure.  Let's just take the -- if you want to look

8    on your report at page 42 -- or 43.

9             Are any of those cases -- go ahead and read it.

10   Are any of those cases for the plaintiff?

11       A    I'm sorry.  I'm trying to get to 42.

12       Q    Oh, my God.  It's 43.

13       A    I'm sorry.  43?

14       Q    Yeah.

15       A    Okay.  I'm on 43.  And your question is are any

16   of those plaintiff cases?

17       Q    Correct.

18       A    Let's see.  No.

19       Q    Okay.  Go to 42 and read through the cases and

20   let me know if any of those are plaintiff cases.

21       A    No.

22       Q    Okay.  Go to 41.  Read through the cases and let

23   me know if any of those are plaintiff cases.

24       A    Hold on.  My thing just --

25       Q    Froze.  It's okay.
```

90

1      A    Let me go back to 42 to make sure I believe that

2   my answer is -- 41.  No.

3      Q    All right.  Go to 40.

4      A    No.

5      Q    What percentage of the cases would you say you

6   take on behalf of a plaintiff versus defense?  And when I

7   say plaintiff, defense, I mean plaintiff being someone

8   that's been injured or hurt by the police and defendant

9   being the municipality or the officers.

10     A    I would say that the majority of my cases are

11  defense cases.  So on behalf of a plaintiff, we -- maybe

12  five percent or close to the time I've been involved as an

13  expert.

14     Q    How many cases do you think you've been retained

15  on in total as an expert?

16     A    Oh, as an expert?  A thousand.

17     Q    A thousand.  So when you say three percent, like,

18  what do you mean?  Like, a handful of cases or a dozen

19  cases?

20     A    A handful.

21     Q    Okay.  Which means that for all these police

22  cases, essentially, your opinion is that the officers

23  used, if it's a force case, reasonable force; right?

24     A    Not necessarily.  You know, your question before

25  was how many cases have been -- have I been retained.  And

91

1    I said several thousand.  Let's go with 2,000, just for

2    the sake of the conversation here.  Of those 2,000, I've

3    had cases where I've been contacted and retained by

4    defense and my opinions were that the officer's actions

5    were not reasonable and/or the force was excessive.  And,

6    of course, those cases are settled.  They don't call me to

7    trial or deposition.  So those cases resolve themselves by

8    themselves.

9            So I don't control when I'm called to testify or

10   not.  I don't -- I'm not retained to give them the

11   opinions they want to hear.  I give them -- I'm retained

12   to give them the opinions that I'm prepared to offer based

13   on my expertise.  Whether they want to use them or not is

14   their choice.

15       Q    Looking at page 40, there's a case right there

16   about halfway through the page, it says it's Atienza

17   versus the town of Danville.

18            (Reporter Clarification)

19   BY MR. BUELNA:

20       Q    A-t-i-e-n-z-a versus town of Danville.

21            Do you see that case?

22       A    I do.

23       Q    And you testified at deposition; is that right?

24       A    I did.

25       Q    And in that case, your opinion was officers used

92

1    reasonable force; right?

2        A    I don't remember the facts of the case.  Some of

3    these are force cases, some of them are not.  This is in

4    2021.  I really don't remember the case, to be honest with

5    you.

6        Q    Do you know where the city of Danville is?

7        A    I don't.  I believe it's in Northern or Central

8    California.

9        Q    I'll give you some of the facts of that case.  It

10   was an officer ended up shooting a mentally ill person

11   that was driving, weaving his car, essentially, through an

12   intersection.

13           In your opinion, I know because I deposed you, is

14   that the force was reasonable.

15           Does that sound familiar to you?

16       A    No.  I wouldn't dispute it.  I mean, I just don't

17   remember the case.

18       Q    Sure.  The officer that you were retained to

19   defend --

20           THE REPORTER:  Slow it down.

21           MR. BUELNA:  Sure.

22       Q    The officer that you were retained to defend was

23   Andrew Paul.

24           Are you familiar with his name?

25       A    No.  And I'm not retained to defend officers.

Robert Fonzi                                                      February 9, 2024

1    I'm retained to offer opinions based on my expertise.

2        Q    Okay.  And are you aware that Andrew Hall,

3    following your deposition, was convicted for his use of

4    force in that case?  Meaning, he went to criminal court,

5    got convicted for assault with a deadly weapon, or

6    something to that effect.

7        A    I don't -- I don't recall anything about the

8    case.

9        Q    Will it surprise you that an officer for whom you

10   said the force was reasonable was later convicted for that

11   same incident?

12           MR. MORIARTY:  Slightly argumentative.

13           But go ahead and answer.

14           THE WITNESS:  You know, criminal and civil are

15   far different, as you know.  I don't control all the facts

16   that may have been presented in either one of the

17   situations.  I'm basing my opinions on what I was

18   provided.  So am I surprised that there may be different

19   outcomes in different arenas?  No.

20   BY MR. BUELNA:

21       Q    Were you aware of the settlement of

22   Andrew Hall?

23           MR. MORIARTY:  Sorry.  Relevance.

24           Go ahead and answer.  I have no idea where this

25   is going.

                                                              94

```
 1              Go ahead.

 2     BY MR. BUELNA:

 3         Q    Does it surprise you that it was for $4.9

 4     million?

 5         A    If your question was do I know, and then now

 6     you're asking if I'm surprised, I don't remember any of

 7     the facts.  So I -- I don't know.

 8         Q    How much have you charged, or invoiced, take the

 9     higher, to date in this case?

10         A    I only -- I believe the only thing I've invoiced

11     is my retainer, which would have been 12,000.

12         Q    Attached to your report, pages 45 through 49, is

13     a breakdown of kind of force options; right?

14         A    Well, it's a little more than that, but yes, it

15     does have a breakdown.

16         Q    And it's partly borrowed from the learning

17     domains; right?

18         A    Yes.

19         Q    Now, under moderate levels of force, which is 47,

20     you included impact weapons and Taser, ECD; right?

21         A    Yes.

22              (Reporter Clarification.)

23              MR. BUELNA:  Yeah, ECD.

24         Q    Which stands for Electronically Conducted Device;

25     right?
```

                                                                95

Robert Fonzi                                                    February 9, 2024

1         A    Yes.

2         Q    You'd agree, however, an improperly used moderate

3    level of force can turn deadly; right?

4         A    Could they potentially, yes.

5         Q    For example, if you strike someone repeatedly in

6    the head with a baton, that could be deadly; right?

7         A    Yes, I would agree.

8         Q    And if you Taser someone in an inappropriate

9    location repeatedly, continuously, that could be deadly;

10   right?

11        A    I would agree.

12        Q    Officers are trained, obviously, to avoid doing

13   both of those things; right?

14        A    Yes.

15             MR. BUELNA:  Okay.  Give me -- go off the record

16   for a like three minutes, and I'll think if I have

17   anything else.  Otherwise, I'll get you out of here.

18             (A break was taken.)

19   BY MR. BUELNA:

20        Q    So in your opinion, then, given that you believe

21   that they had a reasonable suspicion to initiate a stop,

22   that means if Sorrell had run away from the conversation

23   at any point, that would have justified a 148; right?

24        A    Yes.

25        Q    Okay.  You also don't believe that the reasonable

1    suspicion had dissipated based off the answers that

2    Sorrell and his cousin provided to the officers; right?

3        A    In that small moment of time, I don't believe

4    that.  I don't believe it did.

5        Q    Because answers to an officer's investigative

6    questions can dissipate the reasonable suspicion; right?

7        A    It could.  And answer to one question, probably

8    not.  It requires them to look into the call for service

9    and then determine what they're doing or why they're there

10   in that brief moment.

11       Q    And for example, looking for a friend's house on

12   Kelly Avenue was insufficient to dissipate their

13   reasonable suspicion; right?

14            MR. MORIARTY:  Objection.  Incomplete

15   hypothetical.

16            THE WITNESS:  Not necessarily.

17            MR. BUELNA:  All right.  Well, I can't think of

18   any other questions.  So that's my last one.

19            All right.  Thank you for coming in and

20   testifying, Mr. Fonzi.

21            MR. BLECHMAN:  I have a few questions for the

22   witness.

23            MR. BUELNA:  Oh, go ahead.

24            MR. BLECHMAN:  Just kidding.

25            MR. BUELNA:  All right.  Go off the record.

                                                          97

1         THE REPORTER:  Mr. Moriarty, did you want to

2    purchase a copy of the transcript?

3         MR. MORIARTY:  Yes.  Digital.

4         MR. BUELNA:  Okay.  Off the record.

5         (A discussion was held off the record.)

6    BY MR. BUELNA:

7    Q    So we have been going for about two and a half

8    hours.

9    A    Yes.

10   Q    How much do I owe you?

11   A    1750.

12   Q    Okay.  Great.  So we use --

13        MR. BUELNA:  Off record.  We're good.

14        (The deposition proceedings

15        were concluded at 1:19 p.m.)

16                    -oOo-

17

18

19

20

21

22

23

24

25

                                                              98

1                        PENALTY OF PERJURY CERTIFICATE

2

3

4                        I hereby declare I am the deponent in the

5      matter within, that I have read the foregoing transcript

6      and know the contents thereof; that I declare that the

7      same is true of my knowledge, except as to the matters

8      which are therein stated upon my information or belief,

9      and as to those matters, I believe them to be true.

10                       I declare being aware of the penalties of

11     perjury; that the foregoing answers are true and correct.

12

13

14

15                       Executed on the _____ day of _____,

16     2024, at _____ California.

17

18

19                                      _____

20                                           Robert Fonzi

21

22

23

24

25

                                                                          99

```
 1                    REPORTER'S CERTIFICATE

 2   STATE OF CALIFORNIA        )
                                )  ss.
 3   COUNTY OF SAN BERNARDINO    )

 4

 5               I, DONNA BALL, do certify:

 6               That I am a duly qualified Certified

 7   Shorthand Reporter, in and for the State of California,

 8   holder of certificate number 11191, which is in full force

 9   and effect and that I am authorized to administer oaths

10   and affirmations;

11               That the foregoing deposition testimony of

12   the herein named witness was taken before me at the time

13   and place herein set forth;

14               That prior to being examined, the witness

15   named in the foregoing deposition, was duly sworn or

16   affirmed by me, to testify the truth, the whole truth, and

17   nothing but the truth;

18               That the testimony of the witness and all

19   objections made at the time of the examination were

20   recorded stenographically by me, and were thereafter

21   transcribed under my direction and supervision;

22               That the foregoing pages contain a full,

23   true and accurate record of the proceedings and testimony

24   to the best of my skill and ability;

25
```

                                                        100

1            I further certify that I am not a relative

2    or employee or attorney or counsel of any of the parties,

3    nor am I a relative or employee of such attorney or

4    counsel, nor am I financially interested in the outcome of

5    this action.

6

7            IN WITNESS WHEREOF, I have subscribed my

8    name this 6th Day of March, 2024.

9

10

11    _____

                 DONNA BALL, CSR NO. 11191
12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                            101

Robert Fonzi                                                    February 9, 2024

```
 1                          ERRATA SHEET

 2

 3        If any corrections to your deposition are necessary,
          indicate them on this sheet, giving the change, page
 4        number, line number and reason for change.

 5        PAGE  LINE  FROM                    TO

 6        _____ _____ _____     _____

 7        Reason _____

 8        _____ _____ _____     _____

 9        Reason _____

10        _____ _____ _____     _____

11        Reason _____

12        _____ _____ _____     _____

13        Reason _____

14        _____ _____ _____     _____

15        Reason _____

16        _____ _____ _____     _____

17        Reason _____

18        _____ _____ _____     _____

19        Reason _____

20        _____ _____ _____     _____

21        Reason _____

22        _____ _____ _____     _____

23        Reason _____

24

          _____     _____
25        Signature of Deponent                Date
```

102

Robert Fonzi                                                                    February 9, 2024

## $

**$4.9** 95:3

## &

**&** 3:5,17

## *

**\*\*\*** 5:3

## 1

**1** 4:11 6:3,11 11:7

**1:19** 2:16 98:15

**10** 33:2 69:6 88:22

**100** 2:15 21:3 43:22

**11** 4:11

**11:05** 2:16 5:1

**11:57** 45:1

**11191** 1:24 2:18 100:8 101:11

**11550** 83:12 84:22

**11th** 6:3

**12,000** 95:11

**1408** 27:10

**148** 70:4,10 96:23

**15** 33:2 35:7 88:22

**155** 3:6

**17** 6:7

**1750** 98:11

**17-foot** 68:10

## 2

**2** 4:13 17:19,21 46:1,6 50:13,25 69:9

**2,000** 92:1,2

**2:00** 18:15,21

**2:18** 15:14

**2:22:02** 27:19

**20** 33:2 35:7 50:15

**2019** 15:13

**2021** 93:4

**2023** 4:12 6:3

**2024** 1:16 2:17 5:1 99:16 101:8

**208** 3:7

**20-foot** 68:10

**21** 68:17,18,22

**213-4098** 3:14

**21-foot** 68:13

**250** 3:19

**26** 7:8 79:13

**290398** 1:25

## 3

**3** 7:11 69:8 70:2

**3:21-CV-07802-LB** 1:6 2:6

**3200** 2:14

**3480** 3:19

**37** 4:13 46:4,5,19 47:7,22 48:11 80:20

## 4

**4** 7:11 10:18 71:23

**40** 91:3 92:15

**40-passenger** 31:5

**41** 90:22 91:2

**415** 3:14

**42** 90:8,11,19 91:1

**43** 90:8,12,13,15

**45** 4:13 95:12

**47** 95:19

**49** 95:12

## 5

**5** 11:8

**510** 3:8

**5150** 80:18

## 6

**6** 4:11 10:19

**6th** 15:13 101:8

## 7

**7** 70:2

**700** 79:15

**75** 3:13

## 8

**8** 71:4

## 9

**9** 1:16 2:17 5:1

**9-1** 20:19

**9-1-1** 7:23 20:21 21:1,8 21:23 26:12

**91761** 2:15

**925** 3:20

**929-5400** 3:8

**939-5330** 3:20

**94015** 3:13

**94523** 3:20

**94607** 3:7

## A

**a.m** 2:16 5:1 18:15,21

**abiding** 30:15

**ability** 26:13 33:22 57:25 68:14,15,20 83:17,24 100:24

**able** 7:2 26:23 55:2

**about** 8:20,23 13:8 16:16 21:14 22:1 27:22 37:19 41:5 43:19 47:25 53:22 63:22 64:20,21 68:17 70:22 87:24 88:19,23 89:11 92:16 94:7 98:7

**above** 50:25

**absolute** 79:9

**accept** 19:19

**accepted** 28:5,22 30:14

**accordance** 25:10 74:24

**according** 74:23

**accountable** 80:22 82:1 82:16

**accurate** 23:25 39:15 77:5 100:23

**accurately** 38:10

**acknowledged** 75:6

**acknowledges** 34:14,17

**acknowledging** 34:15

**acquire** 12:7

**acquired** 11:24 27:24 61:8

**act** 13:8,9 23:1,20 26:20 26:25 41:19 52:8

**acting** 15:15,18 16:25 17:5,16 18:18 69:24

**action** 101:5

**actions** 9:2,3 10:16 52:6 75:3 76:1 81:24 87:14 92:4

**activate** 73:22 75:2,9

**activated** 75:6

**active** 55:3

**actively** 66:14

**activities** 67:10

**actual** 29:9

**actually** 12:4 63:9 86:21 86:25 87:25

**add** 81:9

**addition** 47:18

**additional** 7:18,23 15:20 15:23 36:4 61:7 80:23

**additionally** 70:13

**address** 27:2,6,10,11,15 27:19,21 34:12 50:8

**addressed** 88:6

**adjust** 51:9

**administer** 100:9

**admitted** 56:11

**admittedly** 71:20

**admonitions** 5:16

Robert Fonzi                                                                                   February 9, 2024

**adults** 20:7

**advantage** 44:14,17

**affect** 10:9

**affected** 51:5

**affects** 83:16

**affirmations** 100:10

**affirmed** 100:16

**after** 9:7,10 28:19 45:5
  63:5 69:17,22 77:4,21
  77:24,25 78:2,4 80:5
  82:11 84:4,20

**afternoon** 17:19

**afterwards** 84:25

**again** 17:18 18:2 28:12
  32:16 48:10 59:2 61:19
  61:23 66:13 79:6 80:7
  85:4

**against** 61:5

**age** 73:20

**agencies** 87:3

**ages** 31:1

**ago** 37:7 49:17

**agree** 8:25 9:10 10:17
  11:6 13:11 14:21,25
  15:4 16:24 19:16 20:4
  20:17 21:17,22 26:2
  28:3,25 29:8,12,22
  30:21 31:6,11 37:10,14
  38:13 41:20 43:24 44:16
  45:6,24 46:8,12,25
  47:21 48:10 49:4,5 50:3
  50:10 51:19 52:7,20,24
  53:8,11,14,15 55:17
  56:4,7 58:20 59:3,16,22
  62:21 64:1 65:16,19,22
  65:24,25 66:11,15,21
  67:18 68:1,9 70:9,12,21
  71:18,22 72:21 73:1,4
  73:20 74:8,12,17,22,25
  75:1,15,18,25 76:5,9,11
  76:12,19 83:6,7 84:6,19
  86:17,18 96:2,7,11

**agreed** 24:19 86:4

**agreements** 56:7

**ahead** 10:6 12:18 14:3
  19:1 20:15 26:8 28:10
  32:5,9,22,24 33:12

34:25 38:7,23 40:24
  42:3 43:5 51:17 59:15
  74:3 78:15 81:15 90:9
  94:13,24 95:1 97:23

**aid** 86:17

**alert** 59:7

**all** 5:10 6:13 9:12,24
  10:18 11:1,18 13:5
  15:16 17:13,23 19:10
  24:15 25:4,5 31:5,7
  34:22 37:21 40:20 45:4
  49:7 50:3,16 56:5,18,22
  62:12 66:1,2,3,10,13
  70:2 71:1,5 79:10,11,16
  81:8,14 82:15 84:24
  85:10 87:13,18,21 88:2
  91:3,21 94:15 97:17,19
  97:25 100:18

**alleged** 68:14

**allegedly** 57:4

**Allen** 89:3,4

**Allen's** 88:24

**allow** 31:6 39:19 40:11
  51:11 53:12 60:22 86:22

**allowed** 19:11,17,20

**allows** 37:9

**Almost** 56:22

**alone** 23:24

**already** 21:21 41:3 62:2
  76:19

**also** 3:23 21:25 23:15
  28:8 30:17 38:4 45:22
  47:8,19 48:15 49:22
  51:22,23 52:5,16 53:16
  58:22 62:23 65:25 66:6
  70:3 72:18 76:7 79:3,23
  82:7,11 96:25

**alter** 10:9

**always** 26:23 67:15

**am** 8:10 10:2 25:22 49:13
  55:23 60:5,10 79:19
  83:7 94:18 99:4 100:6,9
  101:1,3,4

**AMBACHER** 3:17

**ambulance** 86:8,11,16,17
  87:1

**Amendment** 55:10,16,20

**amongst** 71:12

**and/or** 26:11 83:18 92:5

**Andrew** 93:23 94:2,22

**another** 10:8 18:14 48:2
  59:21 61:10 62:4 67:4

**answer** 10:6 12:18 16:19
  16:21 19:1 22:25 28:10
  29:11 32:9,25 33:12
  38:7 39:9,22 40:2 42:4
  42:10,13,14,19,20,22
  46:22 59:15,23 61:17
  81:15 91:2 94:13,24
  97:7

**answered** 4:19 22:4 42:2
  42:12 78:14

**answering** 45:20 46:15

**answers** 16:15 46:17 97:1
  97:5 99:11

**Anthony** 3:16

**any** 6:24,25 7:9 10:10
  14:21,22 15:5,20 20:1
  23:19 25:20 30:9 37:13
  37:15 41:19 53:15 56:10
  56:19 57:22 61:5 71:21
  84:10,14 87:12 90:9,10
  90:15,20,23 95:6 96:23
  97:18 101:2 102:3

**anyone** 30:4 41:9 68:8

**anything** 14:8,9 18:5 35:8
  37:13 67:24 68:4 79:4
  94:7 96:17

**anytime** 55:11 73:25

**anyway** 37:6 43:25 50:7
  61:24

**apologize** 36:15

**appear** 6:9 48:8 53:17

**APPEARANCES** 3:1

**appears** 67:5 82:13

**applicable** 80:18

**application** 29:17

**applying** 29:6,7,10

**approach** 19:18 32:15
  52:23

**appropriate** 16:19 33:20
  35:11,20 38:16 41:12
  44:22,24 52:10,13 59:24

**appropriately** 68:16

**approximately** 5:18
  15:13 69:2 88:21 89:8

**area** 21:21 29:22 30:4,5
  30:21 31:5,7 37:19

**areas** 7:6 8:11 49:16

**arenas** 94:19

**aren't** 34:20 67:15

**arguing** 42:24

**argumentative** 43:4
  94:12

**armed** 59:7 60:25 63:17
  64:17 68:14

**arms** 60:7 61:9

**around** 17:8 43:21 54:15
  56:23 60:12 67:11

**arrest** 7:21,23 8:8 9:8,13
  9:25 10:13 70:4,14 71:2
  80:2,8 82:10 84:4

**arrested** 84:22

**arrests** 8:17

**arrived** 23:3 53:23

**arriving** 26:24 60:15,19

**articulable** 14:11,18,19
  15:18 16:25

**articulated** 41:3

**arts** 54:15

**ask** 5:18 6:23 7:3 16:2
  28:11,19 33:24 37:19
  40:6,8,12,17,25 53:2
  64:2 66:25 74:6 80:9
  87:22 90:3

**asked** 8:2,9 22:3,4,6,11
  22:16 24:18 42:2,12,16
  54:8 56:10 76:5 78:14

**asking** 9:6 15:24 29:8
  34:13 35:1,6,7 36:7
  40:10,16 47:23 49:25
  50:16 81:22 95:6

**asks** 13:10 33:19

**aspect** 73:19

**assault** 64:15 94:5

**assaultive** 71:11

**assert** 41:14

Robert Fonzi                                                                February 9, 2024

**assertion** 26:4

**asserts** 41:10

**assignment** 6:18,19 7:9

**assist** 60:15

**assume** 14:5 37:20 58:6,8
58:16 60:25 66:1,2
72:22 80:9

**assuming** 61:14 72:18

**Atienza** 92:16

**A-t-i-e-n-z-a** 92:20

**attach** 46:1

**attached** 51:1 55:6 95:12

**attack** 68:14,20 79:4

**attempted** 56:24

**attention** 47:9 48:3,7
60:23 88:3

**attire** 17:22

**attorney** 16:12,13,15
101:2,3

**augmenting** 77:3

**authority** 33:9,14,15,18
38:13,14 41:11,14 64:23

**authorized** 100:9

**availability** 6:23

**available** 7:1 8:18 10:14
12:12 22:7 25:17 31:8

**Avenue** 3:13,19 27:11
97:12

**avoid** 34:8,20 35:2 96:12

**aware** 57:11 59:6 78:9
79:19 80:2 94:2,21
99:10

**away** 34:15 35:8 59:5
60:23 65:17,20,23 66:3
68:18,22,24 96:22

### B

**back** 12:9 42:16,21 45:4
53:20 56:24 60:8,13
61:10 66:7 69:5 73:17
89:20 91:1

**background** 83:8,15

**backup** 60:14

**badge** 33:15 48:9

**bags** 20:8,12 22:22,24
23:1 30:13 31:1

**Ball** 1:24 2:17 100:5
101:11

**barring** 53:15

**base** 12:12

**based** 11:9 14:8,14 23:9
23:23 24:17,21 25:16
36:4 51:19 58:2,4,11,16
59:22 61:1 66:10,13
68:13 69:12 70:7 72:20
73:4 82:13 92:12 94:1
97:1

**basic** 31:1

**basically** 23:5 56:8

**basing** 94:17

**basis** 17:17 22:10 37:4
39:12

**bathroom** 44:23

**baton** 34:3 58:8 66:9 72:1
73:3 96:6

**bearing** 9:17

**because** 12:10 13:17 15:5
16:7,11 17:11 19:19
20:1 24:24 26:10 30:20
32:3 37:19 39:3,23 48:8
50:5 55:18 60:3 62:11
63:7,24 68:6 71:15
77:18 81:24 82:12 84:13
88:5 93:13 97:5

**become** 41:15

**been** 5:5,21 7:5 25:21
41:5,19 48:22 63:10
71:9 83:15 84:12 88:11
89:1,16,24 91:8,12,14
91:25 92:3 94:16 95:11
98:7

**before** 2:17 5:24 23:6,9
29:9 41:25 46:3 60:12
64:8 68:15,21 79:11
89:20 91:24 100:12

**begin** 37:14 56:25

**beginning** 2:15 73:15

**behalf** 2:13 91:6,11

**behavior** 45:7 51:9,12
52:11 71:11

**behavioral** 45:7 46:10
47:1 49:9 51:3,4

**behaviors** 9:18 45:11

**behind** 56:24 60:7,13
61:9

**being** 24:7 25:21 46:10
50:4 51:7 68:13 73:1
91:7,9 99:10 100:14

**belief** 99:8

**believe** 11:22 22:16 24:7
27:4 30:13 33:4,19 37:1
41:4 47:2 51:5,9 53:21
58:16 64:6 71:1 75:14
77:4,16 78:5 81:11
83:24 84:22,23 88:5,15
89:6 91:1 93:7 95:10
96:20,25 97:3,4 99:9

**believed** 23:23

**believes** 52:19

**belly** 60:11

**belt** 54:15

**BERNARDINO** 100:3

**Bertrand** 88:12,13

**best** 39:22 40:3 87:19
100:24

**Better** 62:20

**between** 52:10

**bicycle** 65:23

**big** 44:16

**bit** 19:23 30:10 64:21

**bite** 39:20

**bites** 16:3,6,7

**black** 54:15

**blades** 70:20

**blanket** 30:22

**BLECHMAN** 3:18 18:4
18:7,11 97:21,24

**Blechman's** 88:19

**bleeds** 76:21,23

**block** 18:17,21 30:23

**blood** 84:24

**body** 73:21 74:20,23 75:2

75:6,9,10,12,17

**body-worn** 73:6,9,13

**booking** 7:24

**borrowed** 95:16

**both** 8:16 22:22 71:19
74:16 75:5,25 76:24
83:18 96:13

**boundaries** 52:13

**box** 50:15

**brain** 76:21,23

**Brandt** 57:8,10

**B-r-a-n-d-t** 57:10

**Brandt's** 57:13

**breach** 75:15

**break** 44:24 45:3,5 96:18

**breakdown** 95:13,15

**brief** 45:5 64:14 97:10

**briefly** 46:4

**brought** 87:8

**BUELNA** 3:5 4:6 5:9
6:12 8:22 10:11 13:13
14:4 16:23 17:4 18:6,8
18:13 19:9 21:10 22:12
23:21 25:8 26:1 27:1,9
27:13 28:20 31:10,22
32:2,11,18 33:6 34:6,19
35:12,23 36:6,16,24
38:17 39:2 40:4,10,13
40:18 41:13,21 42:6,8
43:1,8,10,16 45:4,18
46:7 48:1,6,24 49:1
50:21 51:21 57:10,12
59:11,19 62:1,9,22 63:3
69:2,7,19 72:6,10,12
73:8 74:1,6 75:24 76:6
77:3,7 78:16,24 81:1
82:3 83:2 88:14,18 89:7
89:18 92:19 93:21 94:20
95:2,23 96:15,19 97:17
97:23,25 98:4,6,13

**bulge** 14:9

**bullet** 11:21,24 12:1
15:12 16:1,9 20:6 22:18
23:3,6 49:15,23 65:5
66:10

**bulletins** 11:21 71:5

Robert Fonzi                                                                                         February 9, 2024

**burglaries** 20:21 21:2,9 21:15 22:1,13

**bus** 31:4,5

**business** 33:16

**Buskirk** 3:19

## C

**CAD** 21:4,6,11,15,17,24 23:15 25:12 27:6,14,17 28:1

**C-A-D** 21:6

**calculation** 9:14

**CALIFORNIA** 1:2,15 2:2,15 3:7,13,20 5:2 70:23 93:8 99:16 100:2 100:7

**call** 9:18 11:15 13:2 15:15 17:6 41:19 57:16 58:16 69:23 86:7 87:1 92:6 97:8

**called** 26:24 92:9

**caller** 20:21 21:1,8,23 26:12

**calls** 7:23 26:6 28:9 30:17 68:12

**calm** 37:9 52:23

**camera** 75:6,9,10,12,17

**cameras** 73:6,9,13,21 74:20,23 75:3

**can** 6:4 7:6,20 9:3,6 13:2 13:3 14:1,11,16,22 15:6 15:8,9 18:10 19:10,11 19:15,25 20:2 28:18 29:6,13,23 30:3 31:3 32:19,20 33:17,25 36:9 36:17,19 37:20,22 38:21 39:14 40:3 41:7,8,22 42:10,16 43:11,22 45:23 46:4,14 47:2,23 48:4 50:11 61:17 64:20 65:16 68:21 81:15,25 82:14 87:15,21 96:3 97:6

**cannot** 28:4,22

**can't** 8:19 12:12 14:10 15:8 16:3 18:4 21:18 30:22 35:24 42:20 50:23 61:4 97:17

**capability** 73:17 80:21

**car** 33:15 35:8 63:13 64:18 93:11

**careful** 67:22

**carefully** 36:7

**carrying** 13:4 20:7,11 22:22,24 23:1 30:13 31:1

**case** 5:23 6:18 7:4,12 10:22,25 25:22 39:16,24 55:13,15 56:5 72:15 74:19 81:7,12 84:11 89:12 90:6 91:23 92:15 92:21,25 93:2,4,9,17 94:4,8 95:9

**cases** 55:24,25 56:14 67:18 72:13 89:20,24 90:9,10,16,19,20,22,23 91:5,10,11,14,18,19,22 91:25 92:3,6,7 93:3

**cast** 28:5,23 30:3,14,22

**CASTILLO** 3:11

**casting** 29:5,22

**categories** 8:12 10:1

**cause** 38:21 68:15 70:4,13 70:14,24 75:19 76:10,13

**Central** 93:7

**certain** 10:1 16:1 35:14 38:5 45:7

**certainly** 17:9 19:3 24:10 27:18 73:6

**certificate** 99:1 100:1,8

**Certified** 2:17 100:6

**certify** 100:5 101:1

**challenges** 44:12 50:2

**change** 10:9 42:17 102:3 102:4

**changing** 19:22 26:23

**charge** 73:22

**charged** 87:13 95:8

**charges** 85:8 87:8

**charging** 64:3

**charts** 11:3

**chased** 65:9

**chasing** 63:5,10

**check** 27:5 50:16 55:2

**check-off** 50:15

**cherry-picking** 16:1,16

**cherry-picks** 16:12

**choice** 14:23 92:14

**chooses** 14:23 41:9

**chose** 24:2

**circumstances** 9:5 18:3 24:11 50:9 53:15 60:22 61:19 64:14 67:8 70:25 72:16,21 79:7 80:3,8,19

**citizen** 38:25 39:3

**city** 1:7 2:7 3:13 30:23 93:6

**civil** 94:14

**Clarification** 8:21 21:5 27:7 28:16 32:6 57:9 73:7 83:1 92:18 95:22

**clarify** 32:20

**CLARK** 3:24

**clear** 15:1 16:3 20:3 21:3 33:18

**clearance** 87:17

**clearly** 53:6

**client** 40:19

**close** 11:13 48:4 59:6,21 91:12

**clothing** 17:23

**cloudy** 39:17

**Code** 70:4 80:18 83:12

**cognitive** 44:5,8 48:19 80:4,12 81:11 82:4,15 82:24 83:4

**colon** 11:17,20 70:25

**come** 42:21 62:4 86:12,16

**comes** 67:16

**comfortable** 5:17

**coming** 54:8 59:5,20 63:7 97:19

**command** 73:14

**commanding** 83:16

**commands** 38:21 43:13 71:25

**commercial** 17:8

**commit** 13:8 80:21 82:1

**committed** 25:21 41:5 66:16 81:17

**committing** 81:16

**communicate** 35:4 58:22 59:25 62:15 63:12,14

**communicated** 63:16

**communication** 45:12,16 45:19 46:9,13

**compare** 79:2

**compel** 42:21

**compensation** 11:3

**competent** 12:20

**competently** 38:10

**complaint** 7:6

**completely** 49:12

**completeness** 16:14

**compliance** 35:4 37:8 38:15 50:8

**compliant** 24:20 44:9,11 48:15,22,23,24 49:5 50:5,7

**comply** 74:12

**compound** 12:17,19 51:15 61:16 75:22 76:3

**computer-automated** 21:11

**conceal** 17:24

**concept** 29:7,9,16

**concepts** 15:2

**concept's** 29:16

**concern** 57:24,25

**concluded** 98:15

**conclusion** 26:7 28:9 30:17

**conduct** 11:12 12:2,4,5 69:10

**conducted** 55:1 72:2,3

Robert Fonzi                                                                    February 9, 2024

95:24

**conducting** 34:21 65:15
78:18

**confess** 48:17,23

**confirm** 55:2

**confirmation** 81:22,23

**conflict** 7:3

**confrontation** 24:6

**confronted** 49:19

**confronting** 77:6 78:19

**connect** 9:20

**connecting** 9:18

**consensual** 15:3,6 19:12
24:2,10 32:13 33:8,17
34:8,21 35:15,24 36:3,8
36:19 37:4,5 41:8,11,15
41:23 42:10 43:12 65:15
65:17 69:11

**consensually** 31:24

**consent** 33:19,20 34:13
34:16,18 35:10,22 56:18
69:14

**consequences** 52:6

**consequently** 75:10

**consider** 24:9 31:12,18

**consideration** 18:1 21:8
24:15

**considerations** 45:23

**considered** 30:13 34:5,18

**consistent** 13:11

**consistently** 82:13

**Consulting** 4:11

**contact** 14:22 19:5,15
23:7,10 24:2,17 25:18
25:20,24 37:3 38:13
41:2,8 52:17 58:15 61:8
67:8 69:17,22 83:9

**contacted** 6:19 23:3 53:23
55:11 88:6 92:3

**contain** 35:19 100:22

**contained** 23:14 79:18
89:21

**containing** 39:11

**contains** 11:21

**contents** 99:6

**context** 17:6,10 30:1,9
31:8 33:3 39:12,21 42:1
42:4,9,13,18 49:25
58:15 59:18 61:21,22
67:5,8

**continued** 65:11

**continuously** 96:9

**contraband** 12:11,14

**contradictory** 49:6

**contribute** 13:5

**contributing** 15:22 82:14

**control** 8:10 60:24 72:1
85:13 92:9 94:15

**conversation** 6:22 19:11
19:25 20:5 92:2 96:22

**convert** 15:7 35:25 36:9
36:19 41:23 42:10 43:12

**converting** 34:8

**convicted** 87:13 94:3,5,10

**cooperating** 24:4,6 34:1

**cooperative** 83:18

**copy** 5:23 98:2

**correct** 7:14,17 8:3,4,6,13
9:1 11:18 20:12 21:12
22:2,14,24 24:8 25:13
46:18,20,23 48:17 52:6
52:8,11,14,18,23 53:3,7
53:10 55:14 57:19 58:5
68:23 69:25 70:5,18
72:17,23 75:3,10,14,20
76:2,21 77:23 79:21
84:5 86:12 87:2,13,15
90:17 99:11

**corrected** 72:7

**corrections** 102:3

**correctly** 7:22 15:16 20:9
20:24 28:13 54:5,11,17
54:20,24 55:4 56:12,20
57:1 65:7,12

**corroborate** 10:1,7

**Corroborative** 10:5

**costume** 18:20

**counsel** 101:2,4

**COUNTY** 100:3

**couple** 89:15

**course** 7:3,7,25 9:5 15:22
19:25 22:4 92:6

**court** 1:1 2:1 94:4

**court's** 26:16

**cousin** 57:6 97:2

**covers** 47:1

**create** 31:19

**credibility** 26:13,22

**crime** 12:25 20:11 22:23
25:25 37:20 41:5 66:17

**crimes** 25:20 38:11 80:21
80:22 81:16,17 82:1

**criminal** 13:8,9 23:1,20
26:20 41:19 94:4,14

**critical** 37:8

**crowd** 32:14,16

**crying** 62:3

**CSR** 1:24 101:11

**cues** 45:7 51:4

**cuffs** 61:3

**curriculum** 11:2 87:18

**custody** 87:6

# D

**D** 4:1 72:5,11

**dagger** 70:14

**Dale** 88:24

**Daly** 3:13

**danger** 67:16

**DANIEL** 3:12

**Danville** 92:17,20 93:6

**dark** 17:23

**dart** 86:21

**DA's** 87:14

**date** 7:9 73:24 74:4 89:20
95:9 102:25

**dated** 4:11 6:3

**dates** 6:24

**David** 69:17,22

**day** 13:3 17:8 25:4,5
73:20,24 74:11 75:12
99:15 101:8

**deadly** 64:5,9,15,24 94:5
96:3,6,9

**dealing** 67:4 77:5

**dealt** 60:11 83:14

**death** 64:7

**decide** 68:19

**decision** 9:21,22,23 37:7
79:8

**decisions** 9:11 83:17

**declare** 99:4,6,10

**deemed** 17:24 34:4

**defend** 68:16 93:19,22,25

**defendant** 3:10,16 77:21
81:10 91:8

**Defendants** 1:8 2:8

**defendant's** 56:1

**defense** 91:6,7,11 92:4

**define** 78:1

**defined** 14:24

**demeanor** 13:4

**department** 73:13 74:9
74:24 75:2

**depend** 61:18,23

**depending** 9:4 15:10

**depends** 15:20 17:6,18
18:2 31:7 33:3,24 37:3
38:24 61:20,22 63:9
67:7 79:6 80:1,7,24
81:21 82:7,16

**deployed** 72:21

**deponent** 99:4 102:25

**deposed** 93:13

**deposition** 1:14 2:13 5:19
22:11 51:1 57:14 71:15
87:25 92:7,23 94:3
98:14 100:11,15 102:3

**depositions** 22:1

**deputy** 83:15

Robert Fonzi                                                                    February 9, 2024

**described** 20:7 71:10 72:25 73:23

**description** 4:10 43:23

**descriptions** 29:5 30:6

**designation** 49:18

**designed** 74:14

**destroy** 75:17,19

**detain** 11:13 14:20 23:17 25:24 26:17 29:25 41:8 80:17

**detained** 15:2 24:17

**detains** 14:14

**detention** 8:8 11:13,23 12:4,5,7,22 15:7 17:17 18:23 19:8 21:19 22:7 22:11 23:11,24 25:13 31:19 34:9,22 35:25 36:4,10,20 37:4,14,16 39:5

**detentions** 8:17 78:18

**determination** 50:11 83:25

**determine** 25:20 26:5,18 45:8 51:9 97:9

**determined** 11:10

**determining** 13:7 23:19 25:24 31:16

**device** 72:3 95:24

**devices** 73:15

**diagnose** 47:16 51:11

**diagnosed** 49:16

**DIARADUCY** 3:24

**didn't** 10:4,5 21:22 23:23 37:15 55:15 75:7 84:4 85:3,4 87:9,14

**difference** 90:2

**different** 15:3 19:23 22:8 51:18,19 52:3,16 69:4 77:1 94:15,18,19

**differentiate** 52:10

**difficult** 40:2 49:22 50:12 63:11

**difficulty** 45:20 46:14 51:24

**Digital** 98:3

**dimensions** 70:18

**diminish** 79:3

**dinosaur** 18:16,20

**dip** 67:23

**direction** 100:21

**directly** 6:21

**dirk** 70:14

**disabilities** 44:3,13 47:9 49:16 50:2 80:21 81:25

**disability** 4:13 44:18 45:9 45:13 46:11 47:3,17 49:11 50:5,17 51:6,10 51:24 52:18,20,22 79:24 80:2 82:5

**disable** 64:23

**disagree** 23:22 28:25 29:12

**discharge** 86:11

**discover** 14:15

**discovery** 7:5 14:16

**discretionary** 79:8

**discussion** 98:5

**dispatch** 21:11,16,18,24 25:12 26:11 27:25 62:24 63:5,7,16,21

**display** 9:19

**dispute** 93:16

**disputed** 56:15 71:12

**disputes** 55:21

**dissect** 84:12 85:5

**dissipate** 97:6,12

**dissipated** 97:1

**distances** 69:5

**distracted** 47:12

**DISTRICT** 1:1,2 2:1,2

**diverting** 60:22

**document** 76:8 77:19 79:23

**documented** 76:16

**documents** 73:18 85:13

**does** 6:9 10:24 12:13 13:18,19,23,24 17:5 18:22 33:21 51:10 57:23 57:25 79:3 83:13 93:15 95:3,15

**doesn't** 9:14 27:23 30:2,9 35:18 36:14 38:4 56:15 58:2 68:4 87:9 88:16 89:9

**doing** 16:5 17:7 32:18 37:9 38:12 40:13 67:3 78:25 89:19 96:12 97:9

**domain** 4:13 34:12 35:2 44:20 45:1 46:2,3,19,24 47:7,15,21 48:11 49:13 49:15,23 50:15,24 80:20

**domains** 47:5,18 95:17

**done** 16:6 37:6 56:22 63:15,18 64:8 65:4 79:20

**Donna** 1:24 2:17 100:5 101:11

**don't** 5:15 6:4,22 8:10 10:12 13:16 14:24 15:1 16:20 22:15,16 23:25 25:5 26:14 27:4,12,19 27:23 28:2 29:22 31:18 32:10 34:9,11 35:14 37:13 38:18 41:10 44:11 44:22 51:15 62:5 65:14 67:23 68:6 77:15 78:5 82:4,23 83:3,24 84:12 84:14,17,18,22,23 85:6 85:9,13 86:1,2 87:12 88:10,15 89:2 92:6,9,10 93:2,4,7,16 94:7,15 95:6 95:7 96:25 97:3,4

**door** 19:18,20,24 20:5

**dots** 9:18,20

**double-edge** 70:19

**down** 14:7 15:25 17:20 18:17,18,20 22:22,24 29:10 30:12 32:19 38:25 40:14 42:7 43:2 61:11 69:18 93:20

**dozen** 91:18

**dozens** 16:11 55:25

**draw** 30:10 49:10

**dressed** 17:23 18:16 54:14

**driver** 64:25

**driving** 18:17 93:11

**due** 6:25

**duly** 5:5 100:6,15

**during** 9:11 10:2 22:11 38:5 61:8 69:24 77:12

**dynamics** 60:21

## E

**E** 4:1

**each** 64:14 79:1 83:5

**ear** 17:13

**earlier** 66:17 87:15

**early** 69:24

**easier** 24:3,20 63:13

**easily** 47:12

**EASTERN** 1:2 2:2

**ECD** 95:20,23

**EDWARD** 3:24

**effect** 67:17 94:6 100:9

**effectively** 35:4

**either** 10:13 21:23 39:12 87:21 94:16

**electrical** 72:3

**electrically** 72:3

**electronic** 6:3

**electronically** 72:2 95:24

**elicit** 24:2

**Elliot** 88:12

**else** 18:21 43:25 68:8 96:17

**elucidate** 13:14

**employee** 101:2,3

**encounter** 15:6 19:12 24:10 31:13 32:13 33:8 33:17 34:8,21 35:15,25 36:3,8,19 41:8,11,15,23 43:12 59:18 60:24 65:16 65:17 66:23 79:24 82:6 83:23

**encountered** 48:20

**encountering** 31:24 32:8 63:22

**encounters** 42:10

**end** 24:23 73:17

**ended** 93:10

**ending** 2:16

**enforcement** 13:12 25:11 26:16 55:12 75:3 83:19

**engaged** 67:9

**English** 29:18

**enough** 12:20 16:6,8 19:5 23:11 30:2,9 35:19 38:9 39:11,12,19,24 56:6 70:8 78:3,6

**ensure** 35:14 74:14

**entire** 29:22 30:4 47:15 49:14

**equipment** 74:19

**equipped** 73:21 74:19

**ERRATA** 102:1

**especially** 58:25 59:20

**ESQ** 3:5,12,18

**essentially** 11:2 12:10 13:20 47:1 57:16 70:17 71:23 91:22 93:11

**establish** 28:4,21 74:16

**estimate** 88:22

**evaluate** 87:4

**evaluating** 73:15

**evaluation** 24:15

**even** 14:17 15:6 16:12 22:3 34:12 40:18 49:6 49:21 55:18 65:20 66:16 68:2 71:19 80:19 81:16 81:25 86:11

**ever** 22:16 26:14,22 63:10 63:15 84:10 85:7 88:11 89:1

**every** 34:1 43:20

**everyone** 30:5,22 51:1 68:11

**everything** 24:9 49:6

**evidence** 75:17

**exactly** 6:22

**exaggerate** 53:9

**examination** 4:6 5:8 6:15 100:19

**examined** 5:6 100:14

**example** 9:13 30:11 32:12 37:18 43:17,19 45:12,20 47:8 58:6 63:4 82:5 86:6 86:10 96:5 97:11

**except** 99:7

**excessive** 73:1 92:5

**exchange** 82:6

**Excuse** 53:5

**Executed** 99:15

**exercising** 38:13

**Exhibit** 4:11,13 6:3,11 46:1,6 50:25

**exhibits** 4:9 11:3

**exist** 13:21

**existed** 70:24

**expect** 81:20

**expected** 47:16 49:18 74:12

**expert** 40:19 82:19,21,23 83:8,11 91:13,15,16

**expertise** 83:20 92:13 94:1

**explain** 14:10 29:13

**exposing** 18:9

**extent** 53:14

**extraordinarily** 12:19

**extraordinary** 39:8

**extremely** 49:21 50:11 53:17

**eye** 67:12

---

**F**

**fact** 13:16 15:18 16:25 23:1 37:21 55:21 61:1 66:13 71:12 78:4 80:25 83:9 86:20

**factors** 15:22 17:25 31:11 31:18 35:14

**facts** 13:21 14:11,18,19 56:1,2,4,5 66:1 71:1 81:14 93:2,9 94:15 95:7

**factual** 25:12

**fair** 10:21 56:6 70:8

**familiar** 21:21 46:5 88:4 88:10 93:15,24

**far** 19:23 24:20 63:13 94:15

**fascinated** 48:8

**fault** 69:19

**fearful** 53:17

**feasible** 59:17,24 62:14 62:24

**FEBRUARY** 1:16 2:17 5:1

**feel** 16:19 40:5

**feeling** 14:10

**feet** 35:8 68:17,18,22,24 69:6

**fellow** 58:22 59:6 64:3 66:25 68:7

**felt** 33:22,23

**few** 16:9 90:1 97:21

**field** 50:13 83:15

**Filbert** 3:6

**financially** 101:4

**fine** 24:3,5,9,10

**finished** 50:20

**fire** 86:18

**firearm** 58:9,14,19,25 61:13

**firm** 6:20 88:11,19 89:1,2 89:11

**first** 5:5,13 11:8 13:19 15:13 26:9 61:2,5 64:20 64:21 87:25 88:13 89:12

**fit** 30:6

**five** 89:20 91:12

**fleeing** 59:18,20 60:2 63:4

**focus** 15:25 16:16

**focusing** 31:2

**follow** 14:13 74:9 89:23

**following** 10:22 11:16,20 34:1 36:13,15 51:3 61:2 66:5 70:25 94:3

**follows** 5:6

**FONZI** 1:14 2:13 4:5,11 5:4,10,13 28:18 97:20 99:20

**F-o-n-z-i** 5:14

**foot** 63:10

**force** 8:8,17 9:8,15 64:5,9 64:24 71:24 72:14,21 73:1 76:8 78:12 80:5 85:22 91:23 92:5 93:1,3 93:14 94:4,10 95:13,19 96:3 100:8

**foregoing** 99:5,11 100:11 100:15,22

**form** 29:12 40:16,17,23 56:8 87:11

**forth** 69:6 100:13

**Fourth** 55:10,16,19

**Fox** 88:8,9,12

**frankly** 47:6 83:11

**FRIDAY** 1:16 2:16 5:1

**friend** 54:4

**friend's** 97:11

**from** 11:8,25 16:7 19:3 26:23 47:21 49:10 50:24 52:3,18 54:8 59:5 60:23 65:5 66:21 67:16 71:7 77:15 79:1 80:20 83:15 83:19,20 85:5 87:6 95:16 96:22 102:5

**front** 19:18 43:19,21

**Froze** 90:25

**full** 100:8,22

**furniture** 64:22

**further** 13:6,15 29:14 101:1

---

**G**

**G** 3:18

**gain** 35:4 38:14

Robert Fonzi                                                                                    February 9, 2024

**gave** 56:18 66:2

**general** 29:4,21,23 30:3,6 31:2 64:3

**generalizations** 28:5,22 29:1,3 30:14

**generally** 6:23 48:25 74:1

**generic** 39:24,25

**get** 43:21 47:23 60:1,7,13 61:3 79:1,11 90:11 96:17

**gets** 14:6 68:12

**getting** 43:23 80:23

**Gi** 54:14

**girlfriend** 64:19

**give** 18:14 32:12 37:17 39:13,21 43:22 44:20 49:13 62:16 89:5 92:10 92:11,12 93:9 96:15

**given** 7:9 11:16,22 26:11 29:1 52:11 64:23 96:20

**giving** 39:11 102:3

**Glaessner** 89:4

**global** 61:21

**go** 5:15 6:6 7:22 9:14 10:6 12:9,18 14:3 15:25 19:1 20:15 26:8 28:10 29:14 32:5,9,22,24 33:12 34:25 38:7,23 39:12 40:24 42:3 43:5 45:1 50:23 51:17 59:15 61:11 69:8 71:4,5 74:3 78:15 81:15 85:5 88:2 90:9,19 90:22 91:1,3 92:1 94:13 94:24 95:1 96:15 97:23 97:25

**God** 90:12

**going** 6:2,13,14 8:25 10:18 11:7,8 13:15 15:25 16:2,22 17:18 18:14 19:14 24:5,23 26:9,22 28:11,17,18,25 32:18 33:14 39:19 40:8 40:11,25 42:17,22 45:4 45:25 49:13 50:24 51:16 53:20,21 54:2 56:9 61:23 62:4 63:6 64:2,18 65:1,25 66:2 67:8 71:5,6 72:10 80:17 83:6,7,8

**89:17 94:25 98:7**

**gone** 87:10

**good** 5:10,11 16:15 17:13 98:13

**got** 59:4 64:18 85:18 87:15 94:5

**grab** 43:18 60:19 68:7

**grasp** 56:24

**GRAY** 3:17

**Great** 6:1 54:2 98:12

**greatest** 62:18

**Greg** 88:8,9

**ground** 60:3 62:3 77:9,17

**Guasti** 2:14

**guess** 34:7

**guessing** 7:21

**guide** 6:14

**guidelines** 26:16 74:16

**gun** 64:19

**guns** 64:17

**guy** 60:19 61:12 63:8 64:17 67:1

## H

**had** 14:17 23:6,9 25:23 26:19 27:5 41:5 48:18 53:22 55:18 56:10,11,16 57:18 59:12 60:3 61:9 61:12,14,20 62:6 64:5 67:1,23 69:9,16,21 70:3 73:12 75:2 76:22 77:13 77:22 81:10 82:12 83:9 83:24 84:1 92:3 96:21 96:22 97:1

**half** 98:7

**halfway** 70:22 92:16

**Hall** 94:2,22

**hand** 34:3 60:23 67:19

**handcuff** 43:18

**handcuffed** 60:6,7 62:2

**handful** 91:18,20

**handling** 77:6

**hands** 56:23,25 60:13 61:3,10 66:7 67:13,16 67:23 68:3,4 71:9

**happen** 16:6 48:18

**happened** 10:2 72:19 76:2 82:11

**happening** 16:7

**happens** 14:15

**happy** 87:24

**harm** 68:15

**has** 7:5 9:17 12:11 14:7 16:13 30:24 31:17 34:3 41:19 45:13,20 50:17 52:19,22 57:5,8,24 58:23 60:2,13,19 62:5 63:8 66:24 71:9 79:24 80:7 81:18 82:15

**haven't** 50:20 61:1 88:17 89:16

**having** 5:5 40:1 70:17 80:4 83:15

**Hazelwood** 89:5

**he** 14:6,17 15:2 23:23,25 24:1,4,5,6,14,19 32:20 54:3,19 55:16 56:10,11 56:15,16 57:5,11,18 60:3,12,13 61:12,14 62:5,6 63:8 64:18 66:24 67:1,22,23 68:4 69:16 70:7,10 73:1 75:6,7,12 76:22,25 77:13,14,22 78:2,4,5,6,7,9 81:17,18 82:9,12,13,15 84:1,14 84:20,22,23 85:18,21 86:3,4 87:13,15 94:4

**head** 17:11 66:9 76:13,25 77:9,11,13,15,17,19,20 77:22 78:8 86:10,15 96:6

**heading** 10:19

**health** 49:18 81:22 83:12

**hear** 18:5 28:18 92:11

**heard** 29:15

**hearing** 9:24 17:13

**held** 20:1 80:22 82:1 98:5

**help** 51:8 60:19 80:23

**helps** 37:9

**her** 88:6,7

**here** 7:22 25:6 27:5 29:3 44:21 53:20 55:21 56:3 56:15,22 66:1,23 79:20 81:24 92:2 96:17

**hereby** 99:4

**herein** 100:12,13

**hereinafter** 11:14

**he's** 34:3 40:8,18,19 60:6 60:11 66:14 67:3

**Hey** 19:14 37:22,24 61:12 62:6 63:7 67:1

**high** 83:23

**higher** 95:9

**Hill** 3:20

**him** 6:20 16:21 24:1 40:11 40:16 43:1 60:7,19,20 61:12,13,23 62:4,5,7 63:5,10 65:10 66:12,24 66:25 67:1,6,12 68:3,7 69:13 72:8 73:2,3 77:6,8 77:9,13 80:17 84:2 85:8 87:16

**himself** 54:22 73:2

**hired** 89:1

**HIRSIG** 3:17

**his** 6:21 34:3 54:10,15 56:23,24 57:6 60:7,8,11 60:13 64:18 66:7 67:12 67:23,24 68:2,4 71:9,17 75:6,9,10 77:9,13,15,16 78:7,9 82:15 84:7,15,18 84:24 88:10,11,25 89:1 89:2 93:11,24 94:3 97:2

**hit** 66:9 77:9,13,17 86:21

**hitting** 77:15

**hold** 25:5 39:6 88:1 90:24

**holder** 100:8

**honest** 93:4

**hope** 17:10 50:7 87:20

**hopefully** 80:22

**hospital** 78:2 85:1,18 87:6 87:16

**hour** 30:21 58:15

**hours** 15:14 69:24 98:8

Robert Fonzi                                                                                          February 9, 2024

**house** 97:11

**how** 16:21 31:13,15 34:7
34:20 35:3 48:19 64:12
68:24 72:19 79:13 80:10
81:7 82:23 83:3,16
85:15,18 87:15 88:21
89:8,24 90:2 91:14,25
95:8 98:10

**however** 14:21 47:4,14
49:7 71:6 96:2

**how's** 19:14

**hunch** 12:13 13:10,11

**Hundreds** 48:21,22 81:5

**hurt** 67:19 91:8

**hypothetical** 12:17 13:16
13:17,19,21 17:2 18:14
18:25 19:22 20:14 23:13
25:15 32:3 33:11 34:10
35:17 36:2,12 38:4,5
39:7 41:17 51:15 59:10
59:14 63:1 66:11 78:22
80:15 97:15

**hypothetically** 31:4

## I

**I'd** 16:16 62:20 88:22

**idea** 29:16 94:24

**identification** 6:11 46:6

**identified** 54:22

**identifies** 51:4

**identify** 26:5

**ignore** 83:9

**ignored** 65:10

**ignores** 37:23

**ill** 93:10

**I'll** 16:19,22 17:11 18:1
21:14 29:14 42:13,21
46:1 59:23 74:6 86:5
88:1 89:4,5 93:9 96:16
96:17

**illegal** 12:11 67:7 70:19
82:14

**illegality** 26:4

**illustrate** 13:14

**I'm** 5:17 6:1,2,13,20,25
7:8 8:6,9,25 9:6,24
10:18 11:7,8 12:15
13:15,20 15:24 16:5,10
17:18 18:14 20:3,19
21:3 22:3,19 24:23
25:16 26:9 28:11,12,17
28:25 29:6,7,8 31:15
32:18,21 34:1 36:7,13
36:15 37:17 38:18 39:9
39:19,23 40:1,10,13,25
42:17 43:1,6 44:19,25
45:25 46:5 47:23,25
50:21,22,24 53:20,21,25
54:2 55:13,18 56:9
57:11 60:23 63:9,12
65:1,4,25 66:2,5 68:18
71:4,5,6 77:3 78:9 83:6
83:7,8 84:13 85:13
86:13 88:10 90:11,13,15
92:9,10,11,12 93:25
94:1,17 95:6

**immediately** 65:5 67:6

**imminent** 64:6

**impact** 95:20

**impaired** 45:12,15,19,22
46:9,13

**impairment** 44:6 80:5,12
81:11 82:4

**impairments** 44:9 48:20
81:18 82:24 83:4

**important** 9:21 63:24
73:22 74:8,22 82:11

**importantly** 73:16

**impossible** 49:20,21
50:12

**improperly** 96:2

**impulsively** 52:8

**inadvertently** 35:15 36:9
36:14,17

**inappropriate** 41:1 52:11
96:8

**incident** 8:8,14,20,24 9:7
9:10,11,13,16,19,25
10:2,9,15 29:7 66:17
71:2 74:5 76:22,24 77:4
77:12,21,24,25 80:5,10
84:20 85:16 94:11

**incidents** 9:20

**include** 80:19 81:21

**included** 71:24 79:20
80:13 95:20

**includes** 10:21 52:2

**Including** 58:19

**Incomplete** 12:16 17:1
18:24 20:13 23:12 25:14
26:6 28:8 30:16 32:3
33:10 34:10 35:16 36:1
36:11 38:3 39:7 41:16
51:14 59:9,13 62:25
78:21 80:14 97:14

**indicate** 18:1 45:12 54:19
87:12 102:3

**indicated** 22:25 24:5,13
46:14 54:9

**indicates** 80:20

**indicating** 69:23

**indication** 34:1

**indicative** 71:10

**indicator** 46:10

**indicators** 45:7 47:1 49:9
51:3,4,7

**individual** 1:4 2:4 9:18
13:1 33:4,19 49:19 50:1
53:12 55:11 57:24 58:11
58:16,17 60:24 67:4
81:25 82:8 83:13

**individuals** 13:1 25:22
29:5 33:18 80:20 83:10

**industry** 25:11

**inference** 49:10

**inflections** 53:9

**influence** 38:14 47:20
82:8 83:10

**influences** 83:17

**inform** 9:7 60:21 61:7,19
78:11

**information** 4:16 8:17 9:2
9:7,24 10:1,8,14 11:17
11:22,25 12:3,5,6,7,12
12:20,23 15:20,23 19:3
19:7 21:7,14,19,22 22:6
22:16 23:5,6,9,10,14,15
23:24 24:1 25:12,17
26:11,12,14,23 29:3,21

**include** 29:24 30:1,7,9,11,25
31:8 35:19 36:5 37:13
37:15 38:9 39:11,14,19
39:20 40:5,10,20 41:4,6
52:19 59:17 61:7,25
63:11,14,22 66:10,13
78:3 81:8 99:8

**informed** 8:19 22:18 54:3
78:7,9

**inherent** 33:16,17

**initial** 29:15 69:10 82:5

**initially** 30:7 36:4 37:3
84:3 88:5

**initiate** 14:22 15:6 19:4,7
19:11,15 25:19,23 41:2
41:7 69:16,22 96:21

**initiated** 24:17 25:18

**initiating** 12:7

**injure** 68:7

**injured** 91:8

**injuries** 77:19

**injury** 64:7 76:10,12,13
76:25 77:11,14,15,20,22
78:8 86:7,11,15

**inserted** 86:24

**instead** 72:5

**institution** 80:18

**instruct** 16:20

**insufficient** 39:20 97:12

**intellectual** 4:13 44:2
45:8,13 46:10 47:3,9
51:6,24 52:18,22

**intend** 10:12

**intended** 64:24,25

**intent** 57:24

**intention** 8:6

**intentionally** 38:14 39:10
39:18 75:17,18,19 76:4

**interact** 82:24 83:4

**interaction** 51:13

**interchanging** 69:5

**interested** 101:4

**interfere** 44:23

Robert Fonzi                                                                                        February 9, 2024

**interrupt** 28:14,17

**intersection** 93:12

**intervene** 64:4

**intimidate** 35:9

**intimidated** 33:23

**intimidating** 32:15 33:4

**intimidation** 34:2,4,5
    35:2,20

**into** 9:14 11:15 18:1 21:7
    24:15 33:8 34:8,21
    35:10,15,25 36:9,19
    41:23 42:10 43:12 59:5
    59:21 67:23 85:5 97:8

**intoxication** 45:22

**investigate** 13:6 19:5
    23:17

**investigating** 19:6

**investigation** 11:15

**investigative** 12:2,22 97:5

**investigatory** 11:12

**invitation** 19:19

**invoiced** 95:8,10

**involved** 7:25 13:1,8
    23:19 25:25 33:18 38:11
    41:7,18 64:16 67:4,9
    73:18 82:11 91:12

**involving** 25:21 85:22

**isn't** 17:17 37:6 39:24,25
    43:8 67:7

**issue** 20:4 34:2,12 62:11
    81:23

**issues** 53:15 82:15

**item** 9:6

**its** 16:24 26:4

**it's** 6:3 8:6,14 9:22 10:8
    10:19 11:24 12:19 13:16
    13:17 14:8 15:11 17:19
    17:21 20:11 21:7,17
    24:20 26:18,24 27:4,12
    27:18 28:18 29:19,25
    30:24 31:4 33:13 35:5
    37:2 39:17 44:22,24
    46:3 49:15,19,21 50:17
    50:22 51:18 57:5,23
    58:6,8 59:17,23 61:21

62:14,24 63:13 67:19
    68:11 70:3,19 72:2,3,11
    72:13,18 73:21 74:8,22
    75:15 76:18 79:6,8
    80:18,24 82:16 85:23
    87:23,25 88:12 89:17
    90:12,25 91:23 92:16
    93:7 95:14,16

**itself** 15:21,23 16:8 17:14
    17:17 18:2,22 19:2
    20:16 22:23 23:10 29:1
    29:9 33:16 34:16 50:24
    67:7

**I've** 5:21 16:5 27:18 63:18
    84:12 91:12 92:2,3
    95:10

---

## J

**jacket** 54:15

**jail** 83:15

**Joanne** 88:3

**Job** 1:25

**jointly** 79:4

**judged** 8:16

**jury** 51:2

**just** 5:12,20 6:1,6,25 10:8
    13:14 14:10 15:25 16:5
    16:7,10 17:11,19,20
    18:8 22:25 26:4,18,25
    29:19 30:22 31:4 32:21
    33:16 34:14 35:5 37:17
    38:25 39:23 42:12 44:19
    44:20 45:25 47:23 50:8
    55:20 57:5 58:2,4,10
    61:13,20,21 62:6 63:11
    65:1,15 66:2 67:1,2,7
    72:9 74:15 83:14 85:25
    86:4 88:15 89:9 90:1,7
    90:24 92:1 93:16 97:24

**justified** 96:23

**justify** 10:15 25:13 37:14

---

## K

**karate** 54:14 71:10

**keep** 16:22 32:14,18
    37:23 53:16

**Keeping** 81:7

**Kelly** 54:4 97:12

**kept** 67:12

**key** 67:6

**kicked** 71:20

**kidding** 97:24

**kidnap** 64:18

**kidnapping** 64:17

**kind** 6:14 7:24 47:23
    57:22 58:3 95:13

**kneed** 71:21

**knew** 9:1 21:25 76:22,24
    77:16 80:11,16 81:10

**knife** 56:11,16 57:5,18,21
    58:8 61:12 64:4 66:24
    67:1,6,23 68:19 70:17

**knock** 19:18,20,24 20:5

**know** 6:4,24 7:7,20 8:16
    9:4 12:4,6 15:5 16:6,10
    16:11 21:1,21 22:15
    24:23 27:4 29:2 37:8
    38:8 39:13 43:1 44:6,11
    50:4 51:15 57:16 58:2,4
    58:10 60:18 61:12 62:5
    62:6 67:15 76:20 77:14
    77:20,22 78:3,4 80:25
    82:8,9 83:13,22 84:1,4,7
    84:14,17,18,20,24 85:6
    85:25 86:1,2 87:15 88:7
    88:8,9 90:3,20,23 91:24
    93:6,13 94:14,15 95:5,7
    99:6

**knowing** 50:6

**knowledge** 87:19 99:7

**known** 49:8 76:18

---

## L

**lacking** 30:8

**language** 29:18 53:2

**large** 28:6,23 30:15,19
    31:5 32:14,16 33:1,3

**last** 5:13 30:19 42:4,9,13
    65:4 89:14,15 97:18

**later** 9:19 16:4 59:4 94:10

**law** 13:12 20:1 25:11
    26:16 30:15 39:16,24
    55:11 70:18 83:19

**law-abiding** 28:6,23

**laws** 20:3

**LAWYERS** 3:5

**laying** 62:3

**lead** 47:2 51:5

**leading** 11:4

**LEANDRO** 1:7 2:7 3:10

**learn** 8:23

**learned** 62:16

**learning** 34:12 35:2 44:20
    45:1 46:2,3,19,24 47:4,7
    47:15,18,21 48:11 49:13
    49:14,23 50:15,24 80:19
    95:16

**learns** 9:7 17:15

**least** 12:24 13:6 19:3
    23:17 49:4

**leaves** 18:19

**left** 53:21 57:8

**legal** 26:7 28:9 30:17
    32:19 40:14

**lend** 15:22 17:22 18:22

**let** 5:18 6:6 7:20 27:5
    31:16 32:12 37:17 60:18
    61:11,13 62:13 64:2
    74:6 80:9 86:5,14 88:2
    89:19 90:20,22 91:1

**Let's** 12:9 15:12 16:22
    18:15 30:10 37:18 60:1
    80:9 88:22 90:7,18 92:1

**letting** 43:1

**level** 96:3

**levels** 84:7,15 95:19

**Lieutenant** 57:8,10,13

**lights** 48:9

**like** 6:24 9:25 14:8 16:16
    18:16 29:13,15 40:5,7
    46:4 48:9 58:7 67:20,24
    77:19 79:4 80:4 91:17
    91:18 96:16

**likelihood** 79:3

**limited** 46:20

**line** 44:23 102:4,5

**list** 7:12,16 71:1 89:20

Robert Fonzi                                                                                   February 9, 2024

**listed** 11:9 90:1

**listen** 13:19 36:7

**literally** 45:25

**little** 13:15 19:22 30:10
  64:21 95:14

**lived** 54:4

**LLP** 3:5,17

**location** 96:9

**lodge** 32:19

**lodged** 50:25

**logs** 75:20

**long** 16:6 18:10 46:22
  50:19,23 87:10 89:16

**look** 6:24 7:20 31:3 40:13
  45:7 90:6,7 97:8

**looking** 18:8 44:25 54:4
  90:3 92:15 97:11

**looks** 17:22 18:19

**lost** 54:3,19 75:20

**lot** 17:8 44:16 72:13

**louder** 53:9

**low** 67:6

## M

**M** 72:5

**machine** 72:2,10

**made** 9:11 11:23 21:1
  23:7,10 100:19

**majority** 91:10

**make** 12:20 13:18,23 14:1
  16:2 23:11,24 28:12
  32:13 36:14 49:18 50:11
  52:13,17 67:12,23 68:3
  83:17,24 91:1

**makes** 20:21 24:3

**making** 13:20 21:19

**male** 20:7,11

**males** 15:15 20:7 30:12
  30:25 69:23

**mandate** 82:17

**manifest** 82:25 83:5

**manner** 29:19 52:23

70:20

**many** 17:25 31:13,15
  33:23 48:19 64:12 68:24
  79:13 87:3 88:21 89:8
  89:24 91:14,25

**March** 101:8

**marked** 4:10 6:11 46:6

**martial** 54:15

**material** 7:16,18

**materials** 5:21 7:4,12
  11:4,9,25 27:18

**matter** 87:14 99:5

**matters** 99:7,9

**may** 8:23 9:4,19 10:1
  12:25 16:8 17:3 18:2
  19:4 21:21 26:10 27:20
  37:11 45:12,17 46:20,22
  47:9,12 48:7,12,15,17
  49:5,11 50:2 51:5,24
  52:5,8,10,17 53:17
  60:21,25 61:6,8,19,24
  67:5,6 68:2 79:7 80:1,17
  80:19,23 81:17,24 85:1
  89:13 94:16,18

**maybe** 17:23 34:17 48:8
  69:8 80:8 81:5 86:17,18
  89:9 91:11

**MCNAMARA** 3:17

**mean** 17:5,9 19:10 27:23
  29:2 30:4 33:14 45:22
  47:19 67:2 69:5 74:1
  78:3 81:21 85:12 87:9
  87:23 88:16 91:7,18
  93:16

**meaning** 60:14 78:19 81:7
  87:8 94:4

**means** 44:6 45:19 47:12
  49:5 55:10 91:21 96:22

**meant** 65:2

**measures** 72:1

**medical** 49:16,18 81:22
  82:19,21,22 83:7,8,21
  84:10,13 86:17,19,22
  87:4,17

**memorized** 52:3

**mental** 44:13 49:18 50:2
  50:17 51:23 52:20 81:22

**mentally** 93:10

**mention** 13:16

**mentioned** 11:3 22:13

**mentions** 57:21

**mere** 38:21

**merge** 15:2

**methamphetamine** 14:7
  14:15,16 83:13 84:7

**methamphetamines** 82:9
  82:12,24 83:4,10 84:1
  84:15,21

**middle** 35:24

**midway** 53:22

**might** 15:21,22 32:15
  34:4 44:9 45:8 58:25
  63:6,22 67:3

**million** 95:4

**mimics** 46:17

**mind** 32:14 33:21,22
  35:13 53:16

**mine** 6:2

**minute** 37:22 65:1

**minutes** 96:16

**misled** 68:12

**misrepresented** 16:4
  68:12

**misrepresenting** 49:12,24

**Misstates** 34:23

**mis-typo** 72:11,13

**misunderstanding** 10:3

**mode** 86:21

**moderate** 95:19 96:2

**modify** 51:12

**moment** 37:7 44:20 49:17
  67:10 78:5 97:3,10

**more** 17:9,20 19:3 29:25
  30:1,24 31:1,2 33:2
  39:13,14,21 44:9,11
  64:21 68:11 73:16 87:24
  88:8 95:14

**MORIARTY** 3:11,12
  10:4 12:16 14:1 16:20
  17:1 18:24 20:13,18

22:8 23:12 25:5,14 26:6
28:8,14,17 30:16 31:21
31:25 32:3,7,16,21
33:10 34:10,23 35:16
36:1,11,21 38:3,22 39:6
40:8,11,16,22 41:16,25
42:2,24 43:3,9,14 45:15
47:25 48:5,23 51:14
59:9,13 61:16 62:8,18
62:25 68:25 72:7 73:24
74:4 75:21 76:3 77:1
78:14,21 80:14 81:13
88:13 89:4,17 94:12,23
97:14 98:1,3

**Moriarty's** 6:20 89:11

**morning** 5:10,11 17:21
  50:13 69:24

**most** 67:18

**Motion** 40:4

**moving** 50:21 61:11

**much** 5:22 24:24 40:6
  95:8 98:10

**multiple** 73:2 75:12 78:18

**municipality** 91:9

**must** 12:23 41:3

## N

**N** 4:1

**name** 5:12,13 27:2,5,12
  27:15,19 88:10,24,25
  89:2 93:24 101:8

**named** 100:12,15

**names** 89:10

**narcotics** 47:20 82:14

**narrative** 49:14 72:18

**narratives** 50:23

**natural** 33:13

**Navarro** 11:11,16,23
  15:14 23:3,22 24:16,18
  53:23 54:3,9,23 55:1
  56:18,24 57:5,6 65:6,9
  69:21 77:22 81:10

**Navarro's** 69:10

**nearby** 37:20

**necessarily** 6:19 21:20
  63:2 67:2 82:18 87:3

Robert Fonzi                                                                    February 9, 2024

91:24 97:16

**necessary** 102:3

**need** 16:20 17:9 19:3
23:18 29:25 30:1 37:24
40:6,21 80:24

**needs** 33:2 76:16

**neighborhood** 20:22 21:2
21:15 22:1,14

**neither** 21:15,17 22:13

**never** 48:18,22 71:20

**next** 20:19 22:18 23:2
29:14 49:21 54:2,7,13
56:9

**night** 18:15

**NOAH** 3:18

**noah.blechman@mcnam**
**aralaw.com**3:21

**none** 4:17,20 32:4

**nonresponsive** 40:4

**nonverbal** 35:21

**nor** 21:15,17 47:16 49:17
101:3,4

**normal** 53:6,10

**normally** 38:15

**Northern** 93:7

**notes** 5:20 27:17,20

**nothing** 17:20 18:21 67:3
100:17

**notify** 67:6

**now** 27:14 37:25 42:25
43:8 44:25 60:14 66:22
70:22 71:4 73:12 79:23
81:8 95:5,19

**number** 11:20 27:22,23
28:1 31:19 32:1,2,7,8
33:3 90:6 100:8 102:4

**numbers** 31:23,25 33:1

## O

**Oakland** 3:7

**oaths** 100:9

**object** 16:22

**objection** 10:4 12:16 17:1

18:24 20:13 22:8 23:12
25:14 26:6 28:8,15,19
31:21,25 32:19,23 33:10
34:23 35:16 36:1,11
38:3 39:7 40:8,14,16,17
40:22 41:16,25 43:3,14
45:15 51:14 59:9,13
61:16 62:25 68:25 73:24
78:21 80:14 81:13 97:14

**objectionable** 16:22

**objections** 14:1 30:16
36:21 38:22 40:14 62:8
100:19

**objective** 61:2

**objects** 48:9

**observations** 12:24 36:5

**observe** 12:6,23 15:11

**obviously** 8:5 32:4 71:12
71:17 87:18 96:12

**occasions** 64:12

**occur** 39:20

**occurred** 12:25 31:17
37:20 56:1,2 61:20
80:10

**occurring** 26:19

**occurs** 6:23 15:10

**o'clock** 17:19,21 50:13

**October** 4:11 6:3 15:13

**off** 24:22 45:1 53:21 58:2
70:7 96:15 97:1,25 98:4
98:5,13

**offer** 8:9,11 10:12 25:22
92:12 94:1

**office** 6:21

**officer** 9:1,7 12:3,10,23
14:5,14,17,21 17:10,14
18:17,18,19 19:17,24
20:4 23:22 26:10 28:4
28:21 29:23 31:3 33:19
33:21 34:3 37:18,21,24
38:19 39:3,4,14 41:2,10
41:22 43:11,21 45:13
49:8 50:5,11 51:5,8
52:19 54:9,23 55:1
56:18,24 57:5 58:2 59:6
59:8,16,21,24 60:1
61:10,12 62:4,15 64:4,6
64:16 65:6 66:9,25 68:6

68:8,15 69:10,21 75:5,9
75:16 83:16 85:20,25
87:16 93:10,18,22 94:9

**officers** 8:16 10:14 11:11
11:16,22 15:5,14 19:10
21:1,18,20,25 22:18
23:2,16 24:16 25:17
26:12,17,24 27:2 30:11
31:12,17 32:1,2,8,12,17
33:2,3,23,24 34:7,17,20
35:3,7,13,19 36:8,18
37:2 38:1,20 39:17 42:9
44:2,5,8 45:6 46:9 47:2
47:15 49:10 50:14 52:16
53:16,23 56:16 57:17,20
58:22 60:14,18,24 61:5
61:7 62:16 63:7,21,25
64:23 65:9,14 66:18,21
67:15 71:19 73:21 74:8
74:12,15,19,23 75:5
76:1,4,7,19 78:10,17
79:4,7,23 80:10,11,25
81:2,5,9,20,23 83:22
86:21,25 91:9,22 92:25
93:25 96:12 97:2

**officer's** 9:21,22,23 10:15
13:5 19:4 33:14 36:22
36:25 37:7 48:9 49:17
72:18 92:4 97:5

**often** 28:25

**oftentimes** 9:3

**okay** 5:15,18 6:13,16 8:2
9:6 10:12,18 11:7,8 12:3
12:9 13:25 14:8 15:12
16:18 17:18 18:7,11,16
20:19 23:2,9,22 25:1,7
26:2 27:22 28:3 29:9
33:25 37:20 41:22 42:20
43:9,17 45:2,19 49:2,12
49:13 51:22 52:2,22
54:2,13 55:1 57:3,13,16
58:21 59:4 60:1,4,11
62:23 63:24 64:20 65:4
65:14 66:3,22 68:2 69:8
70:2 71:4,23 72:6 74:18
75:15 76:19 79:23 80:4
82:23 84:10 86:10 87:5
87:8,25 88:14,19,23
89:11,14 90:15,19,22,25
91:21 94:2 96:15,25
98:4,12

**once** 7:2

**one** 14:19 15:13 16:12
20:19 22:13 27:24 31:11

31:17 33:4,7 34:9 44:25
45:23 46:8,16 48:10
52:21 54:2,7,13 56:9
64:14,15,16,20,21,24
71:6,7 74:18 75:1,5
76:12 79:1 82:10 86:5
86:14 89:9,13 94:16
97:7,18

**ones** 13:22 66:1 85:15

**only** 13:21 24:24 25:24
26:17 27:17 54:19 81:9
88:5 95:10

**ONTARIO** 1:15 2:15 5:2

**onto** 60:3

**oOo-** 98:16

**open** 11:13 89:16

**opened** 66:7

**open-ended** 53:2

**operate** 74:23

**opine** 38:10

**opinion** 11:7,10 12:21,22
15:19 69:9 70:3,22
71:23,24 82:23 83:3
91:22 92:25 93:13 96:20

**opinions** 8:9,11 10:10,20
10:22,24 11:5 25:22
79:11,16,21 92:4,11,12
94:1,17

**opportunity** 16:13 26:17
58:24 59:2 61:6,24

**opposed** 89:19

**opposite** 49:3

**options** 95:13

**order** 12:22 35:14 51:12
65:10

**ordered** 38:19 39:4 65:10

**original** 12:9

**originally** 14:17

**Osman** 88:12

**other** 7:9 15:22 16:9,13
17:25 19:7 20:1 24:16
40:5,20 43:11,12 44:10
47:4,5,18 53:15 56:19
60:14,18 61:7 62:16
63:7,21 67:9 75:9 81:19
82:10 83:5 97:18

Robert Fonzi                                                                February 9, 2024

**others** 89:13

**Otherwise** 42:21 96:17

**our** 6:14

**out** 7:6 12:13 16:4 30:10
34:3 49:25 64:19 75:7
81:19 88:16 89:9 96:17

**outcome** 101:4

**outcomes** 94:19

**outlines** 24:1

**outside** 70:18

**over** 8:10 18:19 30:4,22
33:4 62:24 63:20 65:2
68:3

**overly** 48:15,17,22 49:5
50:5

**owe** 98:10

**own** 13:20 14:1 16:24

### P

**p.m** 2:16 98:15

**pace** 53:13

**page** 4:3,10 6:7 10:18
11:7 53:22 70:2 71:4,7
90:8 92:15,16 102:3,5

**pages** 7:11 95:12 100:22

**Pantejo** 24:11

**Pantoja** 3:16 11:11,16,23
15:14 23:3 24:12,13
53:23 57:6 65:9 69:21
81:10

**paragraph** 11:8

**paramedics** 86:18

**Pardon** 82:20

**parens** 11:13

**parking** 17:8

**part** 8:25 26:9 27:18
30:19 33:16 36:23,25
49:22 59:22 69:11 77:18
85:23

**particular** 9:19 30:20,21
67:10

**parties** 71:13 101:2

**partly** 95:16

**partner** 67:2,9

**parts** 16:12 29:23

**party** 20:6 27:3,9,10

**pass** 55:20

**passed** 23:16

**pat** 61:11 62:4

**pat-down** 56:19 69:14

**patient** 52:25

**PATRICK** 3:5,12

**patrol** 14:5 35:8 63:13
73:5,10,11

**Paul** 93:23

**Pause** 18:12

**pauses** 18:10

**pay** 25:3

**paying** 50:22

**pbuelna@lawyersftp.com**
3:8

**PCM** 72:1

**Pearson** 27:11

**pedestrian** 18:17

**Penal** 70:4

**penalties** 99:10

**PENALTY** 99:1

**pending** 11:15 43:7

**people** 3:5 19:10 44:5,8
44:10,13 47:8 48:19
52:17 78:18,19 86:25

**people's** 19:20

**percent** 21:3 91:12,17

**percentage** 91:5

**perhaps** 17:21

**period** 26:17

**perjury** 99:1,11

**permission** 24:19

**permitted** 66:17

**person** 3:6,12 12:11,13
14:7,14,15,22 17:7,16
17:19,22 18:15,18,20
20:2 26:5 27:15 31:23

32:14,15 33:25 34:14,16
35:10 37:22,23,25 38:12
38:20 41:6,9,18 45:13
48:12 49:11 50:4,6,17
51:10,23 52:22 53:17
61:14 62:2 63:6 65:16
67:11 84:13 93:10

**personally** 88:7

**personnel** 86:18 87:4

**persons** 41:6

**person's** 33:21 47:16 51:5
61:9

**perspective** 19:4 83:19,20
83:21 85:5

**phone** 27:22,23 28:1

**phrased** 29:20

**physical** 13:4 29:4 43:15
71:25

**physically** 34:16 35:21
43:23 44:1 63:9

**pick** 53:21

**piece** 10:8

**pieces** 63:11 74:18

**place** 100:13

**placed** 56:23

**plaintiff** 1:5 2:5,14 3:4
90:10,16,20,23 91:6,7
91:11

**plaintiff's** 55:25 89:25

**Pleasant** 3:20

**please** 42:7

**pmoriarty@cmtrlaw.com**
3:14

**pocket** 14:8,9

**pockets** 67:24

**point** 5:21 7:5,13 12:9
13:15 14:11 19:6 20:6
22:18 23:3 38:5 66:8,12
70:10 96:23

**pointed** 64:19

**POINTER** 3:5

**points** 11:21,24 12:1
15:12 16:1,9 17:15 23:6
46:16 48:11 49:15,23

65:5 66:11

**police** 11:10 14:21 17:10
25:10 33:15 47:15 57:20
64:16 85:10,14,16 91:8
91:21

**policies** 73:23 74:9,13,14
74:24 75:1

**poor** 48:12 52:5

**population** 28:7,24 30:15
30:20

**portion** 27:17 46:4

**position** 26:15 73:12

**possess** 70:19

**possession** 82:9

**possibilities** 47:17 49:7
50:1,10

**possibility** 48:16,18 52:7
58:17 79:6

**possible** 15:11 29:25 37:1
37:2

**post** 8:19,23 9:13,25 10:5
25:19 70:23

**post-incident** 10:13

**potentially** 96:4

**practices** 11:10

**predicated** 9:2,3 53:14

**pre-incident** 10:13

**preparation** 5:20

**prepare** 5:19 7:10

**prepared** 8:9,10 25:9,16
25:22 68:19 79:14,17,21
92:12

**preparing** 82:17

**presence** 71:25

**present** 3:23 16:17 57:11
58:23

**presented** 50:14 94:16

**pretty** 5:22

**prevent** 16:7

**previous** 7:21 22:25 42:14
42:18

**prior** 11:1,5 12:7 23:5
100:14

Robert Fonzi                                                                                    February 9, 2024

**priority** 61:6

**probable** 70:4,14,24

**probably** 12:20 30:4
60:11 62:18 67:10 97:7

**probation** 55:3,7

**problem** 18:11 30:18
39:18

**Proceed** 53:12

**proceedings** 18:12 98:14
100:23

**process** 24:3 73:15

**processes** 81:19

**proclivities** 44:15

**produced** 7:5

**professional** 49:22 75:16
86:23

**progress** 64:17

**prongs** 86:21,22

**pronounce** 24:7

**properly** 73:22

**prosecuted** 85:8 87:13

**protected** 55:16,19

**protocol** 86:7

**provide** 7:11 13:15,22
34:16 59:17 61:24

**provided** 5:21 8:1 9:2
21:23 22:10 24:1 26:12
26:16 27:2,11,15 30:7
30:11 31:9 35:5 39:16
45:10 84:12 85:12,13,21
85:23 94:18 97:2

**providing** 33:20 38:9
39:18 49:15

**proximity** 59:6,21

**public** 52:2 74:15 75:16

**pull** 6:1 44:19 68:19

**pulled** 64:19

**punched** 71:20

**purchase** 98:2

**purged** 75:10

**purport** 76:1

**purpose** 78:25

**purposes** 13:7 23:18
25:24

**pursuant** 19:8 25:19
26:25 37:5 70:23 80:17

**pursuing** 64:22

**pursuit** 63:10 64:15,22

**put** 32:19 40:14 61:21
63:20 71:8,9

## Q

**qualifications** 11:2

**qualified** 83:11 100:6

**question** 8:25 13:10 16:17
16:21 22:5,9 24:22
26:21 28:12,18,19 29:11
29:12,14,19,20,23 30:1
30:8,19,24 32:10,24
35:6,18 36:7,14,15
39:25 40:2 42:17,22
43:6 51:15,18,19 54:10
58:4 59:22 62:11,19,20
67:5 74:5 76:23 77:1
86:14 87:22 88:8 90:15
91:24 95:5 97:7

**questions** 4:19 16:21 38:8
39:10,17,22 40:6,9,12
40:17 41:1 42:20 44:23
45:21 46:15,22 47:24
49:25 53:3 75:21 97:6
97:18,21

**quite** 15:11 16:9 47:5,20
49:3 50:19 83:11

## R

**radio** 21:4,16,18 25:12
27:25 63:12

**raised** 38:5

**ran** 65:5 70:7,10

**rare** 56:4

**rarely** 26:14,22

**reach** 68:19

**read** 11:8,18 15:16 20:9
20:24 33:22 42:16 46:4
47:15 49:14 50:24 51:1
54:2,5,11,17,20,24 55:4
56:9,12,20 57:1,13 65:7
65:12 71:5,6 80:20

85:10,20 90:9,19,22
99:5

**reading** 20:19 47:21
49:24 69:20

**real** 20:3

**really** 7:8 30:18 31:2
35:18 82:16 89:17 93:4

**reason** 14:6 18:9 102:4,7
102:9,11,13,15,17,19,21
102:23

**reasonable** 8:7 9:9 11:12
12:1,15,24 13:6 14:16
14:20,24 19:8 23:17,23
24:14,17 25:18,23 26:3
28:4,21 29:24 37:5,16
38:11,19 41:2 62:14
65:14 69:13,16,21 72:14
91:23 92:5 93:1,14
94:10 96:21,25 97:6,13

**reasonably** 9:15

**reasons** 70:25 72:20

**rebuttal** 8:2

**recall** 22:15 28:2 56:15
85:15,18 86:1 88:10
89:2 94:7

**received** 7:15 9:13

**receiving** 69:17,23

**recently** 7:15

**recognize** 44:2 52:13
88:23,25 89:10

**recognized** 48:7

**recognizing** 20:22

**record** 5:12 38:4 45:1,4
86:5 96:15 97:25 98:4,5
98:13 100:23

**recorded** 100:20

**records** 84:10 85:3 87:12

**refer** 73:16 87:10

**reference** 20:21 21:2,8
80:1

**referred** 11:14

**referring** 32:17

**reflect** 10:24 38:4 44:4

**reflective** 40:1

**refuse** 42:20

**regarding** 81:23

**regardless** 74:11

**regards** 48:2

**register** 38:6

**regular** 32:19

**rehabilitate** 16:14

**related** 7:23 8:14 26:19

**relationship** 38:12

**relative** 23:4 53:24 101:1
101:3

**released** 87:6

**relevance** 80:7 94:23

**relevant** 7:4 9:11,21,23
10:8 21:24 37:6 80:2,6
80:24 81:12,17,24 82:5
82:17

**reliability** 26:21

**reliable** 26:3

**rely** 12:3 21:18 26:10
28:4,22

**remain** 35:8

**remember** 6:22 7:22
27:25 88:16 93:2,4,17
95:6

**remove** 86:22

**repeat** 31:16

**repeated** 71:25

**repeatedly** 96:5,9

**repercussion** 66:19

**rephrase** 62:13

**report** 4:11 5:23 6:5,14
7:8,10,11,21 8:1,3 10:19
14:25 21:4,6 23:15 27:6
53:20 62:23 76:8 77:16
79:18 80:13 81:21 82:17
85:16,20,24 88:3 89:21
90:8 95:12

**reported** 1:24 77:8

**reporter** 2:18 5:5 8:21
21:5 27:7 28:16 32:6
42:7 43:2 57:9 69:18
73:7 83:1 92:18 93:20

Robert Fonzi                                                                    February 9, 2024

95:22 98:1 100:7

**REPORTER'S** 100:1

**reporting** 20:6 27:3,9,10

**reports** 5:20 6:25 9:13
77:9 79:13,25 81:18
85:10,14

**represent** 21:14

**REQUESTED** 4:16

**required** 27:12 39:1
47:16 49:17 73:13

**requirements** 7:8 14:20
76:7

**requires** 26:3 86:11,15
97:8

**researching** 73:14

**residential** 17:8

**resistance** 24:6

**resisting** 66:14

**resolve** 51:13 55:21 92:7

**resources** 80:23

**respect** 8:11 9:17,20 16:5
30:25 45:10 46:19,24
47:7,14 50:14 83:12

**respectful** 52:23

**respond** 63:8 68:16,21

**responded** 15:14

**responding** 63:21

**responses** 13:5 16:3 46:17

**responsibility** 81:20

**restrained** 61:3

**retained** 88:11 91:14,25
92:3,10,11 93:18,22,25
94:1

**retainer** 95:11

**retaliation** 66:20

**retrieve** 73:18

**retrofit** 12:14 13:10,11

**return** 15:12 53:20

**review** 5:20 10:9 11:9
25:17 69:12 85:3 87:10
87:14

**reviewed** 7:12,16,19 9:25
11:4 27:18 71:15 84:10
85:2,4,12,14,15,23

**right** 5:10,16 6:13 7:12,16
8:12,14,19 9:12,16,24
10:16,18 11:1,4,23 12:5
15:3,7 17:13,17 19:12
19:21 20:2 22:7 23:6,7
27:16 29:17 33:9 37:21
37:25 39:22 40:20 42:25
43:8 44:25 45:4,14,21
46:10,15 47:3,10,13
48:9,13,15 49:11 52:25
53:18 55:7,16,22 56:2
56:16,18,22 57:6,18
58:3,9,14,19,23 59:1,21
63:25 65:18,21 66:3,9
66:12,18 67:25 68:3,4,8
69:11 70:2,11,15 71:2
71:13,15,17,21 72:15,19
73:6 74:9,11,15,20,24
75:7,13,17 76:8,10,14
76:17 77:9,19,25 78:12
79:10,18 81:3,5 82:19
82:21 84:16,18 85:3,10
85:16 86:16,23 87:19
88:2 91:3,23 92:15,23
93:1 95:13,17,20,25
96:3,6,10,13,23 97:2,6
97:13,17,19,25

**rights** 19:13 55:11

**road** 2:14 15:25

**ROBERT** 1:14 2:13 4:5
4:11 5:4,13 99:20

**ROBINSON** 3:11

**roughly** 69:6

**route** 52:3

**routine** 52:3

**RP** 27:8

**RP's** 27:6,19

**rule** 7:8 68:10,11,12,13
79:13

**run** 63:12 65:11,20 96:22

**running** 59:5 63:9,15,17
65:10

**runs** 66:3

**Ryan's** 7:25

## S

**safe** 63:25

**safety** 48:9 69:13 74:15
83:12

**said** 15:2 27:14 37:7
41:14 42:18 43:22 49:17
51:7 57:18 60:3 61:12
62:6 63:8 66:7 71:19
72:14,22 80:11 86:3,4
92:1 94:10

**sake** 92:2

**same** 18:24 19:13,17
28:14,19 30:16 36:11,21
38:22 39:6 41:25 59:23
62:8 81:8 94:11 99:7

**SAN** 1:7 2:7 3:10 100:3

**saw** 64:3 77:8,9,13

**say** 10:7,21 17:18 18:1,15
19:14 30:11 37:12,18
48:23,25 50:16 55:13
57:23 60:1 62:6 66:19
69:6 72:10 76:1 79:17
89:4 91:5,7,10,17

**saying** 10:3 12:15 13:20
16:5 37:17 55:18 56:15
58:11

**says** 11:9 15:13 17:15
18:18 23:2 33:25 35:2
37:22,24 53:22 58:1
70:23 71:7 88:3 92:16

**scary** 57:20,23

**scene** 26:24 39:14 78:2,5
85:22 86:7,8,16 87:1

**scheduled** 6:25

**scheduling-wise** 7:3

**search** 24:2,19 33:25 55:6
55:9,12,15,19,20 56:19
56:25 61:13,23 62:4
66:25 67:12 68:3 69:14

**searched** 61:1

**second** 20:6 64:16 71:7

**section** 10:21,24

**sections** 11:1

**secure** 61:2 68:2

**secured** 61:10

**see** 6:4 22:19 27:12,19
31:5 53:25 72:9 77:11

88:22 90:18 92:21

**seeing** 27:25

**seek** 37:7

**seeking** 35:22

**seem** 54:9

**seen** 46:3

**segments** 28:6,23 30:15
30:19

**seizure** 31:13,17 33:8
35:15 38:2,21 39:5
41:15,24 42:11 43:12

**send** 6:2

**sense** 13:18,23 14:6 36:14
48:12

**sentence** 23:2

**separate** 78:20

**serious** 64:7 76:13

**service** 11:15 13:2 17:7
41:20 69:23 97:8

**set** 53:12 56:1 66:1
100:13

**settled** 92:6

**settlement** 94:21

**several** 51:4 92:1

**severe** 48:19 86:6,10,15

**sharing** 9:12

**sheet** 102:1,3

**SHIFLETT** 1:4 2:4,14
3:4 9:14 11:14 23:4
53:24 76:20 83:22 87:6

**shiny** 48:8

**shooting** 93:10

**short** 47:9 48:2,7 53:2
78:6

**shorten** 47:24

**Shorthand** 2:18 100:7

**shortly** 77:21,25 78:1

**shouldn't** 66:19

**show** 6:2 33:8,14 46:1

**showing** 16:14

**side** 89:25

Robert Fonzi                                                                                    February 9, 2024

**sidewalk** 18:16

**signature** 6:6,9 102:25

**similar** 9:20 47:6,20 66:23

**simple** 23:1,18 35:5 50:18 51:25 53:2

**simply** 19:24 20:5 33:24

**since** 67:22

**single** 32:13

**sir** 5:11 6:8 7:13,17 8:15 11:19 15:17 20:10,25 54:6,12,18,21 56:13,17 56:21 57:2 65:8,13 79:22 86:24

**sitting** 16:24 63:13

**situation** 19:23 37:9,10 40:6 52:11 61:22 77:6

**situations** 94:17

**six** 70:19

**skill** 100:24

**slapping** 34:3

**slightly** 49:24 94:12

**Slow** 42:7 43:2 69:18 93:20

**slowly** 53:6,12

**small** 63:11 97:3

**social** 29:22 30:4

**society** 19:19

**solely** 28:5,22

**some** 7:21,22 9:17 11:3 12:11 13:16 14:7 19:4,6 33:8 44:12 49:9,15 50:2 50:8 51:9,12 62:16 63:21 66:16 79:7 82:14 83:20 85:4 93:2,3,9

**someone** 6:21 12:10 15:2 17:15,24 19:12,14 24:4 24:20 29:25 37:19 45:8 47:2 79:24 86:6,19 91:7 96:5,8

**someone's** 44:17

**something** 8:20 26:19 57:20 58:21 62:10 63:20 67:4,17,19 76:16 80:4,5 80:12 94:6

**Sometimes** 78:23

**SORRELL** 1:4 2:4,14 3:4 9:14 11:14 23:4 24:7 53:24 54:3,8,9,14,19,22 55:2,15 56:10,15,18,23 57:4,6,17 65:5,9,10 66:3 66:6,9,23 68:24 69:11 69:17,22 70:4,14 71:8,9 71:20 72:25 78:7 80:11 81:10 96:22 97:2

**Sorrell's** 56:25 69:14 71:15

**sorry** 28:17 31:15 32:21 42:2 43:6 47:25 69:19 86:13 90:11,13 94:23

**sort** 12:14 33:8 56:1 66:17

**sound** 16:3,6,7 39:19 93:15

**Southgate** 3:13

**span** 47:9 48:3,7

**spark** 57:23,25

**speak** 29:18 53:6,9 86:5

**speaking** 40:13 44:19

**specific** 20:4 27:5 29:3,4 30:24,25 31:1 34:11 35:2,9 39:13 62:12

**specifically** 38:18 58:10 76:10 78:10 83:7 84:9 85:19

**spelling** 5:13

**spellings** 89:5

**spidey** 14:6

**ss** 100:2

**staff** 73:14

**stance** 71:10

**stand** 35:7 65:1 88:16 89:9

**standard** 11:10

**standards** 25:10

**standing** 33:4 67:3

**stands** 21:11 95:24

**start** 29:10

**state** 5:12 12:21 100:2,7

**stated** 29:9 81:17 99:8

**statement** 26:2 28:3 56:8

**statements** 49:6 72:20

**STATES** 1:1 2:1

**stay** 59:23

**stays** 81:8

**stenographically** 100:20

**step** 24:18

**steps** 43:21

**stick** 42:13

**still** 5:10 18:4 19:4 29:25 33:17 55:16,19 56:5 82:1,15 86:24

**stop** 11:12 12:2,22 19:13 23:17 29:6,24 31:6 37:22,24 38:20 39:1,3,4 41:8,9 43:24 65:10 96:21

**stopped** 53:22 66:6

**stops** 12:10 15:3 17:15 37:18,21,25

**storage** 73:17

**story** 79:1

**straight** 39:22

**street** 3:6 14:7 17:15,20 22:22,24 30:12 38:25 49:19 54:4

**stretch** 19:7

**strike** 40:4 50:21 57:3 62:13 68:20 74:6 79:12 96:5

**struck** 73:2

**struggle** 26:10 29:20

**struggling** 39:9,23

**stuff** 7:23,25 18:8

**subject** 23:18 30:5 41:19 55:12,20 59:18 60:25 63:4 68:13

**subjective** 15:21 29:2 77:14

**subjects** 20:23 22:21

**subject's** 36:23 59:20

**submit** 87:9

**submitted** 7:14

**submitting** 35:10

**subscribed** 101:7

**subsection** 10:19

**subsections** 11:5

**substitute** 36:17

**successfully** 51:13

**such** 46:14 101:3

**suddenly** 35:25

**suffered** 76:20,25 78:8 80:11

**suffering** 52:17 86:10,15

**suffers** 47:2 86:6

**sufficient** 25:11

**suggest** 33:1 37:12 47:5 47:19

**suggests** 26:21

**Suite** 2:15 3:7,19

**summary** 9:1 10:20,23 11:2

**supervised** 81:2

**supervision** 100:21

**supervisor** 73:12 78:7,9 83:16

**supervisors** 78:11

**supplemental** 7:15

**supply** 14:16 51:8

**support** 7:14 12:1,24 22:7 23:16 29:24 41:4

**supported** 71:1

**supposed** 51:7 79:18

**sure** 6:17,20,25 14:4 16:2 16:10 19:6 20:3,20 22:3 28:12 30:10 31:16 33:25 36:17 67:12,23 68:4 74:6 77:16 80:16 83:22 90:5,7 91:1 93:18,21

**surprise** 94:9 95:3

**surprised** 94:18 95:6

**surrender** 66:8,18

Robert Fonzi																																																February 9, 2024

**surrendered** 73:2

**suspect** 31:14 51:10,11
52:17,22 57:3,21 58:1,7
58:23,25 59:4 60:2,13
63:16 64:3 66:22,24
76:13

**suspects** 32:1,4,8 57:17
66:16 78:20

**suspicion** 11:12 12:1,15
12:25 13:6 14:17,20,24
19:8 23:17,23 24:14,18
25:19,23 26:3 28:4,6,21
28:23 29:24 30:3,14
37:5,16 38:19 41:3
65:15 69:16,22,24 96:21
97:1,6,13

**suspicious** 20:22 22:21

**suspiciously** 15:15,18
16:25 17:5,16 18:19

**sustained** 77:15

**sworn** 5:5 100:15

## T

**table** 50:25 51:3

**tactics** 35:9

**take** 18:1,10 29:23 35:13
44:14,17,25 46:22 62:6
90:7 91:6 95:8

**taken** 2:13 16:3 45:3
96:18 100:12

**taking** 24:15 29:7 49:24

**talk** 14:23 37:18,21,25
41:9,10 87:24

**talking** 31:14 69:3 78:1,2

**talks** 37:25

**tase** 66:12

**tased** 73:3 86:25

**Taser** 72:2 75:20 86:11
95:20 96:8

**Tasers** 86:20

**task** 60:23

**tasks** 51:25

**taught** 47:6,8,17 48:2

**technique** 35:6

**technologies** 73:16

**tell** 7:20 63:7 64:20 66:25
79:21 90:2

**telling** 38:18

**tells** 57:4 66:24

**tend** 30:21

**tendency** 26:4

**term** 29:1,21 36:13

**terminate** 65:16

**terms** 35:9 55:6,9,15,19

**tested** 84:15,20,24

**testified** 5:6 16:11 22:17
24:4,14 71:19,20 76:20
77:22 78:7 83:11 92:23

**testify** 8:6 21:25 25:9,16
42:22 92:9 100:16

**testifying** 97:20

**testimony** 16:13 34:24
71:17 100:11,18,23

**than** 7:9 17:20 19:23
43:12 44:9 53:10 68:11
87:24 95:14

**Thank** 24:24 40:18 42:6
51:22 97:19

**that's** 5:22 9:12 17:24
19:12 20:1 22:8 23:25
24:4,20 26:15 30:8 31:1
31:2 33:16,18,20,25
35:6 39:8,18 40:1,14
41:1 49:22 50:7,24 56:3
56:14 58:21 63:24 67:16
68:6,22 69:11,19 70:7
70:17 71:12,17 72:6,14
73:17 74:5,11 75:14
76:12,16 77:1,3,5 78:3
79:20 80:12 82:10 86:3
88:5 89:16 91:8 97:18

**their** 8:16,17 9:2,3,8
11:15 13:3,4 14:8,23
17:22 22:1,7,10,11
26:25 30:25 31:12 33:22
36:8,18 37:3 38:14,20
41:11,14 42:10 43:24
50:5 51:9,12 55:10
59:18 61:3,9,10 72:20
73:23 74:9,13,24 75:1,2
76:8 77:8 78:11 79:1
80:13 83:17 92:14 97:12

**them** 12:12 14:23 21:23
22:7,13 24:21 26:11
31:6,9,13,20 32:4,14,16
33:25 34:14 35:6 37:9
37:10,19,23 38:1,14
39:4 41:10 43:18,19,21
43:24 47:2 49:24,25
50:12 51:8,11 57:17
58:2,13,23 60:21 61:1,3
61:4,11,15,19 62:16
71:21 73:11,22,23 79:1
80:23 81:20 82:2 83:14
84:12 85:5 87:4 90:4
92:10,11,12,13 93:3
97:8 99:9 102:3

**themselves** 17:22,25
66:18 68:16 82:25 83:5
92:7,8

**theory** 68:11,13

**thereafter** 100:20

**therefore** 41:22

**therein** 99:8

**thereof** 99:6

**there's** 7:2,24 11:20 15:20
16:9 19:19 34:11 35:1,6
52:7 56:7 62:11 75:21
76:7 77:20 78:18 79:8
92:15

**they're** 13:3,4 14:9 17:7
17:20,23 23:19 28:25
30:20 31:14,23 34:1,13
35:5,21 39:8,10,23,24
43:20 46:13 47:8,19,20
48:2 49:4,19 52:5,21,25
55:25 58:22 61:23 65:15
77:18 78:19 80:1 86:24
90:1 97:9

**They've** 48:22

**thing** 48:2 57:21,23 81:9
90:24 95:10

**things** 6:24 8:19,23 9:4
10:1 24:3,5,15 31:2 33:7
39:12 40:1 46:8,14 47:5
50:1,14,16 52:21 76:5
77:19 82:10 96:13

**think** 7:24 12:11 16:20
19:22 23:25 34:11 39:10
41:1 42:12 44:1 65:4
67:19 72:2,3 74:1 79:13
80:12 82:4 87:25 88:12
88:13 89:13 91:14 96:16

97:17

**Thompson** 85:25 87:16

**Thompson's** 85:20

**though** 14:17 16:24 22:6
63:16 73:20

**thought** 72:6 75:6

**thousand** 91:16,17 92:1

**thousands** 83:9,14

**thrashing** 60:12

**threat** 63:22 64:6 66:14

**threats** 62:15,24

**three** 8:12 70:22 78:19
91:17 96:16

**through** 5:15 6:6 18:8
21:23 26:11 53:22 70:23
71:6 87:21,24 90:19,22
92:16 93:11 95:12

**throwing** 56:11,16 57:5
57:18,21 58:8 64:22

**tied** 54:15

**time** 7:13 8:18 9:8,15
10:15 13:3 14:22 15:5
17:7 23:16 24:24 25:3
25:18 26:18,24 40:2
43:20 46:22 48:13 50:19
50:22,23 57:4,17 59:12
62:3,6 63:6 69:1 76:22
76:24 77:5 81:14 86:14
87:23 91:12 97:3 100:12
100:19

**times** 16:11 56:7 63:18
73:2 75:13 84:14 88:21
89:8

**timing** 62:11,12

**tingle** 14:6

**tip** 26:3

**today** 5:19 6:15 74:4
79:17

**together** 37:10

**told** 31:4 56:15 58:7 67:1
67:22 78:6

**tolerance** 84:18

**tone** 53:6

**too** 33:23 38:9 39:23

took 21:7 24:18

tools 51:12

top 71:7 79:10 88:2

total 91:15

totality 70:24 72:16

totally 23:25

toward 17:11

towards 17:13

tower 65:2

town 92:17,20

Trailing 24:22

trained 31:12,17 32:14
34:7,13,20 35:3,13,19
36:8,18 37:2 38:1,20
39:4 42:9 44:2,5,8,12,14
45:6 46:9,13 49:4,10,22
51:22,23 52:5,16,21
58:21 62:10,15,23 67:15
77:18 78:11,17,20 79:23
86:22 87:1 96:12

training 4:11 11:11 13:12
25:19 26:15,25 39:16,25
44:4 45:10 46:16 48:10
51:8,20 70:23

TRAN 3:11 88:3,4

transcribed 100:21

transcript 98:2 99:5

transforms 33:7

transition 36:4,9

transpired 72:19

transpiring 61:20

transportation 52:2

transported 87:16

treat 58:13 61:14

trial 8:10 10:12 16:11
25:9 42:23 79:17,21
92:7

trials 6:25

trouble 17:12

true 66:3,6 72:23,25
87:18 99:7,9,11 100:23

trust 75:16,25

truth 100:16,17

try 43:20 59:12 61:11
79:1

trying 17:24 29:11,13
32:13,21 39:9 40:2
43:20 44:19 55:13 60:6
60:7,12,23 63:12 90:11

turn 10:18 11:7 17:11
35:14 96:3

turned 17:13 56:23 67:11
75:7

turning 34:8,21

turns 12:13

twice 42:17 64:13

two 15:15 20:7,22 22:21
25:21 29:5 30:12 40:1
57:16,17 64:17 65:4
69:23 75:21 76:21,22
78:19 89:9,13 98:7

TYE 3:24

type 19:4 31:8 58:5,10
63:14

## U

uncooperative 53:18

under 24:10 47:19 70:4
70:22,24 72:16,21 82:8
83:10 95:19 100:21

undermines 75:25

underneath 54:14

understand 10:5,6 12:15
12:18 14:12 15:24 25:2
28:10 29:16,18,19 32:7
32:9,10,24 38:7 54:10
55:24 56:14 61:17 65:3
79:10,16 81:2 85:7

understanding 8:5 28:12
45:20 46:15 52:6 55:8
57:19 75:8 87:5

Understood 89:22

undisputed 56:4

uniform 33:15 54:16
71:25

unintentionally 31:19
36:18,19,22 37:12 41:23
43:11 44:9

UNITED 1:1 2:1

universal 61:22

unless 30:6 34:2

unlimited 26:18

unreasonable 66:8

until 84:4

up 5:21 6:1 7:5,13 11:4
19:20,24 20:5 22:21,23
30:12 39:22 44:20 53:21
62:4 65:1 66:7 70:10
71:9 90:6 93:10

updating 63:5

upon 26:10 29:22 99:8

use 6:14 12:14 44:16 53:2
57:25 58:17 61:4 72:1
73:23 75:20 78:11 80:5
82:12 85:22 92:13 94:3
98:12

used 8:8 9:15 64:9 71:24
72:15 86:20 91:23 92:25
96:2

uses 76:8 82:13

using 29:21 52:2

usually 6:22 55:25 72:4

## V

vague 10:4 32:23 38:9
39:10 40:22 43:14 45:15
62:25 68:25 80:14 81:13
81:14

validate 26:13

vandalism 55:3

various 73:15

vehicle 64:24,25

vehicles 17:9

verbal 13:5 35:21 38:21
43:13 71:25

verbally 34:17 35:21 44:1
54:22

versus 31:14,23 58:8,9
91:6 92:17,20

very 27:20 29:18 56:4
63:11 76:12 79:16

vet 7:6 81:19

Via 3:18,24

video 18:9

videos 73:18

violent 83:18

virtually 49:20

vision 17:12

vitae 11:3 87:18

vocabulary 46:20

voice 53:7

Volkswagen 31:7

Volkswagens 31:6

voluntary 35:4 37:8

vs 1:6 2:6

## W

waistline 67:24

wait 29:14

waiting 72:9

waive 55:10

walk 19:20,24 20:5 22:23
43:20 65:17 68:3 87:21
87:23

walked 66:7

walking 14:7,9 17:20
18:15,20 22:21 30:5,12
34:15 37:23 38:20,25
43:19

want 13:25 15:1,25 16:2,7
34:9 37:19 39:21 44:22
61:21 63:20,25 66:22
68:6,7 71:4 81:9 87:23
90:7 92:11,13 98:1

wanted 65:20

wants/warrants 55:2

warning 62:17

warrant 7:24 19:18

wasn't 22:4 27:24 29:4
59:6 64:24

watch 67:15

watched 75:12

waves 18:17

Robert Fonzi                                                                February 9, 2024

**way** 10:10 14:9 16:19
19:17 38:8 39:13 40:3
43:24 49:25 50:6 51:9
55:14,18 71:21

**ways** 43:11,22 52:16

**we** 6:24 7:22 8:16 18:4
19:19 25:5 29:2 31:5
44:25 47:23 64:23 66:23
73:11,14 87:10 91:11
98:7,12

**weapon** 57:22 58:1,3,5,7
58:10,11,13,18,23 59:7
60:2,3,14,19 61:4,15
62:5,7 63:8 64:4,16 68:7
68:14,21 94:5

**weapons** 56:10,19 95:20

**wearing** 13:3

**weaving** 93:11

**welfare** 80:17

**well** 11:24 15:5 16:19
19:10,15 20:3 21:20
25:4 27:20 29:15,19
33:1,7,13 34:7 35:13,24
37:3 38:18 43:22 44:15
44:19 45:19 46:17 47:14
48:12 49:7,9 51:1 59:20
63:25 66:16 67:9 69:8
69:12 70:3 74:2 75:5,19
76:1 77:8,13 78:1 79:16
82:7 83:6 85:12 86:3
87:1,9,20 88:2 89:17
95:14 97:17

**we'll** 13:19 45:1

**went** 50:19 78:2 94:4

**we're** 7:2 15:24 19:5,6
31:4 40:11 56:3 98:13

**weren't** 73:6 87:8

**Werth** 89:5

**we've** 41:3

**whatever** 7:4 14:6 37:10
50:8

**what's** 33:21 38:12 47:6
61:20 68:10,17 78:25

**WHEELER** 3:17

**wheelhouse** 7:7

**when** 11:23 12:5 15:6
22:11 24:3,19 37:12,21

38:15 39:16 43:20 44:12
44:22,24 54:8 56:10,23
57:21 58:1 62:14,24
63:6 67:11 69:2 70:7
73:5,9,11,12 75:3 76:10
78:11,17 84:14 86:6,20
86:25 91:6,17 92:9

**whenever** 65:17

**where** 17:7 22:19 30:8
34:2 50:15 51:15 53:21
53:22,25 54:8 63:6
67:16 71:7 73:21 78:6
78:18 92:3 93:6 94:24

**WHEREOF** 101:7

**whether** 8:7 9:8,15 13:7
14:22 21:3 23:19 25:20
25:25 26:18 27:12 29:8
31:12,16 33:2 38:10
41:2,4 50:4,10 57:24
77:13 80:24 82:7 83:17
85:7 92:13

**which** 7:6 14:19 19:11
23:14 24:2,19 29:20
30:24 34:4 42:15 47:1
47:12 49:10 51:4 66:1
70:2,17,20 71:6,10,24
82:14 83:12 91:21 95:11
95:19,24 99:8 100:8

**while** 63:11,15 77:11

**white** 20:7,11 30:12,25

**who** 23:22 24:13 31:15,23
54:4 59:6 60:2 87:16
88:5

**whole** 100:16

**whom** 94:9

**why** 14:10 18:9 26:15
29:13 39:9 40:1 56:3
77:3 86:3 97:9

**will** 9:3 12:21 39:21 50:25
60:25 67:19 80:22 94:9

**willing** 48:17

**wind** 29:10

**wish** 65:17

**within** 7:7 13:17 14:20
21:4 25:10,12 69:6 74:9
79:18 99:5

**without** 5:17 7:20 18:9
19:6,18 60:22 66:18,19

**witness** 4:3 10:7 12:19
17:3 19:2 20:16 21:6
22:10 23:14 25:7,16
26:9 27:8,10 28:11
30:18 32:10 33:1,13
34:11 35:1,18 36:3,13
36:22 38:8,24 39:8
40:25 41:18 42:1,4,24
43:6,15 45:17 48:25
51:18 57:11 59:16 61:18
62:20 63:2 69:4 72:9,11
74:2 75:23 76:4 77:2,4
78:23 80:16 81:16 88:15
89:6 94:14 97:16,22
100:12,14,18 101:7

**woman** 85:25

**won't** 28:14

**words** 44:16

**work** 24:20 37:10 89:21

**works** 6:21

**world** 13:21 14:2

**worry** 16:15

**wouldn't** 10:7 16:15 22:4
34:15 35:3 38:15 57:23
58:4,6,8,12 67:10 90:3
93:16

**wrists** 68:2

**write** 8:2

**wrong** 8:7

## Y

**year** 89:14

**years** 89:15,20

**yet** 60:6 73:13 83:25

**you'd** 16:24 29:13 46:4
65:16 90:3 96:2

**you're** 9:1 10:3 16:1,2,5
18:9 19:20,22 25:9 29:6
29:21 35:1,7 38:9 39:11
39:18,23 42:22,24 47:21
49:23,25 50:16 55:19,20
55:21 58:21 60:6,7,12
62:10 63:5,12 79:17,21
81:21 82:19,21 95:6

**you've** 16:11 62:16 63:10
76:5 79:13,20 80:20
91:14

## Z

**Zoom** 3:18,24